State of NEW YORK, New York State Racing and Wagering Board, New York State Department of Environmental Conservation, and Town of Southampton, Plaintiffs,

v.

The SHINNECOCK INDIAN NATION, Frederick C. Bess, Lance A. Gumbs, Randall King, and Karen Hunter, Defendants.

Town of Southampton, Plaintiff,

v.

The Shinnecock Tribe a/k/a the Shinnecock Indian Nation, Frederick C. Bess, Lance A. Gumbs, and Randall King, Defendants.

Nos. 03–CV–3243 (JFB)(ARL), 03–CV–3466 (JFB)(ARL).

United States District Court, E.D. New York.

Oct. 30, 2007.

As Amended Feb. 7, 2008.

Robert A. Siegfried, New York State Office of the Attorney General, Albany, NY, for plaintiffs State of New York, New York State Racing and Wagering Board, and New York State Department of Energy Conservation.

Michael Stewart Cohen of Nixon Peabody, LLP, Jericho, NY, for plaintiff Town of Southampton.

Christopher H. Lunding of Cleary, Gottlieb, Steen & Hamilton, New York, NY, for defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

In the above-captioned consolidated actions, plaintiffs New York State ("New York"), the New York State Racing and Wagering Board (the "Board"), the New York State Department of Environmental Conservation (the "DEC") (collectively, the "State"), and the Town of Southampton (the "Town" or "Southampton") (collectively, the "plaintiffs") seek to permanently enjoin defendants, the Shinnecock Indian Nation (the "Shinnecock Nation" or the

"Shinnecock Tribe" or the "Nation" or the "Tribe" or the "Shinnecocks" or the "Shinnecock" or the "Shinnecock Indians"), and its tribal officials sued in their official capacity (collectively, the "defendants"), from constructing a casino and conducting certain gaming on a parcel of non-reservation property known as "Westwoods," which is situated in the western half of the Town in Suffolk County, New York ("Westwoods" or the "Westwoods land" or the "Westwoods site" or the "Westwoods parcel"). Plaintiffs have demonstrated that the defendants' actions and threatened actions with respect to the construction and operation of a Westwoods casino are not in compliance with New York anti-gaming laws and environmental laws, as well as the Southampton Town Code (the "Town Code"). However, because the Shinnecock Indian Nation is asserting immunity with respect to such laws, there are three main legal issues in the case: (1) whether aboriginal title to Westwoods held by the Shinnecock Indian Nation at the time of first European contact in 1640 has been extinguished; (2) whether, even if aboriginal title has not been extinguished, the Shinnecock Indian Nation is barred from asserting sovereignty at Westwoods, under the Supreme Court decision in *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005), because of the disruptive consequences that the construction and operation of a casino would have on the Town and the Suffolk County, New York ("Suffolk County") community; and (3) whether there is any legal basis to allow gambling at Westwoods in non-compliance with New York's anti-gaming laws if the proposed casino development is not within the parameters of federal law as set forth in the Indian Gaming Regulatory Act, 25 U.S.C.

§ 2701 *et seq.* ("IGRA"). This Memorandum and Order sets forth the Court's Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The Court conducted a lengthy and thorough bench trial, which lasted 30 days, and included over 20 witnesses, over 600 exhibits, and over 4,000 pages of transcripts. After carefully considering the evidence and the law, this Court concludes that the plaintiffs have demonstrated that they are entitled to a permanent injunction that prevents the development of a casino at Westwoods that is not in full compliance with New York and Town laws and regulations.[1]

The Court finds that there are three independent grounds for the Court's ruling in favor of plaintiffs. First, the evidence overwhelmingly demonstrated in a plain and unambiguous manner that aboriginal title held by the Shinnecock Indian Nation to the Westwoods land was extinguished in the 17th century. More specifically, a series of colonial era documents demonstrate in clear and unequivocal language that (1) the Shinnecock Indian Nation sold land, which included Westwoods, to non-Indians in the 17th century; (2) the land was subsequently acquired by Southampton; and (3) the sovereign authority of the Province of New York confirmed and ratified the ownership of the land by the Town, including a determination by New York Provincial Governor Richard Nicolls in 1666 in which he confirmed that "all the right and interest" in the land that included Westwoods "is belonging, doth and shall belong unto the town of Southampton" and promised to defend the Town in its peaceable enjoyment of such land "[a]gainst all other

1. In a Memorandum and Order, dated November 7, 2005, the Court determined that the Shinnecock Indian Nation satisfied the federal common law standard for determining tribal existence and, therefore, that issue was not part of the trial.

claims whatsoever." Although the defendants attempt to point to certain aspects of the historical record in an effort to cast doubt on the meaning or validity of these transactions, the Court finds their arguments unavailing and concludes that this colonial-era extinguishment of aboriginal title to Westwoods is clear, unmistakable, and valid. Therefore, although there is no dispute that the Shinnecock Indian Nation currently owns and occupies Westwoods, the absence of current aboriginal title for the Westwoods land renders the Shinnecock Indian Nation subject to the application of New York and Town laws in the development of a casino on such land.

Second, even assuming *arguendo* that the Shinnecock Indian Nation has unextinguished aboriginal title to Westwoods, their proposed casino development is barred under the Supreme Court's decision in *Sherrill* because of the highly disruptive consequences the development and operation of a casino would have on the neighboring landowners, as well as the Town and the greater Suffolk County community. More specifically, based upon the evidence offered at trial, the Court concludes that the construction and operation of a casino at Westwoods would have severe disruptive consequences to the administration of governmental affairs, as well as the health, safety, and long-settled expectations of the residents of Southampton. For example, the substantial disruption to the transportation infrastructure in the Town and Suffolk County is undeniable. The evidence at trial demonstrated that the area in and around Southampton is already plagued with extremely high levels of traffic congestion in the summer months. The only rational conclusion to be drawn from the evidence is that, absent substantial infrastructure improvements (whose cost and feasibility are unknown), the addition of a casino to this already overburdened traffic system would be di-

sastrous and undoubtedly would be highly disruptive to state and local governance and the settled expectations of landowners. In addition, the evidence demonstrated that the operation of a casino would have a multitude of other health and environmental impacts on neighboring landowners and the Town. Therefore, even if unextinguished aboriginal title currently existed, the Shinnecock Indian Nation's delayed assertion of sovereignty over this non-reservation land at Westwoods—after centuries of non-use of the land except for cutting timber and recreational functions—is barred by laches and other equitable principles under *Sherrill.*

A third independent ground exists for the permanent injunction in plaintiffs' favor. It is undisputed that the Shinnecock Indian Nation's planned gaming facility fails to comply with applicable New York law and that the proposed development does not fall within the confines of IGRA, which supplanted any federal common law right of tribes to conduct the type of unregulated gaming that the Shinnecock Indian Nation seeks to operate at Westwoods. The Shinnecock Indian Nation is not recognized by the federal government and Westwoods is not "Indian lands" as defined by the statute and, thus, the Shinnecock Indian Nation cannot utilize the safe-haven that IGRA provides from the otherwise applicable state anti-gaming laws. Therefore, the Shinnecock Indian Nation can only engage in gaming at Westwoods if it is in compliance with current New York gambling laws. Since the operation of a casino at Westwoods would violate New York anti-gaming laws, there is no legal basis for the Shinnecock Indian Nation to operate the casino.

In terms of the requested relief, defendants argue that a permanent injunction is unwarranted because any harm from the proposed casino is speculative and not im-

minent. However, there is nothing speculative or remote about the project—the Shinnecock Indian Nation has a development agreement in place to build a 61,000 square foot ("sf.") casino at Westwoods on 15 acres (which defendants expect to have a capacity to hold 900 to 1,000 gaming machines and 60 table games), it has stated its intention to build the casino without being legally bound by government regulation of any type, and it began clearing trees at Westwoods in 2003 to start the project. Plaintiffs have satisfied the requirements for permanent injunctive relief, including a showing of irreparable harm, if the defendants are not prevented from building a casino in violation of New York anti-gaming and environmental laws, and Town zoning laws and other regulations.

Although the Shinnecock Indian Nation has emphasized to this Court during the trial (and the Court recognizes) the financial importance that the proposed casino has to the Shinnecock Indian Nation as it continues to face substantial economic hardship, this Court's proper role is not to address or remedy those economic hardships, but rather to examine the evidence under applicable law to determine whether the proposed casino development is legally permissible. For the reasons outlined briefly above and in detail in the Findings of Fact and Conclusions of Law that follow, the Court concludes that plaintiffs have demonstrated in an overwhelming fashion that they are entitled to a permanent injunction preventing the development of a casino at Westwoods that is not in compliance with New York and Town laws and regulations.

## I. BACKGROUND

### A. THE CONSOLIDATED ACTIONS

The lawsuit commenced by the Town against the Nation and its three Trustees (03–cv–3466) (the "Town action"), has been consolidated with the lawsuit commenced by New York, the Board, and the DEC against the Nation and its Trustees, as well as the Chairman of the Shinnecock Nation Gaming Authority (03–cv–3243) (the "State action"). Plaintiffs seek declaratory relief that the construction and operation of a casino at Westwoods is illegal under both New York and local law and, as a result of such violations and threatened violations, seek to permanently enjoin such activities. The Court will briefly summarize below the pleadings filed by each of the parties.

### (1) THE STATE COMPLAINT

The State complaint asserts five causes of action. The First Cause of Action alleges that any attempt by the defendants to build and operate a casino at Westwoods would violate New York anti-gaming laws and that such gaming would not be permitted under federal law (as set forth in IGRA) because, among other things, the Nation has not been recognized as a tribe by the Bureau of Indian Affairs (the "BIA"). (State Complaint, at ¶¶ 71–78.) The Second Cause of Action contends that defendants lack a Storm Water Pollution Prevention Plan ("SWPPP") and a Notice of Intent ("NOI") pursuant to a General State Pollutant Discharge Elimination System ("SPDES") permit for construction and operation of a casino and, therefore, cannot legally commence construction of the casino. (*Id.*, at ¶¶ 79–81.) The Third Cause of Action charges that, given the failure to apply for and obtain an SPDES permit under New York environmental law, defendants cannot lawfully commence construction of a casino with a wastewater treatment facility that would discharge effluent into New York waters. (*Id.*, at ¶¶ 82–84.) The Fourth Cause of Action alleges that, because defendants failed to apply for and obtain a permit for a new well under New York environmental laws, defendants may not commence construc-

tion of a casino with an attendant new well having a pumping capacity exceeding forty-five gallons per minute. (*Id.*, at ¶¶ 85–87.) The Fifth Cause of Action asserts that, because the necessary environmental impact studies have not been conducted as required under the State Environment Quality Review Act ("SEQRA"), the DEC cannot issue the necessary permit to allow construction and operation of a casino facility. (*Id.*, at ¶¶ 88–90.) The State seeks a permanent injunction and a declaratory judgment in connection with these claims.

### (2) THE TOWN'S COMPLAINT

The Town also seeks declaratory relief and a permanent injunction. Specifically, the Town alleges that, in July 2003, defendants engaged in site preparation activities at Westwoods in connection with their previously-announced decision to develop a casino at that site. (Town's Complaint, at ¶¶ 12–15.) The Town contends that these construction activities were not preceded by any application for, or the issuance of, the requisite Town permits and approvals and, thus, such activities and threatened activities violate the Town Code. (*Id.*, at ¶ 16.) The First Cause of Action alleges that defendants violated Town Code § 330–184(I), which requires site plan approval or written permission from the Southampton Planning Board before any "regrading, clearing, tree removal or any other work in preparation of future use of a site" may take place. (*Id.*, at ¶ 21.) According to the complaint, defendants did not apply or receive site plan approval before engaging in site preparation activities at Westwoods. (*Id.*, at ¶ 23.) The Second Cause of Action asserts that defendants' activities and/or threatened activities violate Town Code § 325–6(A), which is part of the Town's wetlands protection legislation and prohibits certain construc-

tion activities in a wetland area or within 200 feet of wetland boundaries in the absence of a Town-issued wetlands permit. (*Id.*, at ¶¶ 27–36.) In particular, it is alleged that defendants' site preparation activities at Westwoods qualify under this provision and defendants violated it by not obtaining the requisite permit. (*Id.*, at ¶¶ 31–34.) In short, the complaint alleges that "[d]efendants have refused to acknowledge, much less comply with Chapters 325 ["Wetlands"] and 330 ["Zoning"] of the Town Code, and otherwise have refused to recognize and acknowledge the Town's authority to regulate the uses of the lands within its borders." (*Id.*, at ¶ 36.)

### (3) DEFENDANTS' DEFENSES

Defendants make a number of admissions in their answers to the complaints.[2] Defendants admitted that the Tribe is not listed on the master list of federally-recognized Indian Tribes maintained by the federal government in the Federal Register. (Defs. Ans. to State's Complaint, at ¶ 43.) With respect to the alleged illegal gaming under New York law, defendants admitted that the Nation owns Westwoods and that the Nation intends "to engage in gaming activities in a building to be constructed on a portion of the Westwoods Parcel...." (*Id.*, at ¶¶ 46, 49.) Specifically, defendants admitted to a plan to construct a gaming facility in the summer of 2003 that would have the capacity to accommodate at least "900 to 1,000 gaming machines and 60 table games." (*Id.*, at ¶ 50.) Defendants also conceded that the Nation had not received an identification number issued by the Board or a license issued by the Town authorizing gaming at Westwoods, as required by New York gaming laws. (*Id.*, at ¶¶ 53–54.) With respect to the

---

**2.** The admissions and defenses contained in the Answer to the State Complaint mirror those contained in the Answer to the Town Complaint.

alleged violations of New York environmental laws, defendants admitted that they have not submitted any of the documents to the DEC for an environmental impact study in order to commence construction of a gaming facility at Westwoods under New York environmental laws, and that they also lacked the environmental and building permits and agreements required under Town zoning laws, Town fire code regulations, and New York environmental laws. (*Id.*, at ¶¶ 58–59.)

Although a number of defenses are raised in defendants' answers to the complaints, their core defense is that New York and its political subdivisions, including Southampton, lack the power under the United States Constitution and federal common law to require the defendants to obtain any license, permit, or other form of approval to construct or operate a gaming facility at Westwoods. (Defs. Answer to State's Complaint, at 13, "Third Affirmative Defense"; *see also* Defs. Answer to Town's Complaint, at ¶¶ 8–9, "Third Affirmative Defense.")

## II. PROCEDURAL HISTORY

On June 29, 2003, the State commenced the State action in New York State Supreme Court, Suffolk County ("Suffolk County Supreme Court") to stop construction activities at the Westwood site. On that same date, the State obtained a temporary restraining order (a "TRO") signed by New York State Supreme Court Justice Edward D. Burke. On July 1, 2003, defendants removed the case to this Court and the matter was assigned to the Honorable Thomas C. Platt.

On July 14, 2003, Southampton filed the Town action in Suffolk County Supreme Court, also seeking to enjoin construction activities, based on defendants' alleged violation of the Town's zoning and land use laws. On that same date, New York State Supreme Court Justice James M. Catter-

son granted the Town's application for a TRO. Thereafter, on July 15, 2003, defendants removed the action to this Court and the matter was assigned to the Honorable Thomas C. Platt.

Shortly after removal of the State action, the State moved for remand. The State's motion for remand was denied by order dated July 29, 2003. *See New York v. Shinnecock Indian Nation*, 274 F.Supp.2d 268, 271 (E.D.N.Y.2003). The Town also moved to remand, but later agreed to withdraw its motion when the two actions were consolidated. (*See* Stipulation and Order, dated December 22, 2003.)

The State also moved this Court for a TRO and a preliminary injunction to halt construction of the casino. The Town joined in the State's motion. By Memorandum and Order dated August 29, 2003, the Court granted the preliminary injunction. *See New York v. Shinnecock Indian Nation*, 280 F.Supp.2d 1, 10 (E.D.N.Y. 2003). The Court also stayed the action for a period of eighteen months to allow the BIA to decide the Nation's petition to the BIA for federal recognition. (*Id.*) Defendants appealed the August 29, 2003 Memorandum and Order, and the Second Circuit remanded the case on November 18, 2003, stating that the district court should determine whether a preliminary injunction and stay was still warranted since the BIA could not address the Nations' petition for recognition within the eighteen months contemplated by the Court. *See New York v. Shinnecock Indian Nation*, No. 03–7996, at 1–2 (2d Cir. Nov. 26, 2003). Following the remand, on November 18, 2003, the Court conducted a conference in the State action in which the Town participated. At that conference, the Court lifted the stay, but continued the preliminary injunction pending a decision at trial. The Town action was also consoli-

dated with the State action and the parties were ordered to proceed with discovery. (*See* Stipulation and Order, dated December 22, 2003.)

The parties filed motions for summary judgment and partial summary judgment on July 21, 2005. Defendants sought to dismiss the Town and State complaints on the grounds that the Nation is an Indian Tribe and is therefore entitled to tribal sovereign immunity. Plaintiffs sought partial summary judgment permanently enjoining defendants from operating a gaming facility, alleging that defendants lack the right to engage in tribal gaming under IGRA or under federal common law, and that any gaming was subject to New York gaming and environmental laws. The Town sought partial summary judgment on the grounds that Westwoods is not "Indian country," as defined at 18 U.S.C. § 1151, and thus is subject to state and local law, and that, in any event, the Nation no longer holds aboriginal title to Westwoods because such title was extinguished by sovereign act during the colonial era.

By Memorandum and Order, dated November 7, 2005, Judge Platt denied all motions for summary judgment and partial summary judgment, except that he granted the defendants' motion for summary judgment on the issue of whether the Nation is an Indian Tribe pursuant to the federal common law standard established in *Montoya v. United States*, 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901) and *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59

(2d Cir.1994). *See New York v. Shinnecock Indian Nation*, 400 F.Supp.2d 486, 491–92 (E.D.N.Y.2005). Judge Platt held that "[t]he cases described above, beginning with *Montoya* and continuing to the present, establish a federal common law standard for determining tribal existence that the Shinnecock Indian plainly satisfies." *Id.* at 492. However, Judge Platt emphasized that "recognizing the Shinnecocks as a Tribe does not end the matter. The question remains as to what use Defendants may put the Westwoods property. . . ." *Id.* at 493. Judge Platt also found that the recent Supreme Court decision in *Sherrill* was relevant to considering "the extent of the impact of the 'disruptive' claims [of the defendants], the nature of the Indians' present titles and possibly the length of the delay and the question of laches, and appropriate remedies. These are factual and legal determinations which may only be resolved at a trial." *Id.* at 496. Judge Platt noted that "a remedy may also be disruptive in cases similar to the one at bar, where dispossession is not at issue and only neighboring landowners will be affected by the Indians' claims." *Id.* at 496 n. 6 (citing *Sherrill*, 544 U.S. at 219–20, 125 S.Ct. 1478).

### III. THE TRIAL

A bench trial commenced in this action before Judge Platt on October 4, 2006. On November 15, 2006, after six days of trial, the case was re-assigned to the undersigned.[3] The bench trial resumed on December 4, 2006. On December 6, 2006, the State filed a motion for reconsideration of the denial of their motion for partial sum-

---

**3.** Pursuant to Rule 63 of the Federal Rules of Civil Procedure, when the case was re-assigned due to Judge Platt being unable to proceed with the trial, the undersigned certified familiarity with the record and determined that the proceedings in the case could be completed without prejudice to the parties. (Trial Transcript (hereinafter, "Tr.") 855–57.)

The Court also gave each party the option of recalling any witness who had already testified before Judge Platt. The parties agreed to recall two witnesses and consented to the Court relying on the transcript for the testimony of the other witnesses who had already testified.

mary judgment. The Court denied the State's request that the trial be discontinued until the reconsideration motion was fully briefed and decided. Instead, the Court decided to continue with the trial and address the legal issues raised by the motion for reconsideration at the conclusion of the trial along with the other legal issues in the case. The final witness testified on April 17, 2007. The parties submitted their proposed findings of fact and conclusions of law on May 1 and May 2, 2007, for utilization by the Court in connection with this Memorandum and Order. Summations were heard on May 9 and May 10, 2007.

## IV. FINDINGS OF FACT[4]

### A. THE PARTIES

Plaintiff New York is a sovereign state with offices at the Capitol, in the City and County of Albany, New York. (Joint Pretrial Order Stipulation of Fact (hereinafter, "Stip.") No. 1.)[5] Plaintiff Board is an agency established within the Executive Branch of the government of New York, pursuant to Section 101 of the Racing, Pari–Mutuel Wagering and Breeding Law of the State of New York, and consists of three members appointed by the Governor of New York. (Stip. No. 2.) Plaintiff the DEC is an agency established within the Executive Branch of the government of New York, pursuant to New York Environmental Conservation Law article 3. (Stip. No. 3.)

Plaintiff Southampton is a municipal corporation organized and existing under the laws of New York, situated within Suffolk County and having an address at 116 Hampton Road, Southampton, New York. (Stip. No. 4.)

Defendant Shinnecock Indian Nation was held to be a tribe of Indians in this Court's Memorandum and Opinion dated November 7, 2005, and has offices on the Shinnecock Reservation in Southampton (the "Shinnecock Reservation"). (Stip. No. 5.) The Nation has not been acknowledged to be an Indian tribe by the BIA. (Stip. No. 9.) The Nation does not appear in the list of "tribal entities recognized and eligible for funding and services from the [BIA] by virtue of their status as Indian Tribes," as set forth at 70 Fed.Reg. 71, 194 (Nov. 25, 2005). (Stip. No. 10.) There exists no treaty between the Nation and the United States. (Stip No. 11.) The relationship between the Nation and the government of New York (and its predecessors) predates the existence of the federal government. (Stip. No. 12.) The Nation currently occupies and is in possession of the Shinnecock Reservation, on which some members of the Nation reside. (Stip. No. 13.) The Shinnecock Reservation is generally described in the first sentence of Section 1 of Chapter 46 of the New York Laws of 1859, and does not include the property described below as Westwoods. (Stip. No. 14.)

Defendant James W. Eleazer, Jr. was, at the time the complaints in these consolidated actions were filed, an elected Trustee and official of the Nation, and was sued by the State in his official capacity only. (Stip. No. 6.) By Order of this Court dated April 17, 2007, Mr. Eleazer was dismissed from this action as a defendant, and

---

4. To the extent that any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice-versa.

5. Although this Memorandum and Order makes specific reference to certain, but not all, of the individual factual stipulations set forth in the Joint Pre–Trial Order, each and all of those factual stipulations have been fully considered by the Court in connection with the Court's decision.

Randall King was substituted as a party defendant in the place of Mr. Eleazer. Defendant Lance A. Gumbs was, at the time the complaints in these consolidated actions filed, and is now an elected Trustee and official of the Nation, and is being sued by the State in his official capacity only. (Stip. No. 7.) Defendant Frederick C. Bess was, at the time the complaints in these consolidated actions were filed, chairman of the Shinnecock Nation Casino at Westwoods Authority, and is now an elected Trustee of the Nation, and is being sued by the State in his official capacity only. (Stip. No. 8.) By Stipulation and Order of this Court dated March 21, 2007, Karen Hunter, who is currently Chairman of the Shinnecock Nation Gaming Authority (the "Gaming Authority"), formerly known as the Shinnecock Nation Casino at Westwoods Authority, was substituted as a party defendant in this action in the place of Phillip D. Brown, V, who was the successor to defendant Mr. Bess as Chairman of the Gaming Authority.

## B. THE WESTWOODS PARCEL

The Shinnecock Tribe owns a parcel of land, commonly known as "Westwoods," which is approximately 80 acres in total area, located in the Hampton Bays area within the boundaries of the Town. (Stip. No. 15.) Westwoods is located approximately 85 miles east of New York City. (Stip. No. 37.)

Westwoods consists of three tax lots: (a) Suffolk County Tax Map, District No. 0900, Section 186, Block No. 2, Lot No. 38 ("Parcel A"); (b) Suffolk County Tax Map, District No. 0900, Section 187, Block No. 2, Lot No. 78 ("Parcel B"); and (c) Suffolk County Tax Map, District No. 0900, Section 207, Block No. 1, Lot No. 1 ("Parcel C"). (Stip. No. 16; D259,[6] at 4; D156 a, b, c, d.) Parcel A is property to the north of Newtown Road and south of Great Peconic Bay; this parcel is about 41.5 acres. Parcel B is property north of Sunrise Highway and south of Newtown Road; this parcel is about 36.7 acres. Parcel C is property south of Sunrise Highway and is about 2.0 acres. (D259 at 8; D264; D156d; Stip. No. 16; Tr. 3292–94.)

The Nation currently has fee simple title to Westwoods. (Stip. No. 17.) The Nation currently occupies and possesses Westwoods. (Stip. No. 18.) Westwoods is not part of any reservation established by New York.[7] (Stip. No. 20.) Westwoods does not appear in the records of the BIA as Indian fee land, the title to which is restricted against alienation in accordance with 25 U.S.C. § 177. (Stip. No. 24.) Westwoods is not currently under federal superintendence, as that term is used in connection with land that is a "dependent Indian community" for purposes of 18 U.S.C. § 1151(b). (Stip. No. 25.) Westwoods is not a "dependent Indian community" within the meaning of 18 U.S.C. § 1151. (Stip. No. 26.) Westwoods was not set aside by the federal government for the use of Indians as Indian land, as that term is used in determining whether land is a "dependent Indian community" for purposes of 18 U.S.C. § 1151(b). (Stip. No. 27.) There exists no express agreement between the Nation and the United States regarding Westwoods. (Stip. No. 28.). There exists in the Office of the

---

**6.** Exhibit numbers preceded by the letter D (*e.g.*, D259) represent exhibits introduced by defendants; exhibit numbers preceded by the letter "T" represent exhibits introduced by the Town; exhibit numbers preceded by the letter "S" represent exhibits introduced by the State.

**7.** However, the above-referenced Suffolk County Tax Maps identify both Westwoods and the Shinnecock Reservation at Shinnecock Neck as "Shinnecock Indian Reservation." (D156a, b, c, d.)

Clerk of Suffolk County no recorded deed by the Nation, as grantor, conveying title to all or any part of Westwoods to anyone, nor is there a recorded deed conveying title to all or any part of Westwoods to the Nation, as grantee. (Stip. Nos. 29 and 30.)

There are other areas adjacent to, or in the vicinity of, Westwoods and the Town that are relevant to the instant litigation: (a) Canoe Place or Niamuck ("Canoe Place") is a name given to a place where Indians formerly carried their canoes between Shinnecock Bay and the Great Peconic Bay in what is now Southampton (Stip. No. 35); (b) Canoe Place is located at the approximate current site of the Shinnecock Canal in Southampton (Stip. No. 36); (c) Cold Spring Pond is a body of water within the Town east of Canoe Place and is located approximately two miles east of the closest boundary of Westwoods (Stip. No. 38); (d) Quogue is a hamlet within Southampton to the west of Canoe Place and is located approximately 6–1/2 miles southwest of the closest boundary of Westwoods (Stip. No. 39); and (e) Seatuck is a place located at the southern end of the current western border of the Town (Stip No. 46), and is located at the current border between the Town of Brookhaven and Southampton. (Tr. 2580–81; T226.)

### C. WESTWOODS AT THE TIME OF THE FIRST EUROPEAN CONTACT

The Nation was in possession of the lands in and around Southampton when the first European settlers arrived in 1640. *See Shinnecock Indian Nation,* 400 F.Supp.2d at 489. In fact, plaintiffs' expert agreed that the whole Town was owned by the Shinnecocks at the time of first European contact in 1640. (Tr. 1115–

16.) Moreover, the history of the Town contained in its own records states that when the first settlers arrived "it appears that the whole extent of what is now the town of Southampton was owned by the Shinnecock tribe of Indians, who were divided into many small bands, and were living in villages that were without exception situated near the different creeks or branches of the bays...." (D3, at II–III.) Thus, at the time of first European contact, Westwoods was possessed and owned by the Shinnecocks.

### D. THE SETTLEMENT AND FORMATION OF SOUTHAMPTON

By a Patent granted on April 20, 1635 by the Plymouth Company (the "Sterling Patent"), Lord William Alexander, the Earl of Sterling, obtained undisputed title, in the name of the King of England, to the lands of Long Island. (James P. Lynch, *The Shinnecock and "Westwoods" in Southampton, New York: An Ethnohistorical Analysis,* Feb. 16, 2005(T12),[8] at 18–20; Alexander von Gernet, *On the Authority of New York Colonial Governors to Decide on Matters Relating to Shinnecock Lands and the Town of Southampton,* June 29, 2006(S62), at 6; T29, at 29.)

James Farrett was the duly appointed agent of the Earl of Sterling, who was granted the right and authority to convey lands within the Sterling Patent. (T12, at 21–22; S62, at 6; T32, at 50–51; Tr. 2441.) By deed dated April 17, 1640, Farrett granted free leave and liberty to four named English colonists and their associates to possess and improve a parcel of "eight miles square" of land on Long Island. (T12, at 22–23; S62, at 6; T33, at 45–47.) The deed, dated April 17, 1640,

---

8. Pursuant to stipulation by the parties, the contents of the expert reports were deemed to have been read into the record in lieu of direct testimony. (Joint Pretrial Order, at 30.) Each party was permitted to conduct a direct examination of its expert witness in order to familiarize the Court with the opinions of the expert and the witness was then subjected to cross-examination.

also granted to the four named English colonists and their associates the right to "make purchase (in theire owne names at theire owne leisure from any Indians that Inhabit or have lawfull right to any of the aforesaid land) all or any pt thereof, and thereby assure it to themselves and their heyres as theire Inhabitance for ever." [9] (T12, at 22–23; S62, at 6–7; T33, at 46.).

By a confirmation document dated July 7, 1640, Farrett specified the bounds of the aforesaid "eight miles square" of land that constituted the plantation that came to be known as Southampton (the "Southampton plantation"). (T33, at 49–50; T12, at 23–24; S62, at 7.) In particular, the confirmation of July 7, 1640 specified that the westerly bounds of the "eight miles square" of the Southampton plantation was "the place where the Indians drawe over their canoes out of the north bay over to the south side of the island," *i.e.*, Canoe Place. (T33, at 49; T12, at 23–24.) The lands constituting the Southampton plantation as of 1640 were thus situated exclusively to the east of Canoe Place. (T33, at 49–50; T12, at 24; Katherine A. Hermes, *Rebuttal Report to Alexander von Gernet's Report Entitled "On the Authority of New York Colonial Governors to Decide on Matters Relating to Shinnecock Lands and the Town of Southampton,"* Aug. 21, 2006(D91), at 5; Tr. 2441, 2175.)

On December 13, 1640, certain Shinnecock Indians, including tribal leadership, executed a deed that conveyed to English colonists all of the Shinnecock Tribe's right, title, and interest in lands bounded on the west by "the place where the Indians hayle over their cannoes out of the North bay to the south side of the Island," *i.e.*, Canoe Place, (the "1640 Deed") (S66, at 266–67; T12, at 31; T181, at 266–67; S62, at 7–8.) Only lands located to the

east of Canoe Place are described in the 1640 Deed. (Stip. No. 21.)

In or about 1644, the "Towne of Southampton" was accepted into the jurisdiction of the Colony of Connecticut, under terras and provisions set forth in a document entitled "Ye Combynation of Southampton Wth Har[t]ford." (T12, at 26–27; D95; Katherine A. Hermes, *Report on the History of Land Transactions Between the Colony of Connecticut and the Long Island Indian Tribes in the Seventeenth Century,* June 30, 2006(D25), at 20; Tr. 2443.)

The terms of the "Ye Combynation of Southampton Wth Har[t]ford," provided, *inter alia,* that "if [u]pon vewe of such orders as are alreddy established by ye General Court for ye Jurisdiction of Connectecoate, there be found any difference therin from such as are also for ye present settled in ye Towne of Southampton, the said Towne shal ha[v]e libertie to regulate themsel[v]es acording as may be most sutable to their owne comforts and con[v]eniences in their own judgment, provided those orders made by them concerne themsel[v]es only and intrence not [u]pon ye interestes of others or ye Generall Combination of ye [u]nited Collonies, and are not cross to ye rule of riteousness. The like powre is also reser[v]ed [u]nto themsel[v]es for the future, for making of such orders as may concerne their Towne ocations." (D95, at 567; T12, at 27.)

By reason of these terms and provisions, Southampton, as an already-existing town, had the most liberal association with the Colony of Connecticut of all the towns and plantations under that colony's jurisdiction. (T12, at 27.) Defendants' expert witness, Katherine A. Hermes, testified that "ordinarily, when Connecticut founded towns,

---

**9.** In this Memorandum and Order, unless otherwise noted in brackets, the Court has maintained the original spelling and grammar contained in these colonial era documents.

they were founded from scratch," but Southampton existed as a town prior to its combination with Connecticut and was permitted to keep the laws it had enacted prior to the combination so long as those laws were not in conflict with the interests of others or the laws of the United Colonies.[10] (Tr. 2456; D91, at 5.)

In 1650, the Connecticut General Court enacted an order that makes reference to an earlier order that prohibited individuals from buying any land from Indians, either directly or indirectly, under any pretense whatsoever (the "1650 Order"). (D46.) The 1650 Order remained the law of the Colony of Connecticut until 1663, when the Connecticut General Court enacted an order that replaced it. That successor order prohibited purchases of Indian land by individuals, except with allowance of the General Court. (D100; D25, at 20–21; Tr. 2453.) New England colonies other than Connecticut had similar laws and these laws were very widely published and understood. (D25, at 3.)

## E. THE OGDEN AND TOPPING TRANSACTIONS INVOLVING WESTWOODS

As set forth below, in the 17th century, there were two transactions in which the Nation sold lands west of Canoe Place, including Westwoods, to non-Indians and the Town subsequently acquired those lands.

### (1) THE OGDEN PURCHASE

As of May 12, 1659, the western boundary of Southampton was Canoe Place. (T12, at 24; T33, at 49–50; T181, at 266–67; D91, at 5.) On May 12, 1659, Sachem (Chief) Wyandanch and his son, on behalf of the Shinnecocks, conveyed the lands west of Canoe Place [west to Peaconock], to John Ogden, by an instrument that is referenced herein as the "Ogden Deed." This acquisition by Ogden became known as the "Quogue Purchase" or the "Ogden Purchase." (T50, at 162; T12, at 37; Tr. 872–76, 1067.)

At the time of the Quogue Purchase, Ogden was a Southampton proprietor who was also a magistrate to the Connecticut General Court. (T12, at 37; T59, at 70–71; Tr. 2557; D25, at 24; D136, at 314; D137, at 334.) Moreover, at that time, Sachem Wyandanch possessed political authority over the Shinnecocks, including authority to convey the lands west of Canoe Place to Ogden. (T12, at 33–36; Tr. 889–93, 895–896; T45, at 198; T46; T47, at 295; T49; S62, at 8 & n. 9.) For example, on May 15, 1657, approximately two years before the Quogue Purchase, the Connecticut Colony General Court acknowledged that the Shinnecocks recognized the "Montacutt Sachem" (*i.e.*, Sachem Wyandanch) as their Sachem.[11] (T47, at 295; Tr. 2541.)

---

**10.** Although Professor Hermes testified about the concept of "personal jurisdiction" in the Colony of Connecticut, there is no order or law that provides that the Colony of Connecticut retained jurisdiction over its inhabitants regardless of where those inhabitants might travel. (Tr. 2593–94.)

**11.** On September 19, 1666, Thomas Halsey, a Southampton proprietor, (T181, at 266), reported that during a "time of the trouble in this towne of Southampton by reason of murder committed by the Indians," he witnessed Shinnecock Sachem Mandush cut up a turf of ground in Southampton and deliver it to Sachem Wyandanch, that he also saw Sachem

Mandush and other Shinnecocks stroking Sachem Wyandanch on the back, and that since that time, Sachem Wyandanch "hath acted upon ye aforesaid Interest given to him as by letting and disposing of land at Quaquanantuck and else where...." (T46, at 158.) On September 19, 1666, Thomas Saire (Sayre), a Southampton proprietor, (T181, at 266), reported that he had witnessed all that was reported by Halsey, except for the delivery of turf by Sachem Mandush to Sachem Wyandanch, and also attested that "when Mandush gave up his right to Wyandanch and stroked him on the back, Mandush alsoe told Wyan-

The lands west of Canoe Place, conveyed by Sachem Wyandanch and his son to Ogden on May 12, 1659, were not part of the Colony of Connecticut at the time of that conveyance, as they were outside the territorial limits of Southampton. (T50, at 162; T12, at 24, 26, 32; T33, at 49–50; T34; D91, at 5; D95.) The lands conveyed by Sachem Wyandanch and his son to Ogden included Westwoods. (T12, at 37; D25, at 2, 24; T50, at 162; Tr. 876, 2474.) There is nothing in the historical record reflecting or suggesting that at any time prior to this litigation, the Shinnecock Tribe in any way disputed or contested Sachem Wyandanch's authority to act on their behalf [12] (Tr. 896.)

Sachem Wyandanch died in 1659. (S69, at 57; S62, at 9 n. 13.) By an order dated June 7, 1665, the Court of Sessions in Southold directed that the annual sum of twenty-five shillings per year, which was to be paid to "ye late Sachem Wyandance," pursuant to the terms of the Ogden Deed, (T50), should be made to the "sunk squaw daughter & heire to the said sachem." (T56, at 171; T57; T12, at 38.) Thus, one can infer from the order of June 7, 1665 that the Court of Sessions considered the Ogden Deed a valid, lawful, and effective instrument.[13]

Sometime between May 12, 1659 and February 2, 1663, Ogden sold the lands of the Quogue Purchase to John Scott. (T12, at 38; T53; S62, at 9 & n. 11; Tr. 2472.) On February 2, 1663, Scott sold the lands of the Quogue Purchase to the proprietors of Southampton.[14] (T53, at 175–76; T66 at p. 54; S67, at 175–77; T12, at 38–39; S62, at 9; Tr. 2472.) Upon the sale of the lands of the Quogue Purchase by Scott to the

---

danch that now hee would bee all one dogge." (T46, at 158.)

**12.** In its 1978 Memo (discussed *infra*), the Shinnecock Indian Nation referenced that the Ogden Deed was from "Shinnecock sachem Wiandance" without questioning Sachem Wyandanch's authority over the Shinnecocks. (T229, at page "I" of "Index to Appendices.") Prior to this litigation, the Shinnecock Tribe has never challenged or contested the validity of the conveyance by Sachem Wyandanch and his son, *i.e.*, the Quogue Purchase, to Ogden. (Tr. 896, 2544.)

**13.** It appears from the historical record that the conveyance to Ogden of lands west of Canoe Place was made in part payment of a fine imposed on the Shinnecocks by Connecticut Colony prior to September 8, 1657, by reason of the participation by certain Shinnecocks in an incident of arson. (T12, at 37–38; T52, at 231; T53; T54, at 180; T56; T57; T58, at 166–67; D183, at 62; Tr. 877–81, 883–85, 888.) This conclusion is supported by a number of evidentiary sources, including the following: (1) by an order issued by the Connecticut General Court on May 20, 1658, Ogden was one of four magistrates authorized and appointed to collect and distribute the proceeds of the arson fine imposed previously on the Shinnecocks (D57); Katherine A. Hermes, *Rebuttal Report Responding to 'The Shinnecock' and 'Westwoods' in Southampton New York: 'An Ethnohistorical Analysis,' by James P. Lynch and "Supplement to 'The Shinnecock' and 'Westwoods' in Southampton, New York: An Ethnohistorical Analysis,"* Aug. 21, 2006 (Revised for typographical corrections Sept. 28, 2006) (D32, at 22); (2) according to *The History and Archaeology of the Montauk Indians*, published in 1979 by the Suffolk County Archaeological Association, "[t]he land [of the Quogue Purchase] was sold in part payment of the fire money owed by Shinnecock Indians. Wyandanch had assumed the debt of 400 pounds and was paying in land—Shinnecock land for a Shinnecock debt." (T51, at 65; T12, at 37); and (3) in his treatise entitled *The Algonquian Peoples of Long Island From Earliest Times to 1700*, historian John Strong notes that "[John] Ogden had apparently purchased the debt from the Southampton officials who were unsuccessful in forcing payment from the Shinnecocks" prior to the Quogue Purchase. (T52, at 231.)

**14.** References to "Quaganantick" in the May 1663 records of the Connecticut General Court suggest that Connecticut knew of Southampton's interest in lands west of Canoe Place. (D100, at 402; Tr. 2568–70.)

proprietors of Southampton, Ogden confirmed in writing that "Wyandanch delivered unto him quiet seizen and possession of [those] lands ... all the lands above recited in part of pay of the four hundred pounds the Shinecock Indians stood indebted, and the said Wyandanck bound for the said Indians."[15] (T53, at 176; T12, at 38.)

### (2) THE TOPPING PURCHASE

As of April 10, 1662, the western boundary of the Town was Canoe Place. (T12, at 24, 39–40; T58, at 167–68; D91, at 5.) On April 10, 1662, Sachem Wyandanch's political successor, Weany Sunk Squaw, and others, on behalf of the Shinnecocks, sold and conveyed lands west of Canoe Place to Thomas Topping. This transaction has become known as the "Topping Purchase."[16] (T191; T12, at 39–41; Tr. 896–98; T58, at 167–68; S62, at 9.) At the time of the Topping Purchase, Topping was a Southampton proprietor who was also a magistrate to the Connecticut General Court. (T12, at 39; T59, at 70–71; Tr. 2558; D25, at 24.)

The lands of the Topping Purchase were situated west of Canoe Place, and included the lands of the Quogue Purchase, including Westwoods. (T12, at 39–40; Tr. 899; T58, at 167–68; T191; D25, at 24–25; Tr. 2474.) The lands that were the subject of the Topping Purchase were not part of the Colony of Connecticut at the time of the Topping Purchase because they were situated outside the then-territorial limits of Southampton. (T12, at 24, 26, 32, 41; T33, at 49–50; T34, at 31; T58, at 167–68; T61; James P. Lynch, *Supplement to The Shinnecock and "Westwoods" in Southampton, New York: An Ethnohistorical Analysis*, June 29, 2005(T13), at 12; D91, at 5; D95.) The western boundary of the lands identified in the Topping Purchase was "Seatuck," which is the modern-day border between Southampton and Brookhaven. (T12, at 39; Tr. 897–98; T58, at 168; T61; T191; Stip. No. 46.) The Topping Deed recited that the consideration for the Topping Purchase was "four score fathoms of wampum, or other pay, equivelent." (T58, at 168; Tr. 899, 2183–84.)

By this purchase, Topping acquired the same rights to land west of Canoe Place that were included in the Ogden Purchase. (T12, at 41; S62, at 10; D91, at 7.) Whatever the reason for these overlapping deeds (which both included Westwoods), there is no question that these lands were sold by the Shinnecock Tribe and subsequent determinations by governors, discussed *infra*, confirmed such sale when issues arose related to these lands.[17]

---

**15.** During the trial of the 1667 Action in which Southampton sued Southold to, *inter alia*, confirm its title to certain lands west of Canoe Place and west of Westwoods (discussed *infra*), Ogden testified under oath, and once again confirmed how "hee came seized of the Land in question, that it was about the firemoney the Shinnacock Indyans being to pay a Certaine sume of money for the Mischiefe done by them. The Montauks Sachem being bound for them tooke the Land in question into hi[s] possession, and upon some Consideracion made it over to Mr. Ogdon, and Mr. Ogdon saith all his Right is conveyed to Southton," *i.e.*, Southampton. (D183, at 62.)

**16.** In its 1978 Memo (discussed *infra*), the Shinnecock Indian Nation described the Topping Deed as being from "Weany Sunk squaw, female Shinnecock sachem." (T229, at page "i" of "Index to Appendices.")

**17.** Plaintiffs made a number of challenges to the validity of the Ogden and Topping transactions during the trial. Although some of those challenges involve disputes over historical facts (such as whether Sachem Wyandanch had authority to act on behalf of the Shinnecock Tribe), the Court has addressed these issues in the Conclusions of Law, rather than the Findings of Fact, for purposes of organizational convenience.

### F. Colonial Era Documents and Events Following the Ogden/Topping Transactions

Following the Ogden and Topping transactions, there were several occasions in the 17th century during which issues relating to those lands were brought to the attention of the Governor of the Province of New York and, in one instance, a court. As set forth below, on each of these subsequent occasions, the prior sale of such land to Southampton was confirmed.

#### (1) The Nicolls Determination

In a document dated September 17, 1666, several Shinnecocks recorded their "protest" over the 1662 sale of lands west of Canoe Place by Weany (Sunk Squaw) and other Shinnecocks to Captain Topping, claiming that they were "the true proprietors of the said lands." (T61; Tr. 2180–83.) In the 1666 protest document, the Shinnecock signatories sought to have Governor Richard Nicolls (whom they expressly acknowledge to be the "hon (bbl) & discreet Governor of this Island") determine that they were the "true proprietors" of the lands of the Topping Purchase, and that they should receive payment from the Southampton proprietors, for their conveyance, if so directed by Governor Nicolls.[18] (T61; Tr. 2180–83.)

Notwithstanding its use of the word "protest," the September 17, 1666 document declares the intention of its Shinnecock signatories to "impart and assigne all our said Interest in ye said lands [of the Topping Purchase] . . . unto our ancient and loving ffriends the Townes men of Southampton to them and their successors for ever." (T61; Tr. 2182.) Thus, by the protest document, the Shinnecock signatories were not seeking to unwind, invalidate, or reverse the conveyance of land to Topping, or to obtain the lands of the Topping Purchase for themselves, but instead were merely seeking to be paid, *i.e.,* to receive the "four score fathom of wampum" recited as consideration in the Topping Deed. (T61; Tr. 2182–84.)

Subsequent to the September 17, 1666 protest document, and on October 3, 1666, Governor Nicolls issued a determination (the "Nicolls Determination"), in which he concluded and determined a "difference" between the "town of Southampton" and "Capt Thomas Topping." (T66, at 54–56; Tr. 2177–79.) In his determination, Governor Nicolls noted that he had reviewed several deeds, including the deed from "some of Shinecock Indians to Capt Topping," *i.e.,* the Topping Deed, and the deed from "John Scott to Southampton men," *i.e.,* the 1663 deed conveying the lands of the Quogue Purchase to Southampton. (T66, at 54; Tr. 2185–86; S62, at 10.) In the Nicolls Determination, Governor Nicolls determined, *inter alia,* that "all the right and interest that ye said Capt Thomas Topping" had by virtue of the Topping Deed "is belonging, doth and shall belong unto the town of Southampton . . . and their successors forever." (T66, at 54.)

By virtue of this language, Governor Nicolls determined that Southampton was the rightful owner of the lands of the

---

18. This dispute also was recounted in the Town's records. Specifically, in the Introduction to the First Book of Records of the Town of Southampton, William S. Pelletreau, Southampton Town Clerk, wrote that the land within the bounds of the Town "was honorably purchased of its aboriginal owners" by the white settlers. (D3, at III.) Subsequently, in the Introduction to the Third Book of Records of the Town of Southampton, Pelletreau refers to the "settling of the western part of the town," and states, "[a]s has been stated in a former volume, that portion west of Canoe Place was purchased from its Aboriginal owners in 1666, and the controversy between the Town and Capt. Thomas Topping was decided by a reference to Richard Nicol, Governor of the Province." (D153, at II.)

Topping Purchase. (T66, at 54; T12, at 47–49; T13, at 13–15; S62, at 10–11.) In fact, in the Nicolls Determination, Governor Nicolls promised to defend the Town in its "peaceable enjoyment" of the lands of the Topping Purchase "[a]gainst all other claims whatsoever." (T66, at 55; T12, at 47–49; T13, at 13–15; Tr. 2564.)

Westwoods is located within the boundaries of the lands that were the subject of the Nicolls Determination. (Stip. No. 62.) At the time he issued the Nicolls Determination, Governor Nicolls was the prevailing sovereign authority within the Province of New York, which included Long Island. (T12, at 45–49; T13, at 13; T62; Tr. 1203–04, 2561, 2189–90; S62, at 19–25.) Governor Nicolls had been appointed the first English governor of the Province of New York on April 2, 1664, by virtue of a commission from the Duke of York. (S72; S62, at 19; Tr. 2189–90.) In the Nicolls Determination, Governor Nicolls ordered, *inter alia,* Southampton to pay to the "Indians (concerned to receive it)" the sum of "four score fathoms of wampum," which was precisely the same amount specified in the Topping Deed as consideration to be paid to the Shinnecocks for the lands of the Topping Purchase. (T66, at 55; T58, at 168; S62, at 10–11; Tr. 901, 2183–84.)

The Nicolls Determination does not explicitly or implicitly contest, challenge, or question in any way, the validity, legality, or effectiveness of either the Topping Deed or the deed from Scott to the Town, for the lands of the Quogue Purchase.[19] (T66; T13, at 14; Tr. 2192–93, 2560.) Governor Nicolls possessed law-making authority to promulgate the Duke's Laws and he could settle disputes. (T12, at 45–46; S62, at 19–25; Tr. 2189–91; D91, at 11–12.) Governor Nicolls, under the Duke of York's proprietorship, also had the authority to address the question of Indian land purchases. (S62, at 20–24.) There is nothing in the historical record to suggest that the Shinnecock Tribe has ever challenged, in any way, the validity, legality, or effectiveness of the Nicolls Determination. (Tr. 908.)

Subsequent to, and as explicitly directed by the Nicolls Determination, by a written instrument dated November 6, 1667, Topping assigned and delivered to Southampton the Topping Deed, and all his right, title, and interest in the lands of the Topping Purchase, *i.e.,* the lands from Canoe Place to Seatuck, including Westwoods. (T197; T13, at 15; Tr. 901–02; 2564–65.) Subsequent to the Nicolls Determination, and on February 22, 1667 (N.S.[20]), several

19. The Nicolls Determination was made by Governor Nicolls more than 18 months after the date of a letter to Governor Nicolls from Connecticut Colony Secretary John Allyn (the "Allyn Letter"), advising that "by the established order of this [Connecticut] Colony ... no land was to be purchased to the perticuler use of any person, without the consent of or Generall Courte, and all such purchases to be null in lawe." (D71; T66; Tr. 1200–04, 2194–95.) Thus, at the time of the Nicolls Determination, Governor Nicolls, by virtue of the Allyn Letter, was aware of the existence of a Connecticut General Court order pertaining to the purchase of lands from Indians. (Tr. 2193–95; D25, at 26; D91, at 11–12.) The Allyn Letter does not specify the date or any other identifying feature of the "established

order of this Colony" to which it makes reference, but Professor Hermes testified that the Allyn letter could only have been referring to either the 1650 or 1663 orders of Connecticut Colony. (D71; Tr. 2553.) Professor Hermes also acknowledged that the Allyn Letter was written at a time when Long Island was no longer under the jurisdiction of Connecticut Colony. (D25, at 25–26; Tr. 2552.)

20. Until 1752, when the Gregorian calendar still used today was adopted, England and its colonies followed the Julian calendar, under which March 25 was the beginning of the new year. (D32, at 28.) In this Memorandum and Order, "N.S." indicates that the date is expressed using the modern, Gregorian calen-

Shinnecock Indians, including Weany Sunk Squaw, Accobacco, and others, confirmed and acknowledged (i) their April 10, 1662 sale of lands to Topping; (ii) that Topping had sold those lands to Southampton; (iii) that Governor Nicolls had ordered the Town to pay "fourscore fathom of wampum"; and (iv) that they had received such payment from the Town. (S70; S70A; S62, at 12; D91, at 10; Tr. 902–05, 2198–99.) The Shinnecock signatories of the February 22, 1667 (N.S.) document confirmed also that they were "fully contented with the bargaine origeinally made with Capt. Topping." (S70; S70A; S62, at 12; T13, at 16; Tr. 902–03, 905, 2198–99; 2565–56.) The document ended by stating that "wee will defend the s'd Southton men in the possession and enjoyment of the premisses from the clayms of any other." (S70; S70a.)

### (2) THE 1667 ACTION COMMENCED BY SOUTHAMPTON AGAINST SOUTHOLD

In 1667, a trial was conducted in the Court of Assizes for the Colony of New York (the "Court of Assizes") in an action commenced by the inhabitants of Southampton against the inhabitants of Southold (the "1667 Action"). (D183, at 59; Stip. No. 64.) The 1667 Action concerned Southampton's contention that it was the owner of lands known as Aquebauke Meadows, and Southampton's claim that Southold had trespassed on such lands. (D183, at 59; Tr. 906, 2574–75.) The Aquebauke Meadows were situated to the west of Westwoods, within the lands of the Topping Purchase. (Stip. Nos. 62, 65; Tr. 2576.) During the trial of the 1667 Action, and in order to prove its claim of ownership of the Aquebauke Meadows, Southampton produced the Topping Deed, and stated that the Topping Deed had been assigned to the Town. (D183, at 60; Tr. 906–07; 2576.) Southampton also introduced the Nicolls Determination, and contended that Governor Nicolls "had put a decision to this matter already, when it was before him upon Complaint of the Towne against Captain Tapping." (D183, at 61; T12, at 49; Tr. 907–08, 2576–77.)

The jury in the 1667 Action rendered a unanimous verdict in favor of plaintiff Southampton, and Southampton's title to the Aquebauke Meadows was thereby confirmed. (D183, at 62; Tr. 908.) The jury's verdict in the 1667 Action confirmed the validity, legality, and effectiveness of the Topping Deed, and its subsequent assignment to Southampton, as well as the Town's ownership of all lands included within the Topping Purchase, including the Aquebauke Meadows and Westwoods.

### (3) THE 1676 ANDROS PATENT

On July 1, 1674, Major Edmund Andros was appointed governor of the Province of New York by a commission from the Duke of York. (S62, at 25.) On November 1, 1676, New York Colonial Governor Edmund Andros issued a Patent (the "Andros Patent") to the proprietors of Southampton. (T188, at 279–80; T12, at 49–50; S62, at 14; Tr. 2202–03.) Among other things, the Andros Patent confirmed the existence of "a certaine Towne . . . commonly called and knowne by the name of South Hampton." (D188, at 279.) The Andros Patent confirmed that the "certaine Tract of Land, thereunto belonging" to Southampton extended from Seatuck on the west to Wainscott (the border between Southampton and East Hampton) on the east, which are basically the east and west boundaries of the Southampton as they are known today. (T188, at 279; T12, at 49–50; S62, at 14; Tr. 908–11.) The western boundary of the tract of land belonging to the Town, as specified by the Andros Patent, is identical to the western boundary of the lands

dar (rather than the date expressed in the original document).

specified in the Topping Deed, *i.e.*, "Sea-tuck." (T188, at 279; T58, at 167–68; T12, at 50 n. 12; Tr. 2204, 2208–10, 2580–81.) Westwoods is located within the boundaries of the "certaine Tract of Land" described in the Andros Patent. (Stip. No. 77; Tr. 2506–07.)

In his Patent, Governor Andros declared that he does "Ratifie Confirme and grant, unto [list of individuals] ... as Patentees for and on the behalfe of themselves and their Associates the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land ... and of every part and parcel thereof, to the said Patentees and their Associates, their Heires Successors and Assignes ... for ever...." (T188, at 279–80.) The Andros Patent also provided that "if it shall so happen that any part or parcell of the Lande within the bounds and Limits afore described be not already Purchased of the Indyans It may bee purchased (as occasion) according to Law...." (T188, at 280.) During the colonial era, New York governors frequently exercised their authority to decide on the validity of purchases from Indians and to impose settlements. (S62, at 27.) There is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the 1676 Andros Patent. (Tr. 911.) The Colony of Connecticut had no jurisdiction over the Province of New York at the time the Andros Patent was issued. (Tr. 1205.)

Accordingly, the 1676 Andros Patent, especially when considered in the context of the prior transactions and documents involving Westwoods, confirmed Southampton's ownership of all lands west of Canoe Place, including Westwoods.

### (4) The 1686 Dongan Patent

In January of 1683, Colonel Thomas Dongan received from the Duke of York instructions and a commission constituting him the Governor of the Province of New York. (S62, at 28.) In 1686, Governor Dongan received a new commission and instructions directly from the King of England, which granted him certain powers and authority. (S72, at xvii, 177–78; S62, at 28–29; S74.) Governor Dongan was granted full power and authority "to make, constitute and ordain Laws, Statutes and Ordinances for the publick peace, welfare & good Government of our said Province and of the people and inhabitants thereof." (S72, at xvii; S62, at 28–29; S74.)

On December 6, 1686, Governor Dongan issued a Patent (the "Dongan Patent") to the proprietors of Southampton. (T69; S62, at 15–18; T12, at 50–51.) The term "ffreeholders," as used in the Dongan Patent, described individuals who were the proprietors of Southampton. (Tr. 2294.) There is nothing in the Dongan Patent (relating to Southampton's title) that is inconsistent with the scope of Governor Dongan's authority, as set forth in his 1686 commission and instructions from the king. (S62, at 29.) The Dongan Patent, *inter alia*, confirmed and reiterated the provisions of the Andros Patent, including its description of the "certaine tract of Land" belonging to Southampton, running from Wainscott on the east to Seatuck on the west. (T69, at 385; T188; Tr. 911–12, 2213–14, 2588–89; T12, at 50–51.)

The Dongan Patent recited that it was issued in response to an application submitted by Major John Howell, a freeholder of Southampton, and one of the patentees under the Andros Patent, to "confirm unto ye ffreeholders of said Towne in a more full & ample manner all the aboverecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the [I]ndyans and the ffreeholders of the said towne of Southampton." (T69, at 387; Stip. No.

72.) The Dongan Patent recited that Governor Dongan had "examined the matter in variance between the ffreeholders of the said Towne of Southampton and the [I]ndyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the [I]ndyans and have payd them therefore according to agreement so that all the [I]ndyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid . . . ." (T69, at 387–88; T12, at 50; S62, at 15–16; Tr. 911–13, 2218–19.) The "lands within the Limitts and bounds aforesaid" referenced in the Dongan Patent are stated explicitly to be the lands of Southampton, from Wainscott on the east to Seatuck on the west.[21] (T69, at 385, 387; S62, at 17; Tr. 2217.)

As was the common practice at the time, the Dongan Patent was recorded in the Secretary's Office for the Province of New York and perused by the Attorney General, who found "Nothing Contained therein prejudiciall to his Majys Interest." (S62, at 29; S65 at 394.) The Dongan Patent created and established a body "Corporate and Politique," known as the "Trustees of the ffreeholders and commonalty of the Towne of Southampton" (the "Southampton Trustees"), which was made up of the freeholders and inhabitants of Southampton. (T69, at 388.) There is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the Dongan Patent. (Tr. 913.)

Accordingly, the 1686 Dongan Patent confirmed Southampton's ownership in all lands west of Canoe Place, including Westwoods.

### (5) THE 1676 ORDER OF THE COURT OF ASSIZES

On October 5, 1676, the Court of Assizes noted that the Town of Southold ("Southold") and Southampton had not yet complied with the Law of 1664 and prior orders concerning the taking out of "Grants, Patents or Confirmations for their Towns or Lande." (D77, at 723–24.) By Judgment of the Court of Assizes, dated October 5, 1676, the Court held that Southold and Southampton "have forfeited all their titles, Rights & priviledges to the lands in the sd Townshipps & if they doe not by Monday fortnight next (being the 23rd day of this instant month) send up the acknowledgmt of their past Default & Resolves & Desire to obey & fulfill the Law & the severall orders of the Cort of Assizes, for the taking out their Grants, Patents or Confirmations, as directed by Law, Then Execution to issue out by Authority of this Crt for the above forfeiture to the use of his Maty without further delay" (the "1676 Judgment") (D77, at 724.) The Town complied with the 1676 Judgment, as well as the Law of 1664 and prior orders of the Court of Assizes referenced therein, by October 23, 1676, the deadline set by the 1676 Judgment. (D77, at 724.)

There is absolutely no evidence that the execution of the above-referenced Judgment of forfeiture, and the actual forfeiture of Southampton's titles, ever occurred. According to James Truslow Adams's *History of the Town of Southampton,* in 1670, the Southampton titles,

---

**21.** Although Professor Hermes stated that because the Dongan Patent was issued 12 days after the confirmation of the 1640 Indian deed it can reasonably be inferred that the dispute involved lands east of Canoe Place,

(Tr. 2590), the Court rejects that speculative conclusion and, instead, relies upon the above-referenced description of the land contained in the Dongan Patent that contradicts Professor Hermes's conclusion.

including those acquired from the Indians, "were declared invalid by the Court of Assize[ ] unless renewed under the new government." (D42, at 89.) The foregoing passage confirms that the invalidation of Southampton's titles was conditional only. In other words, it would occur only if the 1676 Judgment were executed, if the Town did not comply with the Judgment by October 23, 1676. (D42, at 89.) The condition expressed in the 1676 Judgment did not occur and, therefore, the forfeiture of Southampton's land titles never occurred.

### G. Use and Occupancy of Land West of Canoe Place, including Westwoods

The Court has carefully examined the evidence to determine what, if any, use and occupancy of land west of Canoe Place, including Westwoods, has occurred by the Nation since these colonial era transactions and events. As set forth in detail below, based upon that review of the evidence, the Court concludes that, with respect to the period from the late 17th century through the 18th century, there is overwhelming evidence that the Nation occupied land to the east of Canoe Place during this period and scant, if any, evidence that they occupied and used land west of Canoe Place, which is where Westwoods is located. Moreover, even if members of the Shinnecock Tribe inhabited areas west of Canoe Place at some time between the 17th and at least the end of the first three quarters of the 19th century—as asserted by defendants' habitation witness Dr. Jack Campisi—there is no evidence that their use or occupancy was exclusive or continuous, and there is no evidence of how many Shinnecock resided there, or where, or for how long. For example, as conceded by Dr. Campisi, there are no records for the period 1743 through 1889 that indicate that the Shinnecock Indians lived west of Canoe Place, but there are records during that period that indicate that the Shinnecock Indians lived east of Canoe Place. (Tr. 2754–57.) Moreover, Dr. Campisi's conclusions are of limited value because he completely disregarded and failed to explain the numerous above-referenced colonial era documents—such as the Ogden Deed, the Topping Deed, and the Nicolls Determination—that support the conclusion that the Shinnecocks sold all their lands west of Canoe Place and resided east of Canoe Place. In short, the Court finds that there is no evidence of regular or continuous Shinnecock Indian Nation habitation on Westwoods from 1640 to the early 20th century. Instead, the use and occupancy evidence is consistent with the conclusion that the Shinnecock Tribe sold its rights, title, and interest in the lands west of Canoe Place in the 17th century and resided east of Canoe Place. The Court has analyzed the evidence offered by both parties on this issue and provides below the reasons for the Court's conclusions.[22]

### (1) The 1703 Lease Lands

By an "Indenture" dated August 16, 1703 (sometimes referred to as the "1000 year lease"), the Shinnecock Indians acquired from the Town certain usufruct rights, for a period of 1,000 years, in lands east of Canoe Place. (T73; Tr. 2755; T12, at 55–57.) The lands that are the subject of the Indenture (collectively, the "1703 Lease Lands") include the Shinnecock Hills, the areas known as Sebonack and Cold Spring, and Shinnecock (Great) Neck.

---

**22.** Although the Court has fully considered all the evidence offered during the trial and has even addressed certain evidence that it viewed as immaterial, not every single piece of evidence on this issue (or on the other issues) is referenced in this Memorandum and Order. To the extent certain evidence is not referenced, the Court did not deem such evidence to be probative and did not believe it warranted particular discussion.

(T199; T12, at 55–56, 63, 65, 76, 87; T73; Tr. 2755.) In conjunction with the execution of the 1703 Indenture, the Shinnecocks executed a confirmatory deed to the Trustees of Southampton, dated August 16, 1703, in which the Tribe confirmed that it did "give grant Remise Release and for ever Quit Claim unto ye said Trustees ... all such Right, Estate, title, Interest and Demand whatsoever, as they ... and their people had or out [ought] to have of in or to all that tracte of Land of ye township of Southampton...." (T72, at 176; T12, at 52–55; T229, at 9, 17.)

As of the latter part of the 18th century (circa 1790), the Shinnecock Tribe was situated only east of Canoe Place, near Cold Spring, and not west of Canoe Place. (T12, at 10, 76, 87; T73; T121, at 541; T199; T203; Tr. 913–21,1220–21.) In the late 18th century, the Shinnecocks constructed, or caused to be constructed, a meeting house that was situated to the east of Canoe Place. The meeting house was completed sometime after September 27, 1791. (T123, at 514; T199; T13, at 18–19; Tr. 919–21.)

### (2) Canoe Place Chapel

The so-called Canoe Place Chapel or Warnertown Chapel was located to the south of Westwoods, and south of Montauk Highway. (Tr. 1222–23.) The Canoe Place or Warnertown Chapel was not exclusively a Shinnecock house of worship. (Tr. 1223–24.) The chapel, which was at one time located next to the burial plot of the Reverend Paul Cuffee, is located to the south of Westwoods. (Stip. No. 41; Tr. 1226–29.) There is no historical evidence that there was a Shinnecock tribal settlement in the location of the Paul Cuffee burial plot, which is located to the south of Westwoods. (Tr. 1236–38.) If members of the Shinnecock Tribe ever lived in the area of Westwoods in the 17th century, that habitation ended no later than 1675.

(Tr. 2658–60, 2727.) There is no evidence of Shinnecock tribal habitation on Westwoods itself.

### (3) Missionary Records

Missionary records do not show that members of the Shinnecock Indian Tribe or Nation inhabited Westwoods during the 18th century. (Tr. 2730–31.) There are no references in missionary Azariah Horton's journals, from the 18th century, to Canoe Place or to the property now known as Westwoods. (Tr. 2731–32; DUO.) The list of places Horton visited, according to his journals, do not show a pattern of Shinnecock residence at Canoe Place or Westwoods. (Tr. 2733–34; D110.) The principal quarters of Long Island Indian tribes were at cornfields, and for the Shinnecocks, the cornfields were at Sebonack or Shinnecock Neck, east of Canoe Place. (Tr. 2734–35.) There were no cornfields at Canoe Place or Westwoods. (Tr. 2735.) Accounts of the Indian missionary Samson Occum provide no evidence of Shinnecock habitation west of Canoe Place. (Tr. 2736–38.) Accounts of the Indian missionary Peter John do not identify the Shinnecock Indians with the church at Canoe Place and provide no evidence of Shinnecock habitation west of Canoe Place or at Westwoods. (Tr. 2738–39.) The church that the Indian missionary Paul Cuffee was instrumental in building was located east of Canoe Place. (Tr. 2740.) The 1809 Annual Report of the Board of Directors of the New York Missionary Society (the "1809 Annual Report") refers to a June 9, 1808 communication from Paul Cuffee, reflecting that he ministered to "four different societies," identified as the "Montauk," "Cold–Spring," "Puspatock," and "Islip." (T205, at 8–9.) The 1809 Annual Report also reflects a communication of Paul Cuffee, dated April 17, 1809, which reported that "[t]he tribe of Chinecock, or Cold–Spring consists, including children, of 109

persons or there-about" (T205, at 17.) Paul Cuffee's communications referring to the society at "Cold–Spring," and to "[t]he tribe of Chinecock or Cold–Spring" suggest that, as of 1808 and 1809, the Shinnecock Tribe was situated to the east of Canoe Place, at Cold Spring.

In the summer of 1902, anthropologist/archaeologist M.R. Harrington undertook extensive archaeological excavations of numerous Shinnecock Indian sites in Southampton. (T13, at 19; T200, at 231.) In his 1924 paper entitled *An Ancient Village Site of the Shinnecock Indians*, prepared for the American Museum of Natural History, Harrington wrote about his 1902 excavations at an ancient village site situated east of Canoe Place, on the west bank of Sebonac Creek. (T200, at 233.) In his paper, Harrington identified this ancient village site as a Shinnecock village, dating back at least "three hundred years ago" (circa 1602), and noted that "we have good reason for assuming that the village was Shinnecock from first to last." (T200, at 233, 246; T13, at 19–20.) This ancient village was situated in the Sebonack/Cold Spring area, east of Canoe Place. (T13, at 19–20; T200, at 233.) The Shinnecock habitation at Sebonack, in the mid–17th century, is confirmed by a 1649 agreement between the Town and the Shinnecocks, who are referenced therein as the "Soaponack Indyans." (T203; T13, at 20–21.)

Defendants' expert Dr. Campisi testified that Indians who attended a church west of Canoe Place may have walked as much as twelve miles to attend church, whether they lived east or west of Canoe Place. (Tr. 2742.) With respect to accounts of Indian missionary William Benjamin, Dr. Campisi admitted that his opinion that 70 members of the Shinnecock Tribe were members of the church in Canoe Place in 1845 may not be correct and, therefore, may not support his conclusion of Shinnecock habitation west of Canoe Place in the 19th century. (Tr. 2743–44, 2746–49.) With respect to Indian missionary James Downs, Dr. Campisi does not know whether his congregation at the church in Canoe Place consisted of Shinnecock Indians or whether it included other Indians and non-Indians. (Tr. 2751.) Downs's history of Canoe Place indicates that around 1830, there were non-Indians living in the vicinity of the churches west of Canoe Place. (Tr. 2751–53; D376.) Downs's *History of the Shinnecocks* indicates that, in 1827, William Benjamin's church at Canoe Place included both Poosepatuck and Shinnecock Indians. (D108, at 13.) Downs, in describing the missionary and preaching activities of Azariah Horton on eastern Long Island between approximately 1742 and 1752 stated, "[h]e [Horton] appears to have ben [sic] untiring in his efforts for the salvation of perishing souls while the principal settlements of the Indians were at Montauk and Shinnecock and therefore most of his time was spent there...." (D108, at 8.) The reference to "Shinnecock" in this passage, given the entire historical record, is a reference to lands east of Canoe Place, within the 1703 Lease Lands. (T73; T199; T226.) Thus, Downs concluded that the principal settlements of the Indians between 1742 and 1752 were located at Montauk and Shinnecock, not any location west of Canoe Place.

Edward Ernest Eells's article entitled *Indian Missions on Long Island*, at Part IV, "Azariah Horton," cites Horton's journal for the following proposition: "Although, as Horton states, Montauk was the home of the largest group of Indians on Long Island, yet there was a large group in Southampton at Sebonac.... These were the Shinnecock Indians...." (D112, at 171 (footnotes omitted).) By 1845 (the date of publication of Prime's *History of Long Island*, (T248)), Shinnecock Neck

was "the residence of the remnants of the Shinnecock tribe of Indians. Their church formerly stood beyond the hills, about 3 miles west, within sight of the isthmus called Canoe Place. It was afterwards removed a little to the west, at the spot where the grave of the Rev. Paul Cuffee is still to be seen.... The Indians having taken up their residence some years ago on this Neck, removed their church thither, where the Rev. *William Benjamin* supplies them half the time." (T248, at 216–17) (italics in original.) The Presbyterian church at Canoe Place was "extinct" by 1845, but a small Congregational church, consisting of only 12 members, still existed in that vicinity. (T248, at 217.)

### (4) LEASE OF TIMBER LANDS WEST OF CANOE PLACE BY THE NATION

By the early part of the 19th century, timber resources within the Town were being rapidly depleted. (T12, at 62–68; T13, at 32–35; Tr. 932–37; T94; T95; T176; T239, at 223.) As the Shinnecocks' timber resources to the east of Canoe Place became depleted, the Shinnecocks sought to obtain from Southampton the right to cut timber situated to the west of Canoe Place. (T12, at 97–98; T13, at 32–35; Tr. 932–37.) At an Indian Trustee Meeting held on April 7, 1808 (the "1808 Trustee Meeting"), it was voted, in the presence of Shinnecock Trustees and the Southampton Trustees, that the Shinnecocks lease 120 acres of land west of Canoe Place. (T134; T12, at 95–97; Tr. 934–37.) The land referred to in the minutes of the 1808 Trustee Meeting was bounded on the west by "Conklin's Corner." (T134; T12, at 96.) Conklin's Corner was a corner formed by lands of Israel Conklin (who owned lands west of Canoe Place, but no lands east of Canoe Place), and it was located in the vicinity of Westwoods, to the west of Westwoods. (T102; T114; T115; T116; T12, at 79–82, 95–96; Tr. 937–39.) The 120 acres referred to in the minutes of the 1808 Trustee Meeting included Westwoods. (T12, at 95–97; Tr. 934–38, 945.) The 120 acres described in the minutes of the 1808 Trustee meeting were to extend from Conklin's Corner "East to the Old Field." (T134; Tr. 938.) According to James P. Lynch, plaintiffs' ethnohistorical expert, the "Old Field" was also known as "Roger's Meadow," was bounded on the east by Canoe Place Pond, and extended westward into the Canoe Place Division.[23] (Tr. 938.)

---

**23.** There are also references to the leasing of land west of Canoe Place in the vicinity of Westwoods in documents relating to the widening of Newtown Road in the 1920s. In particular, on or about November 1920, civil engineer J.A.S. Gregg, in response to the "orders" of the Southampton Town Superintendent, surveyed and laid out part of Newtown Road, in the vicinity of Westwoods. (T207; T208; T232, at 350; T13, at 29; Tr. 976–79.) On or about October 12, 1921, Gregg prepared a statement of land available and land required for the widening and improvement of Newtown Road in the vicinity of Westwoods. (T208; Tr. 977–81.) Gregg's statement references, under the heading "Land already available for road," 2021.7 lineal feet of the "Old road from Mr. Jaques' entrance to land leased to Indians" and 2362.3 lineal feet of the "Old road through land leased to Indi-

ans." (T208.) Gregg's statement also references, under the heading "Land Required," 78,849 sf. of "land leased to Indians." (T208.) Gregg's references to "land leased to Indians" support the conclusion that the current Shinnecock presence at Westwoods was the result of the Shinnecocks having obtained a lease from the Southampton Trustees circa 1808. (T13, at 30–31; Tr. 979–81.) In fact, defendants' title examination and abstracting witness, Mason Haas, testified that he is not aware of any lands, other than Westwoods, referred to in any respect as "Indian land" as of 1921, the year in which Town Exhibit 208 was created. (Tr. 3064–65.) The Town's widening and improvement of the portion of Newtown Road that runs across Westwoods, in the early 1920s, occurred without any objection or protest by the Shinnecock Tribe. (T13, at 29–31; Tr. 976–81.)

**(5) THE 1822 PETITION TO THE NEW YORK STATE LEGISLATURE**

In an 1822 petition of the Shinnecocks to the New York State Legislature, the Shinnecocks claim to be the "lawfull owners of a certain tract of land lying in the said Town of Southampton . . . bounded on the west by a place called canoe place. . . ." (T136; T12, at 99; Tr. 923–25.) Thus, this petition referenced land claims by the Shinnecocks only to the east of Canoe Place, and no claims of ownership were made by the Shinnecocks in this petition for any land west of Canoe Place. (T136; T12, at 99; Tr. 923–925.)

**(6) INDIAN HUTS PHOTOGRAPH**

Defendants offered a photograph of purported Indian huts in 1879. (D377.) However, based upon the description accompanying the photograph, the huts were not located at or near Westwoods, and the photograph does not show the presence of a Shinnecock settlement at Canoe Place. It is also not known whether these huts were occupied by Indians or non-Indians at the time. (T247, at 280, 282; Tr. 2775–78.)

**(7) THE 1890 CASSADY LITIGATION**

The tract of land referred to in the action entitled *Trustees of the Tribe of Shinnecock Indians v. James Cassady*, Supreme Court of the State of New York, Suffolk County, filed July 21, 1890 (the "*Cassady* Litigation"), includes Westwoods, in whole or in part. (Stip. No. 100; Tr. 961.) The record of the *Cassady* Litigation includes no reference to any Shinnecock claim of subsisting aboriginal rights; instead, the Findings of the Court reference defendant's contention that the Shinnecocks had purchased Westwoods. (D2; Tr. 962.) One of the Findings of the Court in the *Cassady* Litigation was that the Shinnecock Tribe had been in "quiet and peaceable possession of the premises where the alleged trespass occurred, for upward of sixty years." (D2, at "First" Finding.) The Findings of the Court in the *Cassady* Litigation did not include any finding or determination that (i) the Shinnecocks had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial; or (iii) the Shinnecocks had been in exclusive possession of the premises since any time prior to circa 1830. (T12, at 116–17; D2.) The record of the *Cassady* Litigation contains no evidence that the Town was aware, at any time, of the purported sale of the subject premises by Shinnecock Trustees to Miles Carpenter. (D2, at "Second" Finding; Tr. 1245–46.) Defendants' witness, Dr. Campisi, testified that the land that was the subject of the *Cassady* Litigation was not where the Shinnecock Indians lived. (Tr. 2781.)

**(8) THE 1922 HUBBARD LITIGATION**

The tract of land referred to in Paragraph "V" of the Findings in the action entitled *Shinnecock Tribe of Indians v. Hubbard*, Supreme Court of the State of New York, Suffolk County, judgment entered December 27, 1922 (the "*Hubbard* Litigation"), includes Westwoods, in whole or in part. (Stip. No. 101; Tr. 963.) The Findings in the *Hubbard* Litigation include a finding that "for more than 70 years last past" plaintiff Shinnecock Tribe and its members "have obtained its firewood and fencing" from Westwoods, but the record in the *Hubbard* Litigation does not include a finding or determination that (i) the Shinnecocks claimed or had aboriginal rights in the subject premises; (ii) the Shinnecocks had been in possession of the premises since time immemorial, or (iii) the Shinnecocks had been in possession of the premises since any time prior to circa 1850. (D1, at Findings ¶ "V"; Tr. 963; T12, at 121–25.) The Opinion of Referee William Pelletreau in the *Hubbard* Litiga-

tion states that the plaintiff tribe "has only such rights to litigate as are conferred by statute." (D1, at Opinion.)

Despite the statement that "within the memory of living witnesses three, four or five families of said tribe resided on said tract," which appears in the "Findings" of the referee appointed in the *Hubbard* litigation, there is no basis on which to conclude that (i) those families resided on the approximately 80–acre Westwoods parcel, inasmuch as the tract at issue in the *Hubbard* Litigation was stated to be "about 100 acres" in size; (ii) any of those families were living in Shinnecock tribal relations; or (iii) any other families or individuals ever resided at Westwoods. (D1, at ¶¶ "V" and "VI" of "Findings;" Tr. 2781–82.) The Findings in the *Hubbard* Litigation also state that "plaintiff [Tribe] has for many years resided on Shinnecock Neck in the town of Southampton." [24] (D1, at ¶ "IV" of "Findings.")

### (9) MAPS

As set forth below, maps of the Town from 1797 to the early 20th century do not support a conclusion of Shinnecock habitation west of Canoe Place or at Westwoods.

A 1797 survey map created by the New York State Department of Transportation (the "1797 DOT Map") depicts the Indian meeting house, discussed *supra,* to the east of Canoe Place, and identifies Indian habitation only to the east of Canoe Place; the 1797 DOT Map indicates no Shinnecock habitation to the west of Canoe Place. (T199; Tr. 920–21, 2760–61; T13, at 18–19.) As depicted on the 1797 DOT Map, the Indian meeting house was situated within the 1703 Lease Lands, which are

depicted on the 1797 DOT Map as "Shinnecock tribe & Indian Reserve." (T199; T13, at 18; Tr. 920–21.) According to Mr. Lynch, the Indian meeting house depicted on the 1797 DOT Map was "a marker denoting the main location of Shinnecock settlement from circa 1602 through 1809 and beyond." (T13, at 18–19.)

A 1780 map prepared by Major John Andre does not show any habitation at all in the vicinity of Westwoods, and no Indian habitation at all west of Canoe Place. (D208a; Tr. 1049–50.)

An 1829 map of Suffolk County created by David Burr (the "1829 Burr Map") does not indicate the presence of Shinnecock Indians to the west of Canoe Place, but does indicate the name Shinnecock (spelled "Shunnecock") east of Canoe Place. (T360; Tr. 1232–34, 2762–63, 2765–66.) The 1829 Burr Map depicts the presence of an Indian meeting house to the east of Canoe Place—the same Indian meeting house that is depicted on the 1797 DOT Map. (T360; T199; Tr. 1233.)

The 1833 Sumner Map shows a triangle symbol, which indicates the location of Indians, east of Canoe Place. (T250; Tr. 2766–68, 2685.)

The 1836 J. Calvin Smith Map (the "1836 Smith Map") erroneously locates a Shinnecock reservation south of Canoe Place, on the west side of Shinnecock Bay, according to a report co-authored by Dr. Campisi. (D119; T251, at 37; Tr. 2769–71.) An 1839 republication of the 1829 Burr map repeats the error of the 1836 Smith Map. (D118; Tr. 2771–72.)

The 1838 U.S. Coast Guard and Geodetic Survey Map shows no Indian dwellings

---

**24.** The testimony of defendant Mr. Gumbs, discussed *infra,* that no portion of Westwoods has ever been allotted to any tribe member, undermines the contention of the defendants, as well as the referee's finding in the Hubbard Litigation, that "within the memory of living witnesses three, four or five families of said tribe resided on said tract." (D1, at ¶ "VI" of "Findings.")

or Indian habitation west of Canoe Place but does show Indian dwellings east of Canoe Place at Shinnecock Neck. (T247, at 265, 269–71; Tr. 2772–75.)

The 1859 Chace Map places the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence west of Canoe Place. (T247, at 272; Tr. 2775; D29, at 12.)

The Gazetter of the State of New York (Tenth Edition), published in 1861, reported that in Southampton, an Indian settlement, which was "the residence of the remnant of the Shinnecock Indians, consisting of about 200 persons," was situated on the east side of Shinnecock Bay. (T144, at 638 n. 12.)

The 1873 Beers Map places the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence or habitation west of Canoe Place. (T247, at 274; Tr. 2775; D29, at 12.)

The Map Showing the Subdivision of the Town of Southampton Among the Proprietors (the "Proprietor's Map"), created by or under the direction of William S. Pelletreau, not later than 1885, references two locations east of Canoe Place as lands in which the Shinnecocks held an interest, namely Shinnecock Hills and Shinnecock Neck, but does not indicate any other lands in which the Shinnecocks held an interest, including but not limited to, any lands west of Canoe Place, including Westwoods. (T226.)

The 1902 Art Village Map shows the Shinnecock settlement at Shinnecock Neck, east of Canoe Place, and shows no Shinnecock presence west of Canoe Place. (T247, at 272, 275; Tr. 2779–80.)

The 1916 Belcher Hyde Map shows the Shinnecock tribal village or residences on the Shinnecock Reservation and contains no indication of Shinnecock habitation or settlement west of Canoe Place. (T247, at 272, 276–77; Tr. 2780.)

The 1929 Dolph Stewart Map includes the words "Shinnecock Indians" in the general vicinity of Westwoods but shows the Shinnecock Reservation east of Canoe Place. (T247, at 275, 278–79; Tr. 2780–81.)

In sum, the maps of the Town during this period do not support a conclusion of Shinnecock habitation west of Canoe Place or at Westwoods.[25] (Tr. 2757–81.)

(10) OTHER RECORDS AND WRITINGS

The Court also has examined other records and writings, referenced by defendants, to determine if they support Shinnecock habitation west of Canoe Place at Westwoods on a continuous basis since the 17th century. None of this other evidence supports such a conclusion. For example, the writings of Timothy Dwight provide no information that indicates a Shinnecock presence or habitation west of Canoe Place in the early 19th century. (Tr. 2782.)

Similarly, Russell Carman's article *In the Beginning: The Shinnecock Indians and the First White Settlers in Quogue,* (D107), is also not reliable or persuasive. Carman reports that "[t]he Indians told my grandfather, and he told me, that a

---

**25.** A February 2003 Stage I Archaeological Survey for the "Shinnecock Reservation— West Hills" concluded, on the basis of archival research and 249 test excavations within a 15–acre area claimed by the Shinnecock, that "the project area witnessed minimal documented human activity in the past." (T135, at ii; T12, at 98–99; Tr. 964–66.) The 15–acre parcel studied in the February 2003 Survey was within Westwoods. (T135 at 16, 17, 21; Tr. 965.)

large portion of the [Shinnecock] tribe lived, except during the severe cold months, on the bluffs overlooking Peconic Bay, on the westerly side of the 'haulover', where the Shinnecock locks are today." (D107, at 1.) However, the article does not identify the historic period during which this information was reported. Moreover, Carman cites no historic sources or historic documents for the information contained in his article concerning Shinnecocks living west of the "haulover" and no historic sources corroborate Carman's account.[26] (Tr. 2724–25.)

To support their position, defendants also rely on a report written by Barbara M. Moeller, who was engaged by the Town to produce a historical profile of Hampton Bays, as well as Ms. Moeller's deposition. The 2005 report made several conclusions, including the following: (1) the Canoe Place Inn (which is about 700 yards south of the closest Westwoods boundary) "has been an Indian habitation location for centuries" (D192, at 13); (2) there was an Indian burying ground at the site of the grave of Paul Cuffee (which is about one-half mile southwest of the closest Westwoods boundary) and that Indian remains

other than those of Cuffee are or were buried at the site (D192, at 16); and (3) early settlers in Hampton Bays mingled with Indians already living in the area (D192, at 54). Ms. Moeller also opined that when the railroad went through the grave of Paul Cuffee in 1869, Indian remains there were dug up and moved to the Shinnecock Reservation. (D359, at 78–80.) The Court finds Ms. Moeller's report and opinions to have little probative value. As an initial matter, it is clear from the circumstances surrounding the commissioning of the work, as well as from a review of the report itself, that it was not intended to be a scholarly work, but rather was meant to provide general historical information as a planning tool related to future development and decisions regarding preservation of structures or sites. (D359, at 28, 69.) Moreover, Ms. Moeller's qualifications in historic research are very limited; in fact, Ms. Moeller conceded that to say that she specializes in historic research is "an overstatement of my talents." (D359, at 37–38.) More importantly, Ms. Moeller does not provide an explanation as to how she arrived at her opinions, and defendants have not offered any evidence to

---

**26.** Dr. Campisi testified that it was his opinion that one of the two possible periods to which the events described in the paragraph of Carman's article recounting Indians living west of the "haulover" could be referring was sometime between 1620 and 1637. (D107, at 1; Tr. 2658–59.) Dr. Campisi also testified that it was his interpretation that the Indians told Russell Carman's grandfather the information about where Shinnecocks lived in approximately 1876. (D107, at 1; Tr. 2656–58.) Thus, according to his interpretation of the time-frames at issue in the Carman article, Carman's grandfather was told by the Indians the information concerning the purported habitation of Indians west of the haulover 200 years after the latest time at which those habitations had occurred. (D107, at 1; Tr. 2726–27.) Dr. Campisi also admitted that he does not know whether the "bluffs," referred to in the Carman article as having been a

location where Indians purportedly lived, included Westwoods. (Tr. 2725.) Dr. Campisi conceded that the Carman article is not a learned treatise, is not a primary historical document, and is not a primary source article on which he would rely solely. (Tr. 2654–55, 2726.) Thus, Dr. Campisi acknowledged that Carman's hearsay article "is not the strongest piece of evidence in the world" concerning purported Shinnecock habitation. (Tr. 2658–60.) Dr. Campisi also admitted that: (1) historic sources indicate that the locations regularly occupied by the Shinnecocks in the 17th and 18th centuries were at Shinnecock Neck, Quogue, and Sebonack, sometimes called Cold Spring (Tr. 2725–26); and (2) historic sources do not include the property now known as Westwoods as the location regularly occupied by the Shinnecocks in the 17th and 18th centuries (Tr. 2726).

otherwise support these conclusions. Thus, in light of the entire trial record, the Court declines to credit these unsubstantiated conclusions.[27] Moreover, even if Ms. Moeller's conclusions are true, the presence of Indians in the vicinity of Westwoods falls far short of establishing continuous use and occupation of Westwoods by the Shinnecock Nation.[28]

### H. STATEMENTS BY NATION REPRESENTATIVES REGARDING WESTWOODS

#### (1) 1888 NEW YORK STATE LEGISLATIVE HEARING

In 1888, the New York State Legislative Assembly appointed a "Special Committee to Investigate the Indian Problem of the State of New York" (the "Special Committee"). (T133.) Milton Winfield Lee, a Shinnecock Tribe member who was later elected multiple times as a Shinnecock Tribal Trustee, provided sworn testimony before the Special Committee. (T145, at 850–51; T229, at Appendix 14; T12, at 95, 98, 107, 112–13.) Lee testified to the following: (1) "The tribe bought fifty acres of wood land"; (2) "I think they [the tribe] have a deed of this tract"; and (3) "We bought it of Wakeman Foster ... a white man...." (T145, at 851; T12, at 95, 98, 107, 112–13; Tr. 958–60.) The "wood land" referred to by Lee included a portion of Westwoods. (T12, at 94–95; Tr. 959.) According to Mr. Lynch, Foster held no rights in lands in the vicinity of Westwoods, and thus Foster could not have been the source of any rights claimed by the Shinnecocks in Westwoods. (T12, at 107, 113–14; Tr. 960.) According to Mr. Lynch, the loss of the Shinnecock's native language, which occurred as a result of "profound socio-cultural change," caused Shinnecock memories, based on oral tradition, to become distorted.[29] (T12, at 107, 109; T144.)

27. For similar reasons, to the extent that defendants also seek to support their position or to undermine or discredit Mr. Lynch's analysis by pointing to the draft article by Town Historian Henry Moeller entitled *Three Indian Meetinghouses*, as well as discussions by Mr. Lynch about that draft article, the Court does not find that Mr. Lynch's concern with the article undermines his credibility or conclusions. In fact, Henry Moeller acknowledged that the draft article was not published because he is not convinced that he knows what happened as it relates to these historical events. (D363, at 337.) In short, the article has virtually no probative value and does not impact the conclusions drawn by the Court based on the entire trial record.

28. Defendants also suggest that "[n]umerous documents relating to Indian records and archeology, possibly containing information relevant to the Shinnecock Indian Nation's possession of Westwoods, known to have been in the custody of the Town have disappeared." (Defs. Proposed Findings of Fact, at ¶ 1.) The primary basis for this contention is a statement by Mr. Moeller that "sensitive" archeological information given to the Town of Southampton Planning Department in the 1970s could not be found when he looked for such information more recently. (D199, at 1; D363, at 220–22.) However, there is no evidence as to the content or subject matter of this information, and there is no reason to believe that it had any relevance to the issues that are the subject of this litigation. Moreover, Mr. Moeller also agreed that the archeological information that he was unable to find may have been kept in "a different form" by the Town within the Town records. (D363, at 224–25.) Thus, the Court does not find any basis to conclude that documents relevant to this litigation are missing or that, even if they were missing, they would be favorable to the Nation's position. As discussed in detail *supra*, there is an overwhelming historical record from which the Court makes its conclusions in this case on the issue of extinguishment of aboriginal title.

29. On August 10, 1888, James H. Foster, a Southampton native familiar with the Shinnecocks, also provided sworn testimony before the Special Committee, at Southampton. (T133 at 827–838.) Mr. Foster was a Justice of the Peace of Southampton. (T133 at 831; T169 at 296.) Mr. Foster testified to a Shinnecock claim that the Tribe had purchased

(2) THE 1943 JOINT LEGISLATIVE COMMITTEE

On October 14, 1943, Fred Smith, who identified himself as a member of the Shinnecock Tribe, gave sworn testimony at a public hearing of the "Joint Legislative Committee on Indian Affairs," which had been established by the New York State Legislature. (T233, at 39; Stip. No. 94.) Smith was 74 years of age when he testified on October 14, 1943, and he had always lived in Southampton. (T233, at 39.) Mr. Smith was referring to the Westwoods Parcel or to a parcel of land including Westwoods when he referred to the "west wood land" in his testimony. (Stip. No. 95.) Mr. Smith testified that the Tribe had purchased Westwoods "by some money the Shinnicocks [sic] had." (T233, at 42.)

(3) THE 1978 SHINNECOCK NATION LITIGATION REQUEST

In February 1978, the Shinnecock Indian Tribe submitted to the United States Department of the Interior a "Litigation Request and Statement in Compliance with 25 CFR § 54.6 by The Shinnecock Tribe" (the "1978 Litigation Request"). (Stip. No. 89; T229.) The land that was the subject of the 1978 Litigation Request did not include Westwoods or any other land located to the west of Canoe Place. (Stip. No. 90.) In support of the 1978 Litigation Request, the Shinnecocks submitted to the Department of the Interior a "Memorandum in Support of Litigation Request" (the "1978 Memo") and various "Appendices" and documentary exhibits. (Stip. No. 91; T229.) One of the three signatories of the 1978 Memo was Marguerite Smith, an attorney admitted in New York and also a member of the Shinnecock Indian Nation.

(Stip. No. 92.) The 1978 Memo was prepared by, or on behalf of, the Shinnecock Tribe, and its submission was authorized by the Nation. (Stip. No. 93.) The 1978 Memo does not suggest that either the Ogden Deed or the Topping Deed was void, invalid, or illegal. (T229.) To the contrary, in the 1978 Memo, the Shinnecock Nation acknowledged the validity and legality of the Ogden Deed and the Topping Deed by stating that "the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662," and also that "[t]he tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662." (T229, at 8, 16.)

I. THE ORAL TRADITION OF THE NATION REGARDING WESTWOODS

The Court has also examined the oral tradition of the Nation regarding Westwoods. During the course of a Shinnecock tribal meeting held on February 4, 2003, Kevin Eleazer, a former Shinnecock Tribal Trustee, stated that "we're not even sure if we own the land at West Woods.... It was given to us by a millionaire, and yet there was never a deed for that." (T261, at 42; Tr. 2947–48.)

Defendant Mr. Gumbs, Chairman of the Shinnecock Tribal Trustees, admitted that he personally heard Kevin Eleazer's statement at the tribal meeting of February 4, 2003 that Westwoods "was given to us by a millionaire," and that he (Mr. Gumbs) had heard another unidentified tribal member make a statement like that previously and that Kevin Eleazer was reiterating it. (S251, at 249.) Mr. Gumbs admitted that the reason he believes Kevin Eleazer's

---

"about fifty acres" of woodland, "seventy or eighty years ago," i.e., 1808–1818. (T133 at 830; T12 at 111–12; Tr. 945–946, 954–958.) The "woodland" referred by Mr. Foster in his testimony before the Special Committee was

Westwoods. (T12 at 94–95; Tr. 958; T133 at 830.) During Mr. Foster's testimony before the Special Committee, there was no mention that the Shinnecock had subsisting aboriginal rights to Westwoods. (T133; T12 at 115.)

February 4, 2003 statements about West-woods were inaccurate is that they were based on statements that Kevin Eleazer had acquired from someone else, who had acquired them from someone else before that, and that as stories go "down the loop" over time, they change. (Tr. 2949; S251, at 249–50.) The passing down of stories or memories, orally, from one person to another, from generation to generation, is precisely how Mr. Gumbs came to his understanding of the oral history concerning Westwoods, through what he was told by Augustus (Gus) Thompson and others. (Tr. 2938, 2846, 2849–54.) Mr. Gumbs's understanding of the reputation in the Shinnecock community concerning Westwoods is that it is "land that we have," that "[i]t's been used in the past for firewood purposes" and "[g]enerally in the community it has been used as a means of survival and as recreation for the community." (Tr. 2846.) The principal source of Mr. Gumbs's understanding and knowledge of Westwoods, particularly its history and the origin of the Shinnecock's rights and interest therein, was Mr. Thompson, who died when Mr. Gumbs was 10 years old, and with whom Mr. Gumbs became familiar through nightly dinners and helping Mr. Thompson on his garbage collection route. (Tr. 2846–49.) Mr. Thompson told Mr. Gumbs that the Tribe "always owned" Westwoods. (Tr. 2854.) The only specific information about Westwoods history that Mr. Thompson told Mr. Gumbs was that Mr. Thompson pointed out to Mr. Gumbs "indentations" in the land at West-woods on the north side of Newtown Road that Mr. Thompson believed were for "wiki-ups," which could have been used for shelter or a cellar to store things. (Tr. 2850–52.) Notwithstanding Mr. Gumbs's testimony that Mr. Thompson told him that the Tribe "always owned" Westwoods, Mr. Gumbs acknowledged that he could not say one way or the other whether Lee's 1888 testimony that the Shinnecocks had purchased 50 acres of woodland (*i.e.,* Westwoods) was incorrect. (Tr. 2949–52.) In so acknowledging, Mr. Gumbs conceded the possible validity and veracity of testimony about the origin of Shinnecock ownership of Westwoods that was in direct conflict with his testimony of his understanding of the reputation within the Shinnecock community, based on the Tribe's oral history, of the origin of the Shinnecock's ownership of Westwoods, *i.e.,* that the Shinnecocks "always owned" Westwoods. Mr. Gumbs acknowledges that "once or twice" he has heard members of the Shinnecock Tribe say that they did not believe the Tribe owned Westwoods, but he dismissed those statements simply because one of the persons, when confronted about such a statement made at a tribal meeting, had no explanation of how he arrived at it. (Tr. 2854–55.) No evidence was presented by defendants that Mr. Thompson ever was elected a Tribal Trustee, that he held any other elected or appointed position within the Tribe, that he enjoyed any particular formal or informal status of respect or authority within the Tribe, or that he was ever deemed by the Tribe at any point as knowledgeable on any matter of Shinnecock history, including its oral history generally, or specifically as that oral history relates to the Shinnecock's alleged ownership, use, and/or occupancy of Westwoods. No evidence was presented that Mr. Thompson's recounting to Mr. Gumbs of his understanding of the Shinnecock's ownership of Westwoods, including the origin thereof, what may have been located at Westwoods over time, and how the Tribe may have used Westwoods over time, represents anything more than the isolated statement, or opinion of one single tribal member, which is entitled to no greater weight, authority, or reliance than the statements about Westwoods from any other tribal

member. Mr. Gumbs indicated that his understanding of the source of what Mr. Thompson told him about Westwoods was Mr. Thompson's own experiences going to Westwoods and what "his father had told him." (Tr. 2851.) No evidence was presented by defendants that Mr. Thompson's father was ever elected a Tribal Trustee, that he held any other elected or appointed position within the Tribe, that he enjoyed any particular informal status of respect or authority within the Tribe, or that he was ever deemed by the Tribe at any point as knowledgeable on any matter of Shinnecock history, including its oral history generally, or specifically as that oral history relates to the Shinnecock's alleged ownership, use and/or occupancy of Westwoods.

The Shinnecock Tribe does not have anyone who is designated as the tribal historian. (S249, at 30.) Defendants did not present any evidence that there is any one person who is deemed authoritative within the Tribe with respect to the Tribe's oral history and oral tradition, or is a keeper or custodian of accurate and/or reliable oral history, including as that oral history and tradition relates to the Shinnecock's alleged historical use and occupancy of Westwoods, and the origin of their title to and interest in Westwoods.

In sum, there is no basis to conclude that Mr. Gumbs's testimony about the Shinnecock Nation's oral history concerning the Tribe's purported historical use and occupancy of Westwoods, including the origin of the Tribe's rights in Westwoods, is in any respect more reliable or is entitled to any greater weight than the oral statements about how the Shinnecocks acquired Westwoods through gift or purchase made by persons identified as members of the Shinnecock Tribe, to wit, Kevin Eleazer, Milton Winfield Lee, and Fred Smith.

## J. THE TOWN'S TREATMENT OF WESTWOODS FROM THE STANDPOINT OF GOVERNMENTAL AUTHORITY

### (1) LACK OF PROPERTY TAXES ON WESTWOODS

No property taxes have been assessed or imposed on Westwoods from 1927 to the present, and Westwoods is not listed in any tax records of the Town for the years 1800 through 1926. (Stip. No. 32.) There exists no known evidence that Westwoods ever has been listed as taxable property in any assessment records of Southampton. (Stip. No. 33.) Neither the State nor the Town is aware of any evidence that Westwoods ever has been listed in any assessment records of Southampton as anything other than tax-exempt Indian land. (Stip. No. 34.) The relevant Suffolk County Tax Maps describe both the Shinnecock Reservation and Westwoods as "Shinnecock Indian Reservation." (D232; D156d.)

### (2) THE CANOE PLACE DIVISION

As set forth below, the Southampton proprietors laid out in or about 1738 a 3000–4000 acre subdivision of property consisting of 39 numbered lots, which includes at least a portion of Westwoods within its boundaries (the "1738 Canoe Place Division" or the "Division"), and there is no documented record of any objection or challenge to the laying out or allotment of the Division.

#### (A) THE LAYING OUT, ALLOTMENT, AND BOUNDARIES OF THE CANOE PLACE DIVISION OF 1738

In or about 1738, Southampton proprietors laid out a 3000–4000 acre subdivision of property known as the "Canoe Place Division" of the Quaga purchase, consisting of 39 numbered lots, running from "Jeremiah Culver's land" on the east, to "Red crick" on the west. (T97; Martin A. Read, L.S., *The Location of the "Westwoods" Parcel Relative to 1738 Canoe Place Division*, Barrett, Bonacci & Van

Weele, P.C., June 28, 2006 (T210), at 1–2; T12, at 68–70; Tr. 971–72, 1268–69.) The surveying and laying out of the 1738 Canoe Place Division is reflected in a portion of Town records dated March 27, 1738, entitled "A Return of the Canoe place Division," which also provides a description of the lands constituting the Division. (T210, at 1–2; T97.) The 1738 Canoe Place Division is described in "A Return of the Canoe place Division," (T97), as being bounded southerly by the highway running "from Canew place Gate to tianah," northerly by "the beach from Conew place pond on the north side to Red crick gut," westerly "on a direct line northwardly to a fresh pond near Red crick the southward part thereof to [be] a tree marked with No. 38, by the pond, and still running northward to Red crick and so along the branch and by the side of the crick to the north sid[e]," and easterly by "Jeremiah Culvers land which he bought in said Purchas at the South end butting up on Quaga Road, and the north end butting on the beach." (T97, at 123–24; T210, at 1–2; Tr. 1268–69.)

Defendants' title abstraction and examination witness, Mason Haas, admitted that according to Town Exhibit 215, the boundaries of the 1738 Canoe Place Division were north by Peconic Bay, south by Montauk Highway, east by Canoe Place Pond, and west by Red Creek. (T97; Tr. 3041.) Using modern-day landmarks, the Division is generally bounded on the south by Montauk Highway, on the north by Great Peconic Bay, on the west along a line running from Tiana Creek northerly to Red Creek, and on the east by a north-south line in the vicinity of the present day Shinnecock Canal. (T210, at 1–2; Tr. 1269.) The dotted line on Town Exhibit 217, created by plaintiffs' expert land surveyor, Martin A. Read, depicts accurately the northerly, southerly, and westerly boundaries of the 1738 Canoe Place Division, as described in

"A Return of the Canoe place Division," (T97), superimposed on an enlarged portion of the 1894 Beers Atlas Map that depicts the westerly portion of Southampton. (T217; T210, at 1–2; Tr. 1271–72.) Although Mr. Read could not locate the easterly boundary line of Lot No. 1 of the Division with a degree of specificity that would have allowed him to plot it on Town Exhibit 217, he was able to determine that the approximate eastern boundary of the Division, using modern landmarks, was in the vicinity of the Shinnecock Canal. (T217; Tr. 1272–73; T210, at 2.)

The 1894 Beers Atlas Map refers on its face to the "Canoe Place Division" and its having been " '[l]aid out in' 1738." (T216; Tr. 1270, 3047–48.) The location of the words "Canoe Place Division" on the 1894 Beers Atlas Map substantiates generally the east-west reach or boundaries of the 1738 Canoe Place Division, as those boundaries are described in "A Return of the Canoe place Division." (T97; T216; Tr. 1270; T210, at 2.) The Proprietor's Map, (T226), refers to "Canoe Place Division Divided–1738," and the location of those words is consistent with the approximate location of the lands of the Division, as established by the testimony of both Mr. Read and Mr. Haas. (T226; T210, at 1–2; Tr. 1268–73, 3041–42; T97; T215; Tr. 3048.)

The lots described in the 1738 Canoe Place Division are aligned in a northerly/southerly direction. The first 37 lots are numbered consecutively, running from east to west, with Lot No. 1 of the Division being the easterly most lot. (T97; T210, at 1–2; Tr. 1269.) The document "A Return of the Canoe place Division" sets forth a specific acreage for each of the 39 lots of the Division, as well as a description of the physical location of each lot in relation to the other lots within the Division. (T97, at 124–25; Tr. 3045.)

The land located immediately to the east of the eastern boundary of Lot 1 of the 1738 Canoe Place Division is described as being "Jeremiah Culvers [sic] Land." (T97, at 124; Tr. 3045.) That land of Jeremiah Culver was purchased by Culver from the Town prior to the creation of the 1738 Canoe Place Division. (T97, at 124; Tr. 3044–45.)

On April 2, 1739, the Southampton Town Proprietors met to allocate interests in the 39 numbered lots within 1738 Canoe Place Division; that is, to determine which proprietors would obtain rights in which of the 39 lots of the Division (the "Canoe Place Division Lot Drawing"). (D172; T107; T12, at 70). The 39 numbered lots within the Division were allotted to specifically-named Town proprietors during the Canoe Place Division Lot Drawing. (D172; T97; T107.) For each of the 39 lots in the 1738 Canoe Place Division, the Canoe Place Division Lot Drawing identifies one or more named individual Proprietors of the Town who received interests or allotments (expressed in terms of "fifties" or portions thereof) in said lots. (D172; T107; Tr. 3045–46.)

None of the individuals (each, an "Allottee") whose names appear in the Canoe Place Division Lot Drawing found within the *Third Book of Records of the Town of Southampton, Long Island, N.Y. with Other Ancient Documents of Historic Value,* at 129–32, were members of the Shinnecock Tribe. (Stip. No. 79.) There is no documented record of any objection or challenge by or on behalf of the Shinnecock Tribe of Indians to the laying out or allotment of the 1738 Canoe Place Division. (Stip. No. 80.)

(B) WESTWOODS GENERALLY IS SITUATED WITHIN THE 1738 CANOE PLACE DIVISION

The lands that were part of or the subject of the 1738 Canoe Place Division were located exclusively to the west of Canoe Place; that is, using modern landmarks, the lands of the Division were situated entirely to the west of the modern day Shinnecock Canal. (T97; T215; T216; T217; T226; T210, at 1–2; Tr. 1268–73, 3041–42, 3047–48.) Westwoods is located entirely to the west of Canoe Place, that is, to the west of the modern day Shinnecock Canal. (T214; Stip. Nos. 16, 35, 36.) Westwoods is generally located within the boundaries of the 1738 Canoe Place Division as they were described by plaintiffs' expert Mr. Read, with recourse to modern landmarks.[30] (T214; T97; T210, at 1–2; T217.) The Court found Mr. Read's testimony to be credible, as supported by his extensive analysis of various documents including deed histories and maps, that at least a portion of Westwoods, namely some portion of Westwoods that is north of the Milton Reiner Property as it runs from west to east, lies within Lot No. 2 of the 1738 Canoe Place Division and that no portion of Westwoods lies west of the westerly boundary of Lot No. 4 of the Division.[31] (T210, at 1, 5–6; Tr. 1267–68.)

30. Mr. Haas admitted that he had testified under oath at his deposition in this action that Westwoods is located within the lands that were the subject of the 1738 Canoe Place Division. (Tr. 3041–42.)

31. It should also be noted that Town Exhibit 111 is an excerpt of the Southampton Town Records from 1795, depicting a plan for the laying out of a road across the 1738 Canoe Place Division. (T111; Tr. 3065–66.) Town Exhibit 111 refers to a highway running "from the Canoe place ditch at the Western Boundary of the Indian Land to the Said Red Creek Island Road." (T111; Tr. 3065–66.) According to Mr. Haas, Exhibit 111 relates to the laying out of a portion of Newtown Road, and at no point in history is he aware of a time when Newtown Road began at Westwoods. (Tr. 3065–67.) Mr. Haas admitted that if one assumes that the "Canoe Place Ditch" referenced in Town Exhibit 111 is

Although Mr. Haas contends that the Canoe Place Division was simply a proposal that was never implemented (Tr. 3042–43, 3055), the Court rejects that opinion as contrary to the historical record—including land records, maps, and deeds—which support the conclusion that the Canoe Place Division was executed. (T97, T107, T215, T216, T226; T210, at 5; D158D, D159C, D161C, D166C; Tr. 3042–55.) The inability to locate a subdivision map, or to locate deeds from the Trustees of the Town to any of the Allottees of the 39 lots within the Division, are not sufficient to ignore the compelling evidence that the Division existed and was executed.

In addition, deeds within the chains of title for property adjoining Westwoods which refer to Westwoods as "Indian land," "Indian reservation," or "Land of the Shinnecock Tribe of Indians," make up the majority of the evidence that Mr. Haas cites to support his opinion that the Shinnecocks have owned Westwoods for the entirety of the existence of recorded land title records within the Suffolk County Clerk's Office. (D157, at 1–20; D154, at ¶¶ 8–10; Tr. 3024–27.) However, deeds for properties adjoining Westwoods also contain some references that are more ambiguous as to the purported Shinnecock ownership of Westwoods, including "Indian land, so-called," "so called Indian Land," "land now or formerly of the Shinnecock Tribe," "land now or formerly of the Shinnecock Indian Tribe," "land now or formerly of The Shinnecock Indian Reservation," "lands reputed to be Indian Lands,"

"land now or formerly of Trustees of the Shinnecock Tribe," and "what is known as Indian land." (D157, at 2–8, 12–13, 15–19; Tr. 3027–29.)

In any event, Mr. Haas's opinions regarding ownership of Westwoods are limited to the period from 1845 going forward. (Tr. 3030.) In other words, Mr. Haas admitted that there is no reliable documentary evidence of Shinnecock ownership of Westwoods prior to 1845 and that he found nothing in his title work in this case to indicate any interest that the Shinnecocks had in Westwoods prior to 1845. (Tr. 3030.) Thus, he acknowledged that there is nothing in his opinions that is inconsistent with the position that the Shinnecock Tribe acquired an interest in Westwoods in or around 1808. (Tr. 3031.)

(3) Southampton's Historic Regulation of Timber Resources

At various times during the 18th century, the Southampton Trustees regulated timber resources throughout the Town, as well as the rights of the Shinnecocks to cut timber. (T12, at 62–68; Tr. 925–32.) For example, by orders of the Southampton Trustees, dated May 5, 1741, April 2, 1745, and April 1, 1746, no timber was permitted to be cut or carted in Shinnecock Great Neck, and Sebonack Great Neck, both of which locations are situated within the 1703 Lease Lands, east of Canoe Place. (T12, at 63; T88, at 6; T89, at 34; T90, at 44; T199; Tr. 925–29.) By order of the Southampton Trustees, dated March 5, 1747, no "green timber" was to be cut or carted "[i]n or upon any part of the Indian

located where the modern-day Shinnecock Canal is located, the reference in Town Exhibit 111 to "Indian land" could not be a reference to Westwoods. (Tr. 3067.) The Canoe Place Ditch is the place where Indians formerly carried their canoes between Shinnecock Bay and the Great Peconic Bay, and was located where the modern day Shinnecock Canal is situated. (Stip. No. 35; T12, at 76–

78.) Thus, the reference in this 1795 document to "Indian Land" does not appear to be a reference to Westwoods, but instead appears to be a reference to the 1703 Lease Lands, i.e., the lands situated exclusively to the east of Canoe Place, which were the subject of the 1000 year lease. (T73; T12, at 52–57; Tr. 2755.)

Land," *i.e.,* the 1703 Lease Lands. (T91, at 55; T12, at 63; Tr. 927.) By order of the Southampton Trustees, dated July 3, 1744, the Shinnecocks were granted "a mile of timber" "on lands 'from the Conueplace Eastward,' through a 50–year lease to the Indians." (T92, at 26; T12, at 64.) By order of the Southampton Trustees, dated June 2, 1747, the Shinnecocks were granted "all the timber in Shenecock Great neck ... and also all the timber in Sebonack neck." This order also provided that the timber granted to the Shinnecocks should "Ly ... from the Conneu-place ditch Eastward as far as the Coldspring...." (T93, at 57; T12, at 64–65.) The area of timber granted to the Shinnecocks by the aforesaid order of June 2, 1747 was in close proximity to the Shinnecocks' main village at Cold Spring (Sebonack). (T93; T12, at 64–65; T13, at 25–27, 32–35.) By reason of a growing shortage of timber resources, and the sale of timber by individual Shinnecocks to local townsmen, 32 Shinnecocks entered into a mutual agreement dated June 12, 1764, which provided, *inter alia,* that "[n]either Shall any Indian or Squaw Sell any timber on penalty of Eight Shillings for any trees so Sold...." (T94; T12, at 65; Tr. 930–31.) By order of the Southampton Trustees, dated April 30, 1782, it was recognized that the Shinnecocks had complained to the Trustees that agreements not to sell timber, such as the foregoing agreement dated June 12, 1764, had been "broken thrugh," and the Shinnecocks had made an application to the Southampton Trustees for aid and assistance in fostering "a Strict Observance of sd. Agreement." (T95, at 384.) The April 30, 1782 order prohibited the cutting or carting of wood "off any part of the Indian land," except for the consumption of persons having an interest in such lands. (T95, at 384–85; T12, at 66–67; Tr. 931–32.) By order of the Southampton Trustees, dated April 2, 1754, no timber

was to be cut or carted off "any part of the undivided land westward of Canuplace on penalty of six shillings...." (T176, at 108; T12, at 65; Tr. 933–34.) By a second order of the Southampton Trustees, dated April 2, 1754, there was to be no flaxseed "soed on any part of the Indian land." (T176, at 108.) By distinguishing between the "Indian land" and the "land westward of Canuplace" in the two orders of the same date, it appears that the Southampton Trustees viewed the "Indian land" to be situated exclusively east of Canoe Place, while the lands west of Canoe Place were not considered "Indian land." (T176, at 108.)

### K. The Nation's Treatment of Westwoods from the Standpoint of Governmental Authority

#### (1) Use of Westwoods for Firewood and Recreation

Defendants are aware of no written document reflecting that the Shinnecock Tribe and/or its Trustees ever made any allotments of land within the borders of Westwoods to any member of the Nation. (Stip. No. 31.) Tribal Chairman Mr. Gumbs, who claimed to be knowledgeable about the reputation within the Shinnecock community concerning the history of Westwoods, testified at trial that as far as he knew, no portion of Westwoods had ever been allotted to a tribal member in the history of the Tribe. (Tr. 2835, 2845, 2937, 2939–40.) Mr. Gumbs admitted that the Shinnecock Tribe has no written tribal laws at all, including any concerning the use of Westwoods, or any environmental standards that are referenced in the agreement originally entered into between the Shinnecock Gaming Authority and Ivy Ong, discussed *infra.* (D237, at section 6.7; Tr. 2886–87, 2947, 2938–40.)

Mr. Gumbs also admitted that, according to Tribal history, Westwoods is to be

used for firewood and recreational purposes. (Tr. 2938.) The historical use of Westwoods only for firewood and recreational purposes is consistent with the testimony of other Shinnecock Trustees. (S249, at 39; S248, at 198.) No permanent structure currently exists on any part of Westwoods. (Stip. No. 19.) Except for the erection of gates across roadways, the Shinnecock Tribe has never fenced in the Westwoods property. (D251, at 262–64; S248, at 161.) Defendants Messrs. Eleazer and Bess testified that the Shinnecock Tribe has never adopted or enacted any written rules or regulations regarding the use of Westwoods by Tribe members. (S249, at 100; S248, at 160–61.) To the extent that the Shinnecocks used the area now known as Westwoods in the 19th and 20th centuries, they used it primarily as a timber lot for cutting wood and timber. (Tr. 2782.)

As stated by Tribal Trustees, the purpose of the development of a casino at Westwoods would be for the Tribe's economic development, that is, to meet the financial needs of the members of the Tribe, and to enjoy the economic success achieved by other Indian communities that engage in gaming. (Tr. 2880–82; S249, at 108–09.)

### (2) ENCROACHMENTS ON WESTWOODS

Mr. Gumbs admitted that the Shinnecocks have been aware of the fact that the driveway of a neighboring/adjoining property owner currently encroaches on Westwoods. (Tr. 2941–42; S251, at 224–26.)

Specifically, Mr. Gumbs acknowledged that a former owner of that encroaching driveway, Mr. Raynor, was obligated to pay rent to the Shinnecocks for the use of the portion of Westwoods on which the driveway encroached, but stopped remitting payments. (Tr. 2941–42; S251, at 224–25.) Mr. Gumbs conceded that the driveway has continued to encroach on Westwoods since Mr. Raynor sold his property. (Tr. 2942; S251, at 226.) Mr. Gumbs admitted that the Shinnecock have never commenced a lawsuit against Mr. Raynor or the current owner of the encroaching driveway, seeking payment of rent or the removal of the encroachment, and that Mr. Gumbs does not have any knowledge that even so much as a letter from the Shinnecock was sent to either Mr. Raynor or the current owner of the property demanding the removal of the encroaching driveway.[32] (Tr. 2942–43; S251, at 226–27.)

### L. SOUTHAMPTON ZONING LAW

In 1957, when Southampton initially adopted its zoning code, Westwoods was zoned "C residential," which was a single-family residential district, with a minimum lot area per dwelling of 15,000 sf. (T5; T265; Tr. 94–97.) In 1972, pursuant to the Town's 1970 Comprehensive Plan, the Town re-zoned Westwoods "R–60," which is a residential classification for a single-family residence with a minimum lot size of 60,000 sf. (T6; T266; Tr. 98–100.) In 1984, Southampton re-zoned Westwoods "R–80," which is a residential classification for a single-family residence with a mini-

---

32. On the issue of governmental authority, there is an unpaved parking area at Westwoods used by the Shinnecocks, and Mr. Gumbs testified that no Town or New York official ever objected to the clearing of land for a parking lot. However, Mr. Gumbs admitted that the parking lot was created "before his time," that he does not know when the parking tot was created, and that he does not know whether the Town was aware that the parking lot was being created. (Tr. 2940–41.) No evidence was presented at trial that Southampton or New York was ever aware that land was cleared for the creation of the parking lot on Westwoods, or an awareness that the parking lot on Westwoods, in fact, existed. Mr. Gumbs also admitted that the parking area at Westwoods is not related to any commercial activity by the Tribe. (Tr. 2941.)

mum lot size of 80,000 sf. (T264, T312; Tr. 100–03.)

Former Southampton Town Planner David Emilita testified that the R–80 zoning classification of Westwoods, as adopted in 1984, was omitted from the Town's subsequent zoning map, and as part of the Town's "Master Plan Update Number Three of 1985" it was proposed that Westwoods be reclassified from an R–80 zone to an R–60 zone. (Tr. 103–04.) Town Exhibit 9 includes the 1985 recommendation for the rezoning of Westwoods to an R–60 zone, in order to "Replace Omitted Zoning Map Designation." (T9, at third to last page; Tr. 104–06.) The third to last page of Town Exhibit 9, including the words "Replace Omitted Zoning Map Designation," was prepared by Mr. Emilita. (Tr. 105–06.) Mr. Emilita testified that the words "Shinnecock Indian Reservation," which appear on the third to last page of Town Exhibit 9, were placed there by him, "[f]or identification," and that such words were intended to show that Westwoods was owned by the Shinnecocks, and that the words had no zoning significance. (Tr. 107–08; 121.)

A public hearing was held in Southampton Town Hall in 1985, concerning proposed updates to the Town's Master Plan, including the designation of Westwoods as property bearing an R–60 zoning classification. (T8; Tr. 108–09.) A letter authored on behalf of the Shinnecock Tribe, which requested that the Town remove markings from the zoning map that showed the Town's zoning authority over the Shinnecock's lands, was read into the public record at this 1985 public hearing. (T8, at 11–13; Tr. 109–12.) Southampton did not grant the Shinnecock's request that it remove markings from the zoning map that showed the Town's zoning authority over the Shinnecock lands. (Tr. 112.) In 1986, the Town approved the proposed changes that appeared in Town Exhibit 9, and re-zoned Westwoods R–60, through the enactment and adoption of Local Law No. 7 of 1986. (T11; Tr. 113–14, 241–42.)

Since the enactment of Local Law No. 7 of 1986, there have been no Southampton Local Laws that have affected or changed the R–60 zoning designation of Westwoods. (Tr. 242–43.) Westwoods currently remains zoned R–60 by the Town. (Tr. 240–42; T11.) As an R–60 designated parcel, the use of Westwoods is limited to single-family residential use. (T267; Tr. 114, 245.) A gaming casino is not a permitted use in an R–60 zone. (T267; Tr. 245.) A gaming casino is not a permitted use anywhere in the Town. (T267; Tr. 245.) A gaming casino is not authorized by Southampton zoning law. (T267; Tr. 246.)

Mr. Emilita testified that there is no impact, from a zoning standpoint, resulting from the fact that a Town zoning map shows no zoning classification for Westwoods. (Tr. 104.) At all times from 2003 to the present, § 330–184(I) of the Southampton Town Zoning Law provided that "[n]o regrading, clearing, tree removal or any other work in preparation of future use of a site may take place until site plan approval or written permission has been received from the Planning Board." (T267, at 330.) At all relevant times, the operation of a gaming casino and related commercial structures and activities, such as hotels, restaurants, and retail stores have not been identified as "permitted" or "special exception" uses within any "Country Residence" or "Residence" zoning districts in the Table of Use Regulations appearing at § 330–10 of the Town of Southampton Zoning Law, including R–60. (T267; Tr. 246–47.)

To date, neither the Shinnecock Tribe, nor any representative, Trustee, or any

other person or entity acting on its behalf has applied for or received a bingo or games of chance identification number from the Board. (Stipulation, dated January 17, 2007, Stip. No. 5.) To date, the Town has not issued any state-authorized license to any defendant to permit gaming within Westwoods. (Stipulation, dated January 17, 2007, Stip. No. 6.)

Town of Southampton Planning and Development Administrator, Jefferson Murphree, testified that no commercial structure can be constructed within the Town in compliance with the Town Code in the absence of a Town-issued building permit. (Tr. 247–48.)

Neither "Shinnecock Indian Reservation," nor "Indian Reservation," nor "IND–RES" is a zoning district or classification within the Town. (Tr. 116–17,235–36, 244, 269; T267.) Mr. Murphree testified that the labeling of Westwoods as "Indian Reservation" or "IND–RES" suggests nothing as far as the zoning of Westwoods is concerned. (Tr. 244.) It is the Town's practice to zone all lands within the Town.[33] (Tr. 236, 261, 266.) Shinnecock Trustees Messrs. Gumbs and Eleazer admitted that they were aware that Westwoods was assigned a zoning classification by the Town.[34] (Tr. 2943; S249, at 12, 98–99.)

M. CURRENT TOPOGRAPHY AT WESTWOODS

The Westwoods project site is bordered to the north by the Great Peconic Bay, to the south by the Sunrise Highway, and to the west and east by residential areas. (S125, at 40; Tr. 1842; T1; T2; T3.) The sections of the Westwoods parcel north and south of Newtown Road generally include hilly terrain with centrally-located high points. The north parcel includes the bluff topography sloping towards the Great Peconic Bay (to the north) and generally towards Newtown Road (to the south). The south parcel includes topography generally sloping towards Newtown Road (to the north) and towards "Canoe Place" (to the southeast). (S125, at 40.)

The topography reflects that Newtown Road is a relative low point between higher elevation lands on the north and south parcels, and surface runoff is directed towards Newtown Road from both parcel sections. (S125, at 40.) The project site is located within Seismic Zone C, which is identified as a region of intermediate seismic hazard. (S125, at 9; S150.)

The portion of Westwoods located on the north side of Newtown Road, along the shore of the Great Peconic Bay, contains a coastal bluff approximately 50 to 70 feet above mean sea level (as defined in the National Geodetic Vertical Datum ("NGVD") 1929). (S125, at 9; Stipulation dated January 16, 2007, Stip. No. 6.) The coastal bluff, one of the unique and sensitive environs that contribute to the overall community character of the Town, acts as a natural protective barrier that absorbs

33. The May 20, 1987 letter from then-Southampton Town Attorney Fred Thiele to the New York Department of State ("NYSDOS") refers only to the Town's then-existing policy concerning its zoning laws with respect to the Shinnecock Reservation; it makes no explicit or implied reference to Westwoods. (D229.) Mr. Thiele's letter also states unequivocally that "the Town of Southampton zones all the lands in the Town excluding incorporated villages," (D229, at 1), and this is consistent with the trial testimony of Mr. Murphree. (Tr. 236, 261, 266.) There are no properties

within Southampton that do not carry a zoning classification assigned by the Town. (Tr. 236.) Because the 1987 letter addresses the Shinnecock Reservation, the Court views it as having little, if any, probative value on the issues related to Westwoods.

34. Shinnecock Trustee Mr. Bess testified that Westwoods was assigned a zoning classification, but he believed it had been removed. (S248, at 210–12.)

wave energy and mitigates impacts from erosion and high water, and also provides a source of material for other natural protective features, such as beaches and dunes. (S125, at 10; Tr. 1842.)

Proposed development along the waterfront area within the Town is reviewed by the Town for consistency with these local community waterfront objectives. (S125, at 10.) Soils underlying Westwoods are part of the Plymouth–Carver soil association. Characteristic of the Pine Barrens, the Plymouth–Carver soils are distinguished by their coarse texture, which allows for rapid permeability. (S125, at 11.) The soils at Westwoods and their underlying geology allow for a renewable source of fresh ground water, which recharges the aquifer through percolation of rainwater or snowmelt, which is an important characteristic for an area served by a ground-water-based sole source for the municipal water supply system. (S125, at 11.)

The high soil permeability at Westwoods also increases vulnerability to contamination by septic systems, spills, and other development-related discharges. (S125, at 11, 52.) Westwoods is characterized by undulating topography with spot elevations ranging from a high of 92 feet NGVD, on the southern Westwoods parcel, elevation of 37 feet along Newtown Road, and elevation of 50 feet on the northern Westwoods parcel. (S125, at 12; S166.)

N. Current Environmental Resources and Conditions in Southampton Generally and at Westwoods

(1) Water Resources

Southampton, as well as the rest of Long Island, obtains its water supply solely from ground water sources, which consist of three primary aquifers: the Upper Glacial, Magothy, and Lloyd aquifers. (S125, at 12; Stipulation, dated January 16, 2007, Stip. Nos. 7, 9–10.) Infiltration from precipitation, runoff, and snowmelt are the only sources of recharge to these aquifers, and where no development has occurred, approximately 50% of the precipitation that falls on the land could be expected to recharge the underlying aquifers, with the remainder of the precipitation lost through evaporation and plant transpiration. (S125, at 13; S162, at 9–11.)

Where development has resulted in impervious surfaces (e.g., rooftops, parking lots, streets, and sidewalks), a greater percentage of precipitation becomes overland flow—runoff—before infiltrating to the aquifers. (S125, at 13.) Most of the surface waters on Long Island are fed from the ground water. (S125, at 13.) Eight specific hydrogeologic zones based upon different flow patterns have been identified on Long Island, and Southampton is located within Zones III, IV, V, and VI. (S125, at 14, and Figure 6.)

Westwoods is located in hydrogeologic Zone IV, and adjacent to Zone III. (S125, at 14 and Figure 6; D298.) Zone III is an area that has good ground water quality in both the Upper Glacial and Magothy aquifers. (S125, at 14.) Zone IV encompasses the northern and eastern portion of the South Fork, and is characterized by shallow flow systems that discharge directly into streams and marine waters. (S125, at 14 and Figure 6; S162, at 9; D298.)

There are no named streams, ponds, or lakes on Westwoods, but nearby or adjacent water bodies include: (a) Great Peconic Bay (approximately 19,100 acres), which borders the site to the north; (b) Shinnecock Bay (approximately 4,550 acres), which is located approximately one-half mile to the southeast; (c) Shinnecock Canal, which connects Great Peconic Bay and Shinnecock Bay, is located approximately one-quarter mile to the east at its closest point; (d) Squire Pond (approximately 19 acres), which is located approxi-

mately one-quarter mile to the northwest; and (e) Flanders Bay and Reeves Bay (approximately 2,600 acres), which are located approximately 7 miles to the west, at the westernmost area of the Peconic Estuary. (S125, at 15.)

Westwoods is located within the watershed of the Peconic Estuary. (S125, at 15; Stipulation, dated January 16, 2007, Stip. No. 15). Storm water and snow-melt water runoff in the watershed that does not percolate to ground water is conveyed by overland flow to Great Peconic Bay, and runoff from Westwoods and other lands within the watershed have a cumulative qualitative and quantitative impact on the Great Peconic Bay. (S125, at 15.) The Great Peconic Bay is a part of the Peconic Estuary, which separates the North and South Forks of the eastern end of Long Island; the Peconic Estuary consists of over 100 bays, harbors, and tributaries, and includes over 128,000 acres of land and 120,000 acres of surface waters. (S125, at 15.) The Peconic Estuary is part of the Natural Estuary Program ("NEP"), which has designated it as an "Estuary of National Significance." (S125, at 15.) The portion of the Westwoods property along the shoreline of the Great Peconic Bay is within a flood zone area. (S125, at 17 and Figure 9; S137.) The Great Peconic Bay and the Shinnecock Canal have been mapped by the DEC as tidal wetlands (littoral zone). (S125, at 19; Stipulation, dated January 16, 2007, Stip No. 13.) Westwoods includes tidal wetlands along its Great Peconic Bay shoreline. (S125, at 19; Stipulation, dated January 16, 2007, Stip. No. 13.) A federal National Wetland Inventory map published for the Mattituck quadrangle contains the Westwoods property and identifies wetland habitats on the Westwoods property along the Great Peconic Bay shore that coincide with the United States Geologic Survey mapping of

hydric soils, also an indicator of potential wetlands. (S125, at 19–20.)

The Coastal Area mapped by the NYS-DOS includes a portion of the Westwoods property north of Newtown Road within the coastal zone for purposes of the federal Coastal Zone Management Act and related New York statutes. (S156; S125, at 19–20.)

(2) Air Resources

Long Island, including Suffolk County, is in the Ozone Transport Region and is within a moderate non-attainment zone for nitrogen dioxide and ozone, two substances for which National Ambient Air Quality Standards ("NAAQS") have been set. (S125, at 20–21.) Long Island, including Suffolk County, is in the non-attainment zone for particulate matter (dust) below 2.5 microns in size, a substance for which a NAAQS has also been set. (S125, at 21.)

(3) Biological Resources

Terrestrial habitats contribute to the area's community character, as well as the well-being of the area's native species. (S125, at 21.) Westwoods is covered primarily by a "Pitch Pine—Oak Forest." (S125, at 21; Tr. 1842.) Extending shoreward (from north to south), Westwoods has three primary zones—coastal, transitional, and terrestrial woodlands—that contain the following ecological habitat types: maritime beach, maritime shrubland, maritime oak forest, pitch pine slope, pitch pine oak forest, successional maritime forest, successional old field, and maritime pitch pine dune woodland. (S125, at 21; Tr. 1842–43.)

The "maritime oak forest" habitat located on Westwoods has a high ecological value; the habitat "maritime pitch pine dune woodland" that is on Westwoods has been assigned the highest value available within New York for a habitat site because this habitat is especially vulnerable to ex-

tinction. (S125, at 21–22; S152, at 83, 123.) There is potential habitat on the bluff area located on the northern Westwoods parcel for a plant species known as the Nantucket juneberry, also known as the Nantucket shadbush (*Amelanchier nantuckentensis*), an endangered species. (S125, at 27, Appendix B.)

Protection and sustainable management of the Peconic Estuary and its resources—including fish and shellfish—are critical to the community character and economic well-being of eastern Long Island. (S125, at 27–31.) The Peconic Estuary, to which Westwoods is hydrologically connected, is threatened by algal blooms; nutrient pollution arising from fertilizer runoff; infiltration from septic systems; storm water runoff and wastewater discharges; degradation and destruction of natural habitats on land adjoining the estuary; pathogen contamination of shellfish beds; and toxic chemical pollution from human activities. (S125, at 28–30.)

Although defendants' expert, James Mansky, states that Westwoods "is classified as Coastal Oak—Heath Forest in accordance with the document *Ecological Communities of New York State*" the Court credits the testimony of plaintiffs' expert, Robert Graver, that the correct habitat classification of the Westwoods property is pitch pine—oak forest. (S226, at 2; D259, at ¶ 11; Tr. 1954.) Westwoods is part of a continuous pine barrens habitat that includes the Central Pine Barrens and possesses the same habitat characteristics as the pitch pine—oak forest that comprises much of the Central Pine Barrens.[35] (S226, at 2–3; Tr. 1955.)

The forest on Westwoods can be characterized as one in excellent condition that exhibits the appropriate stratification and structure of a pitch pine-oak forest, has old-growth trees 90 to 110 years of age, does not have significant incursions of invasive species, is relatively large and unfragmented by Long Island standards, and supports many wildlife species indigenous to this habitat type. (S226, at 4; S125, at 25–26; Tr. 1954.) Large numbers of small trees, mostly oaks, that were less than four inches, as measured in diameter at breast height ("DBH"), are present at Westwoods. (S226, at 4.) The presence of small trees at Westwoods is evidence that forest regeneration is actively taking place as older trees are lost to senescence, disease, and blowdown, and thus is an indication of good forest structure and vitality. (S226, at 4; Tr. 1955.) Hundreds of small pitch pines and dozens of small oak have become established in the previously cleared five to ten acre area at Westwoods, demonstrating that the cleared area is rapidly undergoing reforestation. (S226, at 4.)

Approximately 30 species of birds were identified on Westwoods during two short visits by Mr. Grover to Westwoods on April 12, and August 9, 2006. (S226, at 5; Tr. 1959.) The New York State Breeding Bird Atlas divides the state into survey blocks of nine square miles, and Block 7052A, which includes the Westwoods property, covers much of the area known as Hampton Bays. (S226, at 5.)

Interim data for 2000–2005 shows 73 breeding species for the survey block, of which at least 40 of these species nest in the type of habitat provided by the Westwoods property; since there is ample woodland habitat on the property, it is reasonable to assume that all or most of these species use the property for breeding purposes. (S226, at 5–6, Exhibit 1; Tr. 1958–59.)

**35.** In any event, this dispute regarding classification is not critical in the Court's analysis regarding the impact on the forest on Westwoods from the development of the property.

The Westwoods property also supports habitat for New York Special Concern Species, including the Eastern Box Turtle. (S226, at 5–6; Tr. 1955–56.) Other special concern species, including the Sharp-shinned Hawk and Cooper's Hawk, would be expected on this property, based on habitat, during the winter. (S226, at 6.)

### O. Current Community Services in Southampton Generally and at Westwoods

Hospitals/medical centers that serve the eastern Long Island area, including the area of Westwoods, are Southampton Hospital (about 7.5 miles east, in Southampton); Peconic Bay Medical Center, formerly Central Suffolk Hospital (about 8 miles northwest, in Riverhead, New York); Eastern Long Island Hospital (about 30 miles northeast, in Greenport, New York); and University Hospital (about 33 miles northwest, at SUNY Stony Brook, New York). (S125, at 37.) Ambulance service for the area is provided by the Hampton Bays Volunteer Ambulance Corp, Inc., Flanders–Northampton Volunteer Ambulance Co., Inc., Riverhead Volunteer Ambulance Corps, Inc., Southampton Town Volunteer Ambulance Corps., and East Quogue Fire Department (a volunteer fire department). (S125, at 38.) Fire and rescue service for the area is provided by the following: Hampton Bays Fire Department (about 2 miles southwest); Flanders Fire Department (about 4 miles west); Southampton Fire Department (about 7.5 miles east); and Riverhead Fire Department (about 8 miles west). (S125, at 38.) The Town of Southampton Police Department would likely be the first responding agency in the event of a police emergency at Westwoods. (S125, at 38.)

Westwoods is located within the Hampton Bays Water District ("HBWD"). (Stipulation, dated January 16, 2007, Stip. No. 8.) The HBWD supplies potable water for commercial and domestic use, and also provides fire protection water to businesses, schools, municipal agencies, apartment complexes, and private homes in the community of Hampton Bays. (S125, at 39.) As an undeveloped property, there is no current water demand on Westwoods. (S125, at 39; Stipulation, dated January 16, 2007, Stip. No. 11; Tr. 1843.)

Westwoods is not served by a community sewer system or municipal wastewater treatment plant, and in the absence of a community sewer system, residential, commercial, and industrial businesses must provide for their own wastewater treatment. (S125, at 40; Tr. 1843.) Two options for wastewater disposal at Westwoods are either a subsurface (on-lot septic tank with a leach field) or on-site wastewater treatment facility. (S125, at 40.)

As an undeveloped site, there is currently no demand for electrical power at Westwoods. (S125, at 41; Tr. 1843.) An electrical substation with a capacity of approximately 10 megawatts ("MW") is located south of Sunrise Highway about one-quarter mile from Westwoods. (S125, at 41; D248.)

A high pressure natural gas line is located approximately one-half mile southeast of Westwoods, and runs north along Newtown Road and terminates near Holtzman Drive southeast of Westwoods. (S125, at 41; Stipulation, dated January 16, 2007, Stip. No. 19.) As an undeveloped site, there is currently no demand for natural gas at Westwoods. (S125, at 41; Stipulation, dated January 16, 2007, Stip. No. 17; Tr. 1843.)

Because the Town does not provide curbside collection or disposal of solid waste, private collection service companies collect approximately one-half of the residential waste stream and all of the solid

wastes generated by commercial, industrial, and non-hazardous institutional entities, as well as farms; large-volume generators must arrange for private haulers to collect and transport trash, recyclables, and construction/ demolition debris to receiving centers located outside the Town. (S125, at 41.)

### P. Southampton Demographics and Community Character

#### (1) Demographics

Suffolk County's population on January 1, 2005 was estimated to be 1,483,396 persons, and is expected to increase between 2004 and 2030 by 19%. (S125, at 42.) In 1962, the County's saturation population was projected to be 3.4 million people, but a much lower saturation population is now expected due to lower average household sizes, zoning changes, land preservation efforts, and other measures taken by Southampton that also are designed to retain community character. (S125, at 42.)

Southampton is the largest and most populated of the five "East End" towns of Suffolk County with a population (as of January 2005) of 58,564 permanent residents, including 504 residents of the Shinnecock Reservation (0.8% of the total Town populace). (S125, at 43.) The Southampton population swells dramatically during the summer tourist season from the July 4th to Labor Day holidays, reaching its peak in July and August at nearly triple the year-round population, with the second-home population comprising the largest component of Southampton's summer population. (S125, at 43; Tr. 1472–73.) Tourism and the vacation home industry drive the Town's economy. (S125, at 43.)

#### (2) Aesthetics

Unimpeded views of the beach along the Great Peconic Bay exist on Westwoods and adjacent properties, and recreational boaters and other users of the Great Peconic Bay can view the coastal bluffs, including the coastal transitional and terrestrial woodland zones. (S125, at 44.) These visual resources are unique and important visual corridors and vistas. (S125, at 44.) The coastal bluff is an important local aesthetic resource that contributes to the overall community aesthetics in the Town. (S125, at 44.) The Sunrise Highway is a Scenic Road Corridor. (S125, at 45.) Ambient sound levels on the Westwoods property are associated with residential activity on the western, eastern, and southern boundaries. (S125, at 45.)

#### (3) Community Character

Westwoods is zoned residential 60,000 ("R–60"), and is surrounded by lands zoned as residential 80,000 ("R–80"), "R–60," and residential 15,000 ("R–15"), where 80,000 sf., 60,000 sf., and 15,000 sf., respectively, are the minimum lot sizes in the zoning classification. (S125, at 31–32, 47 and Figure 14; S167; T4.) Southampton's unique scenic quality and sense of place is derived from the interrelationship between rural farmland, areas of undeveloped open space, and the hamlet centers. (S125, at 47.) This rural character, with significant natural and historic resources, is the quality that maintains Southampton's economic vitality as a visitor attraction, as well as an attractive place to live and work. (S125, at 47; S167.) Southampton's zoning is intended to maintain its natural, historic, and scenic resources, green space and recreational areas, and promote affordable housing. (S125, at 34–37; S167.) Southampton's zoning is also intended to maintain a diverse economy that capitalizes upon but does not erode the Town's natural, historic, and scenic resources, and enhance its rural and historic scenery, beach, and recreational amenities, and cultural and specialty retail amenities, while protecting the established character and the

social and economic well-being of both private and public property. (S125, at 35–36; S167.)

Q. THE NATION'S DEVELOPMENT PLAN FOR GAMING FACILITY AT WESTWOODS

The Gaming Authority is an instrumentality of the Shinnecock Indian Nation. (Stip. No. 49.) The Gaming Authority was formed by the Nation in or about 2003 in order to enter into a contract regarding gaming at Westwoods on behalf of the Nation. (D237; D238; Tr. 2842.) The Gaming Authority entered into a Development/Management Agreement ("Development/Management Agreement") with Ivy Ong and Ong Enterprise, LLC (collectively, "Ong"), dated May 1, 2003, for the development, construction, and operation of a gaming facility at Westwoods. (D237.) The intent of the parties to the Development/Management Agreement was that only the parties to the agreement would have the right to enforce any provisions of the Development/Management Agreement, and in particular, that the State and the Town would not have any right to enforce any provisions of the Development/Management Agreement. (D237, at ¶ 6.7; Tr. 2914–15.) A Closing Letter was executed on or about March 19, 2004, between Ong and Gateway Casino Resorts, LLC ("Gateway"), with the consent of the Gaming Authority, assigning the rights of the developer/manager set forth in the Development/ Management Agreement to Gateway. (D239; Tr. 2924.) An Addendum to the Development/Management Agreement was executed in or about March 2004, by the Nation, between the Gaming Authority and Gateway. (D238.)

Mr. Gumbs negotiated the Development/Management Agreement on behalf of the Nation and its Gaming Authority. (Tr. 2886.) The Development/ Management Agreement provides for an Initial Facility of approximately 61,000 sf. on a 15–acre tract of land on Westwoods (on the south side of Newtown Road) capable of holding between 900–1000 gaming machines and 60 table games. (D237; D238.) The Development/ Management Agreement also provides the developer/manager a right of first refusal with respect to the expansion of gaming facilities on other portions of Westwoods. (D237, at ¶ 4.4; Tr. 2913–14.) The Gaming Authority, with approval of the Nation, could enter into a contract with another developer for development on those portions of Westwoods not the subject of the Development/Management Agreement and provide for development on those portions of Westwoods, and it is the position of the Nation that should its at-large council agree, the Nation could develop all portions of Westwoods without regard to any New York or local law. (Tr. 2916.)

The Development/Management Agreement provides that the construction, maintenance, and operation of any gaming facilities at Westwoods would be conducted "in a manner which adequately protects the environment and the public health and safety and for that purpose shall comply with the requirements of all other applicable health, safety and environmental standards enacted by the Tribe" and would comply with "[t]hose standards generally imposed by the laws and regulations of the State relating to public facilities with regard to building, sanitary and health standards and fire safety ... [and] water discharges ...," except that if there are "federal water standards specifically applicable to the Reservation [they] would preempt such State standards." (S237, at ¶ 6.7.) However, the Nation could excuse compliance with such standards in the future. (Tr. 2915.) Moreover, although the Development/Management Agreement as amended by the Addendum provides for

the construction of gaming facilities and related ancillary facilities on 15 acres at Westwoods, the Nation could allow construction of additional facilities at Westwoods on other portions of Westwoods in the future, including portions of Westwoods north of Newtown Road. (S237, at ¶ 4.4; S238, at (4), (10); Tr. 2929.)

### R. Configurations of Other Potential Casino Complexes at Westwoods

The Nation and its Gaming Authority have received several gaming facility configurations ranging from a temporary gaming facility to a multi-component entertainment complex. (S113–16; S118–19.) In the past, the Economic Development Committee of the Nation has considered economic development proposals that include development constructed on portions of Westwoods north of Newtown Road, including the construction and operation of a marina along the north shore of Westwoods in Great Peconic Bay. (S113–16; S118–19; Tr. 2906–08.)

The following components of a casino complex have been identified by developers and others for a casino complex at Westwoods: (a) temporary casino (21,600 sf., including a 1,200–1,300 seat bingo hall); (b) casino (130,000 sf.); (c) theater (3,000 seat, 50,000–60,000 sf.); (4) retail (75,000 sf.); (d) hotels (1,604 rooms), including a 400 room, 6 floor hotel on northern parcel, a 600 room, 4 floor hotel on northern parcel, a 300 room hotel on southern parcel, a 160 room hotel on southern parcel, and a 144 room hotel on southern parcel; (e) spa (25,000 sf.); (f) convention center (50,000 sf.); and (g) restaurants. (S113–16; Tr. 1840, 1867–69.) The proposed 130,000 sf. casino would contain 3,500 gaming devices and 140 table games, not including "back of the house" space. (S113.)

The Tribe may ultimately construct (or expand) a gaming facility at Westwoods to the maximum extent possible, restricted only by the physical dimensions of the site. (S125, at 1–2; Tr. 1840–41.) Speaking on behalf of the Nation, Mr. Gumbs has said that "[o]nce [the Tribe] get[s] a shovel in the ground we can do whatever we want" when discussing the building of a casino at Westwoods. (Tr. 1479–80.) Westwoods is physically large enough to accommodate a casino and commercial and hotel components as described above, with enough space to allow expansion of the casino to 340,000 sf., a casino complex similar in size to that at Foxwoods in Connecticut that occupies approximately 54 acres. (S125, at 2–3 and Figure 2.)

Win per unit per day ("W/U/D")—how much a gaming device wins per day on average within a gaming facility—is a major factor in determining the potential size of a gaming facility in terms of its overall revenue profitability. (Tr. 1394, 1397.) At a minimum, a casino with a W/U/D within the range of $180 to $240 is financially viable. (Tr. 3216.) It is a conservative conclusion that a stand-alone casino at Westwoods comprising 162,500 sf., including a 130,000 sf. casino and approximately 32,500 sf. of "back of the house" space, with 3,500 gaming devices and 140 table games, would likely have a W/U/D of approximately $300, and would be financially viable. (S1, at 3, 6–8; Tr. 1392–93, 1395–96.)

As concluded by defendants' expert, Steven Rittvo, a casino at Westwoods with 6,500 positions and a 1,000 person hotel would be financially viable and have a W/U/D in excess of $220. (S268; Tr. 3113–15; 3212–13, 3216.) Mr. Rittvo also concluded that a casino in Mastic, New York, just 20 to 25 miles closer to New York City than Westwoods, with 6,500 gaming positions, would likely generate a W/U/D of more than $300 and have an attendance in excess of 7.6 million visitors

per year. (Tr. 3228–30; S14, at 2–4; S271.)

The difference in travel time from New York City and other locations west of Mastic to Mastic, as compared with travel time from New York City and other locations west of Mastic to Westwoods—approximately 25 minutes—would not account for a significant reduction in the number of visitors to or the financial performance of a casino at Westwoods as compared to a casino at Mastic. (S14, at 2–4.)

### S. PHYSICAL COMMENCEMENT OF CASINO PROJECT AT WESTWOODS

On or about July 12, 2003, trees and brush were cleared by use of a bulldozer and other construction equipment from a portion of Westwoods located to the south of Newtown Road. (Stip. No. 47.) The clearing of trees and brush within Westwoods, on or about July 12, 2003, was done by the Shinnecock Indian Nation in furtherance of its intention to construct a building on a site within Westwoods located to the south of Newtown Road, in which it intended to conduct gaming. (Stip. No. 48.) Shinnecock Trustee Bess was unable to identify any activity at Westwoods that occurred prior to the clearing of land in 2003 for a casino as to which he believed the Town could have enforced its laws, but did not. (S248, at 212.) No evidence was presented at trial by defendants that the Shinnecocks had engaged in any activity or use of Westwoods prior to their 2003 clearing of land for a casino with respect to which the Town could have enforced any of its zoning or land use laws, but did not.[36]

Neither the Nation, nor any representative, Trustee, or any other person or entity acting on the Nation's behalf, has done the following: (1) applied for or received site plan approval for any activity at Westwoods from the Town for any purpose at any time (Stip. No. 51); (2) submitted environmental or building permit applications to the Town showing compliance with Town zoning laws, fire code regulations, and New York environmental laws with respect to any building to be constructed at Westwoods (Stip. No. 53); (3) applied for or received permission from the Southampton Town Planning Board to engage in any activities at Westwoods in preparation for its development (Stip. No. 55); or (4) applied for or received any permit or approval from the Town for any activity conducted or to be conducted on any portion of Westwoods (Stip. No. 56). Prior to the summer of 2003, there had been publicized efforts by the Shinnecocks to develop Westwoods. (Defs. Ans. to Town Compl., at ¶ 12.)

As discussed *supra*, the zoning classifications of the properties in the general vicinity of Westwoods are predominately residential. (Tr. 253.) Southampton has a Comprehensive Plan, which sets forth the Town's vision, goals, policies, and objectives regarding growth within the Town, and which sets forth where inhabitable land usage (residential, commercial, or industrial) should go, and which seeks to avoid incompatible land usage. (Tr. 233, 235–36.) Southampton's adoption of zoning laws and zoning designations is a mechanism by which the Town implements its Comprehensive Plan, and the zoning

---

**36.** Michael Benincasa is now the Chief Building Inspector for the town. He testified that, before he did his 2003 physical inspection of Westwoods following the clearing of the land for the casino, he had never had any occasion to inspect anything at Westwoods or enforce zoning or building regulations at Westwoods because it was vacant property. (D364, at 51–52, 67.) He understood at the time of the inspection that Westwoods was zoned residential and advised the people present on the property that clearing the land was a violation of the Town Code, but he received no response. (D364, at 54–56.)

laws and designations must be consistent with the Comprehensive Plan. (Tr. 233–34.) Construction of a gaming casino at Westwoods would be inconsistent with the Comprehensive Plan. (Tr. 253–54.) There are no planning goals of the Town that would be satisfied by the construction of a casino at Westwoods. (Tr. 254.) The construction of a casino at Westwoods would be entirely out of character and inconsistent with the Comprehensive Plan. (Tr. 254.)

Chapter 325 of the Town Code contains the Town's wetland protection law. (T268.) In Southampton, the purpose of a wetlands permit is to ensure that any land disturbance or development that occurs in wetlands or within 200 feet of wetlands does not result in significant adverse impacts to wetlands. (Tr. 276–77.) Land disturbances or development within 200 feet of wetlands includes the clearing of natural vegetation, grading, excavation, placement of fill, building, structural changes, the installation of any man-made structure, planting, or landscape activities. (T268; Tr. 277–78.) The northern parcel of Westwoods contains or lies adjacent to wetlands, as the Great Peconic Bay system is regulated as wetlands under Chapter 325 of the Town Code. (Tr. 279–80.)

The Peconic Estuary, which includes the Great Peconic Bay, has been designated as an estuary of national significance by the United States Environmental Protection Agency. (Tr. 280.) Development on the northern parcel of Westwoods could implicate Chapter 325 of the Town Code. (Tr. 281.) Notwithstanding the Nation's stated intention to meet or exceed federal, state, and local environmental standards in connection with the development of a casino at Westwoods, the Nation admitted that no assessment or analysis had been done to determine whether it would be feasible to meet or exceed those standards in connec-

tion with a gaming facility at Westwoods. (Tr. 2886–88, 2947; D237, at 6.7; S248, at 193–94.)

T. IMPACT OF CONSTRUCTION AND OPERATION OF A CASINO COMPLEX AT WESTWOODS

As set forth in detail below, based on the evidence at trial, the Court concludes that the construction and operation of a casino complex at Westwoods would disrupt the Town's governmental administration and the settled expectations of Southampton residents, and have disruptive environmental and traffic impacts in Southampton, as well as in Suffolk County generally.

(1) FAILURE TO COMPLY WITH STATE ENVIRONMENTAL PERMITTING REQUIREMENTS

None of the defendants, nor any person or agency acting on behalf of any of the defendants, has submitted any application for any type of permit or authorization from New York alleged by the plaintiffs to be required for development of the Westwoods Parcel. (Stipulation, dated January 16, 2007, Stip. No. 1.) The construction of a casino at Westwoods likely would require the following permits or authorizations that under New York law are issued by the DEC: (a) a permit for the construction and operation of a waste water treatment facility that will discharge to ground or surface waters pursuant to ECL Article 17; and (b) the SPDES General Permit for Stormwater Discharges from Construction Activity, Permit No. GP–02–01, pursuant to ECL Article 17, titles 7 and 8, and ECL Article 70. (Stipulation, dated January 16, 2007, Stip. No. 27.) The DEC would generally use certain procedures in conducting the assessments or studies relating to the issuance of any permits or authorizations in connection with the proposed construction of a casino at Westwoods, including likely requiring the preparation of an environmental impact statement ("EIS") with

public notice and review.[37] (Stipulation, dated January 16, 2007, Stip. No. 25.)

Neither the Nation, nor any representative, Trustee, or any other person or entity acting on its behalf, has submitted a completed environmental assessment or any other form to the DEC with respect to construction of any building to be constructed at Westwoods. (Stip. No. 52.) No project for development of Westwoods by the defendants, or by any person or agency acting on behalf of any of the defendants, has been the subject of a consistency review pursuant to the Waterfront Revitalization and Coastal Resources Act, State Executive Law, Article 42 and 19 N.Y.C.R.R. Part 6. (Stipulation, dated January 16, 2007, Stip. No. 2.) The Nation has enacted no environmental statutes, laws, or regulations. (Tr. 2887.)

### (2) NON-TRAFFIC RELATED ENVIRONMENTAL IMPACTS

The type of construction activities that reasonably could be expected for a casino complex at Westwoods include the following: site clearing, grubbing, and grading; excavation and fill activities; hauling of construction materials, and of construction debris; transport of construction workers to and from the site; material staging; sand mining; material backfilling; excavation dewatering; storm water management; construction of foundations and facilities, roadways, parking, signage, and lighting installation, or the extension of infrastructure (water, sewer, electrical power, natural gas, telecommunications, and cable); and site restoration and landscaping. (S125, at 3.)

The types of equipment that would be required to construct a casino complex include the following: earth-moving equipment (front loaders, bulldozers, dragline, backfillers, scraper/graders, and trucks); materials-handling equipment (concrete mixers, concrete pumps, a motor crane, and delivery trucks); and stationary equipment (pumps, generators, compressors, lighting, fuel storage, dumpsters, roll-offs, and other waste handling and storage equipment). (S125, at 3–4.) Construction activities would likely extend over a 24–month time period based on an 8 hours per day, five to six days per week schedule. (S125, at 4.) A casino at Westwoods most likely would operate 24 hours per day, 7 days per week, consistent with other existing casinos in the northeast such as Foxwoods Resort Casino, Mohegan Sun, and Turning Stone Resort Casino. (S125, at 4.) Impacts on adjacent properties, including those associated with operational noise and traffic, would be expected to occur during the 24–hour period. (S125, at 5.)

As set forth below, even without consideration of the adverse impacts arising from increased traffic to and from an operating casino at Westwoods, construction and operation of a casino at Westwoods would have disruptive practical consequences, disrupt settled expectations of the local communities and residents surrounding Westwoods, and seriously burden the administration of state and local governments.

### (A) IMPACTS TO GEOMORPHOLOGY

On the approximately five to ten acres that have been cleared at the Westwoods site, no measures are present to prevent erosion of cleared soils and vegetation, and new erosion patterns are visible from the action of storm water runoff on the site. (S125, at 49.) Because of the large sand content (70 to 100%) of the soil, it could be mined for use as a sand source, and devel-

---

**37.** The procedures are set forth in more detail in the January 16, 2007 Stipulation, Stip. No. 25.

opment projects in the region are known to remove (mine) sand for sale elsewhere, while lower quality fill is hauled to the development site as replacement material. (S125, at 11.)

Potential short-term (construction-related) adverse impacts on geological resources from the construction of a casino complex at Westwoods include the following: (a) increased erosion due to the clearing of existing soil-stabilizing vegetation; (b) increased erosion and sediment transport due to additional site clearing, grading, and the stockpiling of soils at the site; (c) the absence of erosion control measures will result in soil erosion and sedimentation of adjacent, downgradient surface waters in the Peconic Bay watershed, including the nearshore area of the Great Peconic Bay; (d) erosion, storm water runoff, and flooding, or ice formation in the winter, have the potential to impact NYS Route 27 due to the proximity of the southern boundary of the property immediately adjacent to the highway's right-of-way corridor; (e) degradation of surface and ground water quality from the discharge of chemicals, solvents, and petroleum products from heavy machinery and other construction uses; and (f) impacts on air quality due to dust generation during construction. (S125, at 49–50; Tr. 1845.)

Potential significant long-term adverse impacts to geological resources from the operation of a casino complex at Westwoods include the following: (a) incompatibility of facility design with on-site geologic conditions (i.e., seismic zones, soils, and subsurface conditions), and consequent safety risks if facility designs are not prepared consistent with established practices for seismic protection and geotechnical considerations and are not subject to appropriate review and oversight; (b) permanent modifications to existing topography due to site grading activities resulting in the loss of the scenic quality afforded by the undulating (morainic) characteristics of the site; (c) degradation and instability of the existing coastal bluff through reduction in vegetation cover, increased slopes, and consequent erosion, affecting the surrounding land and the shape and form of the beach below, and increasing sedimentation in the nearshore water; (d) accelerated erosion of the bluff due to a significant increase in human activities on the steeply-sloped bluff, the increased numbers of people who will have uncontrolled access to the bluff, and the increased quantity of storm water runoff; (e) if wastewater discharges are directed to the bluff directly or indirectly, accelerated erosion of the bluff; (f) as a result of the instability to and deterioration of the bluff, reduced capacity for the bluff to act as a natural protective barrier against wave energy and high water; (g) significantly increased erosion potential due to regrading, vegetative clearing, and an increase in storm water runoff resulting from the creation of impervious surfaces (e.g., rooftops, parking lots, sidewalks, and roads); (h) in full development of property, adverse impacts on the surrounding residential neighborhoods from eroding soils, sediment transport, increased storm water runoff, and localized flooding; and (i) impairment of the natural viewshed due to changes in local topography, the deterioration of the coastal bluff, and the imposition of structures on the viewshed that includes the bluff and the beachfront at the Great Peconic Bay. (S125, at 50–51.)

(B) IMPACTS TO WATER RESOURCES

Potential short-term (construction-related) adverse impacts to water resources from the construction of a casino complex at Westwoods during construction include the following: (a) off-site sediment transport resulting in sedimentation of sur-

rounding surface waters including the nearshore area of the Great Peconic Bay, degrading water quality of affected surface waters and adversely affecting aquatic habitats, recreational uses, and aquaculture; (b) deposition of eroded sediments on adjacent properties resulting in drainage and aesthetic/landscaping problems that can be costly for homeowners to address; (c) discharge of petroleum products stored in tanks (*e.g.*, diesel fuel for construction vehicles and gasoline for other machinery) and 55–gallon drums (*e.g.*, lubricating oils), solvents in containers up to 55–gallons in size for parts cleaning and related machinery maintenance, as well as cleaning agents, paints, thinners, and other materials containing solvents, all of which are subject to leaks, spills, and general releases thereby impacting surface and ground water quality and aquatic habitats on- and off-site; and (d) impacts on tidal wetlands and buffer along the Great Peconic Bay shoreline, including removal of wetland vegetation and habitat, and erosion and sedimentation. (S125, at 52–53.)

Potential long-term impacts to water resources from the operation of a casino complex at Westwoods include the following: (a) because of the significant amount of impervious surfaces (*e.g.*, parking lots, buildings, sidewalks, and paved areas), reduced opportunities for rainfall and snowmelt to percolate to ground water to recharge the aquifer; (b) an increase in runoff with the potential to negatively impact surface water quality; (c) increased nutrient loading of nearby surface waters, including the Peconic Bay Estuary, due to increases in storm water runoff at the site from the increase in impervious surfaces; (d) modifications to the existing floodplain elevation along the Great Peconic Bay shoreline and construction of facilities within the designated flood zone altering the conveyance of floodwaters that can result in flooding of adjacent lands and

destabilization of the coastal bluffs; (e) direct (*i.e.*, filling) or indirect (*i.e.*, disruption of drainage patterns and hydraulic inputs) impacts on nearshore wetland habitats and associated values and functions; (f) increased instability of the bluff resulting in sedimentation of surrounding surface waters including the nearshore area of the Great Peconic Bay, degrading water quality of affected surface waters, and adversely affecting aquatic habitats, recreational uses and aquaculture; (g) removal of wetland vegetation and wetland habitat erosion and sedimentation, and permanent damage to wetland functions and values; and (h) increase in the contribution of toxic compounds to surface waters, including the Peconic Estuary, due to the use of toxic substances at Westwoods. (S125, at 53–54; Tr. 1846–47.)

### (c) Impacts to Air Resources (Non-Traffic Related)

Potential adverse long-term impacts on air resources include emissions from the following: (a) natural gas or fuel oil fired boilers; (b) emergency/standby generators; (c) motors associated with fire pumps; (d) heating, ventilation, and air conditioning ("HVAC") systems; and (e) off-site power generating facilities required to provide electricity to the site. (S125, at 56.)

### (d) Impacts to Biological Resources

Potential short-term (construction-related) adverse impacts on biological resources (other than fish, shellfish, and bay biota) from the construction of a casino complex at Westwoods include the following: (a) short-term displacement of species during construction phase activities; and (b) loss of wildlife food and cover, as well as disruption of normal nutrient cycling during construction activities. (S125, at 60.)

Potential long-term significant adverse impacts on biological resources (other than

fish, shellfish, and bay biota) from the operation of a casino complex at Westwoods include the following: (a) the permanent loss of maritime pitch pine dune woodland habitat at Westwoods, which has been identified as being rare, (SI), and especially vulnerable to extinction in New York; (b) habitat modifications and/or degradation due to vegetative clearing and removal of trees (including trees 90 to 110 years old); (c) loss of habitat (maritime oak forest) identified as having limited acreage, (S3), or vulnerable to extinction, (S2), in New York; (d) removal, significant reduction, or segmentation of the coastal, transitional, and/or woodland zones characterizing Westwoods; (e) loss of diverse habitats on Westwoods, several of which are fragile, not well-represented in New York, and subject to extinction; (f) introducing of "edge" habitat along the perimeter of the clearing that will facilitate the incursion of undesirable species into the interior portions of the woodland areas, resulting in the displacement of native birds; (g) degradation of important coastal habitats and consequent impacts due to construction and operation of gaming-related facilities and influx of a significant concentration of people (casino patrons) along the Great Peconic Bay shoreline; (h) increased development pressures of Town lands from businesses that provide support to the casino development (such as suppliers, vendors, maintenance and repair, and business support) or businesses that will leverage the casino operations for their own gain (such as other entertainment, restaurant, hotel, retail, or service ventures). (S125, at 61; S226, at 3; Tr. 1848, 1957–58.)

The lights, noise, and activity associated with the use of a casino complex at West-

woods will further disturb the wildlife in any remaining woodlands, further degrading the woodlands' value as a habitat. (S226, at 4.)

### (E) Impacts to Land Use

Potential long-term adverse impacts related to land use from the operation of a casino complex at Westwoods include the following: (a) reductions in the residential quality of life in areas surrounding Westwoods resulting from lighting, noise, traffic, litter, the presence of multi-story buildings, the absence of buffers, and other operational characteristics of a casino; (b) impairment of the area's rural character resulting from, among other things, the daily assembly of a large number of people on the surrounding streets and increased commercialization; (c) increased potential for accidents, and increased dust and vehicle air emissions that can adversely affect the health, safety, and welfare of the existing, surrounding residents; (d) loss of the ability for the Town to manage its finite infrastructure resources consistent with the Comprehensive Plan; (e) loss of a vegetative buffer between Westwoods and adjacent residential land uses; and (f) increase in ambient noise in the adjacent residential neighborhoods from truck and other vehicular traffic. (S125, at 63–64; Tr. 1848–50.)

### (F) Impacts to Community Services

#### I. Fiscal Impacts

The daily number of employees at a 130,000 sf. casino (with an additional 32,500 sf. as "back of house" space) at Westwoods, with related hotels and related facilities, are to be estimated between 3,227 and 4,927, with approximately one-third of the employees on site at one time.[38] (S16,

---

38. As noted above, it was estimated that the 130,000 sf. casino would also include 32,500 sf. for "back of house" space. As discussed

*supra,* based upon the expert evidence offered at trial, the Court concludes that a casino of

at ix and 4 (Table 3).) The daily number of visitors at a 130,000 sf. casino at Westwoods with related hotels and related facilities is estimated to be between 17,994 and 35,000. (S16, at ix, and 4 (Table 3).) The total daily population at a casino that would be built at Westwoods is estimated to be between approximately 21,000 and 40,000, with between approximately 10,500 and 19,500 persons present at any one time. (S16, at ix and 4 (Table 3).)

If the Nation exercises exclusive sovereignty over Westwoods, no revenue to the Town will be generated by local taxes during the operation of a casino at Westwoods, although Town costs for the provisions of local services will increase. (S16, at viii, 3, 34.) The total cost of municipal services for the Town are likely to increase by $21.1 million if a 130,000 sf. casino with related hotels and facilities operates at Westwoods over a build-out period of 4 and one-half years and the first 1 and one-half years of operation. (S16, at xiii, 2, 34–38.) For example, the total cost of municipal services for the HBWD and Ambulance District are likely to increase by over $5.3 million if a 130,000 sf casino with related hotels and facilities operates at Westwoods over a build-out period of 4 and one-half years and the first 1 and one-half years of operation. (S16, at xiii, 36–37.) Moreover, the total cost of State Police services is estimated to increase by over $2.1 million if a 130,000 sf. casino with related hotels and related facilities operates at Westwoods over a build-out period of 4 and one-half years and the first 1 and one-half years of operation. (S16, at xiv, 38.)

II. OTHER IMPACTS RELATING
TO COMMUNITY SERVICES

The operation of a casino complex at Westwoods, the influx of a significant

this size certainly would be economically feas-

amount of people to one site, the increased traffic congestion on local roads (discussed *infra*), and the incompatible nature of the proposed use with the surrounding existing residential uses will cumulatively result in the increased need for emergency services including the following: (a) police and security services to respond to emergency situations including theft/burglary, drunk driving, underage drinking, noise complaints, and trespass on adjacent residential properties; (b) police and security services to manage potential conflicts between users of the gaming facilities and adjacent landowners; (c) police and emergency services associated with increases in traffic accidents; (d) police services associated with managing traffic flow; (e) emergency services associated with responding to health-related emergencies at Westwoods; and (f) emergency services associated with fighting fires (including potential multi-floor fires) at Westwoods. (S125, at 66, 77; Tr. 1851.)

(G) IMPACTS TO POTABLE WATER
SUPPLIES AND DISTRIBUTION

The existing water transmission network is unable to support necessary fire flow demands. (S125, at 67.) Development of a casino at Westwoods would significantly increase potable water demand. (S125, at 68.) The current system pumping capacity of 6.7 million gallons per day ("MGD") cannot accommodate a Westwoods casino development. (S125, at 67–68.) The existing water transmission system, consisting of combinations of 4–inch, 6–inch, 8–inch, 10–inch, and 12–inch diameter mains, depending on which water supply pump stations may be providing water at any given time, will not support a seasonal population water demand with the addition of a casino at Westwoods. (S125, at 68.)

ible at Westwoods.

Modifications to the HBWD's existing water supply, storage, and conveyance system would be necessary to support a casino at Westwoods. (S125, at 68; Tr. 1902–03, 3300–01.) Potential long-term adverse impacts from modifications of the HBWD's existing water supply, storage, and conveyance system include the following: (a) localized drawdown of ground water elevations and increased salt water intrusions from pumping of an on-site well supply or increased pumping of existing municipal supplies to meet Westwoods's water demands; (b) increased cost of potable water supply resulting from the cost of new well sites, acquisition of buffer areas around well sites, pipes, and related equipment necessary to pump and convey additional supplies of potable water; and (c) reduced groundwater supplies for use as potable water for uses other than the casino at Westwoods. (S125, at 14, 68; Tr. 1923–24.)

Potential adverse impacts from the construction and use of an on-site water supply source (*i.e.*, well(s) and a storage facility (for fire flows)) to provide potable water for a casino include the following: (a) increased intrusion of salt-water into the Upper Glacial aquifer, thus limiting its usefulness as a source of water supply for the HBWD; (b) localized drawdown of ground water due to pumping of an on-site well supply; (c) impairment of the area's viewshed resulting from the installation of a water storage tank; (d) additional site clearing associated with constructing water supply facilities; (e) additional security measures associated with protecting water supply; and (f) additional treatment chemicals on site and increased potential for spills associated with water treatment. (S125, at 68.)

(H) WASTEWATER TREATMENT IMPACTS

Operation of a 130,000 sf. casino at Westwoods will require the construction and operation of a wastewater treatment facility capable of handling a design wastewater peak flow rate of 1.44 MGD with effluent discharges to either groundwater or surface waters. (S125, at 69.)

Because estimated sewage flows exceed the maximum population density equivalent flow rate of approximately 46,200 gallons per day that could be treated using an on-lot subsurface septic system, a wastewater treatment facility will be necessary in order to prevent contamination of groundwater or surface waters if a 130,000 sf. or a 300,000 sf. casino were to operate at Westwoods. (S125, at 69.)

If a casino of 130,000 sf. or larger were opened at Westwoods, the potential long-term environmental impacts of a discharge to groundwater or surface waters, even with a wastewater treatment plant, include the following: (a) reduction in groundwater and surface water quality resulting from the discharge of nutrients and oxygen-demanding substances and disinfectants, which are residual in the treated wastewater; and (b) increased likelihood of algal blooms due to nutrient discharges to nearshore waters. (S125, at 69.)

(I) SOLID WASTE IMPACTS

Potential adverse environmental impacts associated with the collection, on-site storage of solid wastes, and subsequent hauling to offsite transfer/disposal facilities from a casino complex at Westwoods include the following: (a) generation of odors from stored solid wastes causing nuisance conditions to neighboring residential properties; (b) visual impairment due to litter generated by visitors and wastes dropped along local roads; (c) increased noise resulting from the operation of solid waste compactor units and trucks hauling solid wastes to off-site transfer/disposal facilities; and (d) potential for increased numbers of vermin (*i.e.*, rodents

and insects) and resultant health and safety issues. (S125, at 73.)

### (J) AESTHETIC IMPACTS

Short-term and long-term aesthetic impacts from construction and operation of a casino complex at Westwoods include the following: (a) encroachment on setbacks and height restriction exceedances typically applied to residential areas (if there is maximum build-out); (b) visual impacts on the coastal bluffs and scenic highway (Sunrise Highway); (b) significant changes in the viewshed from the Great Peconic Bay; (c) significant loss (if not elimination) of the tree buffer between the Westwoods site and adjacent residential land uses; (d) increased noise due to significant traffic increases on Newtown Road and Sunrise Highway; (e) increased noise due to day-to-day operations such as deliveries and workers' entering and exiting the establishment; (f) increased noise due to building HVAC units and restaurant exhaust fans; (g) irreversible changes to the neighborhood and Town community character; (h) light pollution from facility and parking lot lighting; and (i) noise from facility patrons. (S125, at 75–76.)

### (K) IMPACTS FROM ENERGY INFRASTRUCTURE CONSTRUCTION AND OPERATION

Potential adverse short-term and long-term impacts from the construction of electrical transmission lines to the site to provide the necessary energy needs of facilities at Westwoods include the following: (a) disruption of traffic along residential roads during construction causing potential congestion, as well as safety issues (*e.g.,* traffic accidents and injuries); (b) particulate air emissions during construction potentially resulting in visual impairment and health-related respiratory effects (*e.g.,* asthma and reduced lung capacity); (c) increased noise impacts on neighboring residential properties during construction; (d) additional growth inducing aspects and

associated impacts from increasing electrical capacity to the area; (e) impairment of the area's viewshed due to overhead power lines and poles; and (f) traffic disruption during routine maintenance of the power lines and poles. (S125, at 56, 71–72.)

Potential adverse long-term impacts from the extension of a natural gas supply line to Westwoods to provide for on-site natural gas and the operation of a cogeneration facility in lieu of extension of high power lines include the following: (a) an increase in the localized area of criteria air pollutants including carbon monoxide ("CO"), hazardous air pollutants ("HAPs"), greenhouse gases such as nitrogen oxides ("NOx"), particulate matter equal to or less than 10 microns ("PM10"), sulfur dioxide ("SO2"), and volatile organic compounds ("VOCs"); (b) ground level ozone formation as a result of NOx, VOC, and CO emissions; (c) visibility impairment impacts as a result of NOx and SO2 emissions; (d) acid rain impacts as a result of NOx and SO2 emissions; (e) traffic disruption for routine maintenance of the natural gas lines; and (f) additional growth-inducing aspects and associated impacts from increasing natural gas capacity to the area. (S125, at 57–58.)

Potential adverse long-term impacts from the operation of on-site storage of distillate oil and an on-site distillate oil-powered cogeneration facility, such as a No. 2 fuel oil powered cogeneration facility, include the following: (a) an increase in the localized area of criteria air pollutants including CO, HAPs, NOx, PM10, S02, and VOCs; (b) ground level ozone formation as a result of NOx, VOC, and CO emissions; (c) visibility impairment impacts as a result of NOx and S02 emissions; (d) acid rain impacts as a result of NOx and S02 emissions; (e) potential for spill or leaks of fuel oil during storage tank re-filling operations; (f) potential for spill or leaks from

the storage tanks during normal facility operations or catastrophic failure; (g) potential contamination of surface and ground water resources due to spills or leaks; and (h) roadway congestion and safety concerns due to daily trucking of fuel oil deliveries on residential roads in order to access the site. (S125, at 58.)

### (L) Traffic-Related Impact

As set forth below, the Court concludes that the operation of a casino at Westwoods would have substantial disruptive impacts on the community due to increased traffic.

### 1. Traffic Analysis

The engineering firm of Greenman–Pedersen, Inc. ("GPI") was retained by the State to conduct an analysis of the traffic impacts that would be created by the construction and operation of a casino complex at Westwoods. (S108, at 2; Tr. 1519.) The traffic impact analysis was conducted by the Transportation Service Division of GPI, headed by Michael J. Salatti, a Professional Engineer and a Professional Transportation Operations Engineer. (S108, at 2; Tr. 1510–11, 1514, 1519.) The Court found this analysis to be credible and reliable in determining potential traffic impact and the results of that study are summarized below. In analyzing the traffic impact of a proposed land use, traffic engineers assume a "reasonable-worst-case" scenario in order to ensure that all the actual impacts are assessed and addressed.[39] (Tr. 1528, 1530.) In order to analyze a "reasonable worst-case" scenario, GPI analyzed the traffic impacts of a casino complex at Westwoods during the peak traffic hours in the peak summer season. (S77, at 6–7.)

### 2. 2006 (Baseline) Traffic

Traffic on the east end of Long Island has been growing progressively slower and more congested since the 1990s. (Tr. 1438–39.) People driving to the Hamptons from the New York City area take the Long Island Expressway to CR 111 to SR 27 as the preferred route. (Tr. 1445–46, 1449.) There currently is congestion on CR 111 during the peak periods of Friday afternoon and Saturday morning going eastward and Sunday afternoons and Monday mornings going westward during the months of April through October, and particularly heavy congestion in the months of July and August during such periods, and including Thursday nights going eastward. (Tr. 1449–50.) The Hamptons Bottleneck is where SR 27 becomes CR 39 going eastward near the intersection of SR 27/CR 39 and North Road. (Tr. 1452–53.)

The Town has legitimate concerns that changes to improve traffic on SR 27/CR 39 and to relieve the traffic at the Hamptons Bottleneck have created safety problems. (Tr. 1458–59.) In addition, congestion on SR 27 and CR 39 east of Southampton has not been relieved by measures addressing congestion at the Hamptons Bottleneck. (Tr. 1459–60, 1468.)

Traffic at the traffic circle on SR 24 is very heavy with severe congestion in various directions along the circle's entry points. (Tr. 1448.) There are backups and heavy traffic blocking SR 24 leading to the intersection of SR 24 and Old Montauk Highway. (S95, at 31–33; Tr. 1464–65.)

The roads around Westwoods are smaller, winding residential roads without shoulders and curbs and usually without sidewalks and street lights, and are inappropriate for travel by tour buses. (Tr.

---

**39.** GPI's analysis is contained in an initial report and an addendum to that report. (S77; S108.) GPI also prepared a rebuttal report addressing the analysis of defendants' experts. (S95.)

1466–67.) GPI analyzed current traffic impacts in the vicinity of Westwoods in April and June of 2006. The primary study area included roadways close to the project site that would receive the maximum number of vehicle trips generated by the proposed casino complex at Westwoods. The secondary study area encompassed locations further from the site and included major intersections, ramps, weaving areas, and corridors on roads from the New York. City metropolitan area to Westwoods. (S77, at 7–9.)

### 3. BUILD CONDITION 2010 (TRAFFIC IN 2010 WITH CASINO COMPLEX AT WESTWOODS)

The traffic volume estimated for the "2010 Build Condition" consists of traffic capacity without a casino complex (the "No–Build 2010 Condition") on the primary and secondary street network [40] plus the new traffic generated by operation of a casino complex at Westwoods for the Friday and Sunday PM peak traffic hours during the peak summer season. (S77, at 26.) GPI assumed the following elements of a casino complex at Westwoods when calculating vehicle traffic generated by its operation: (a) casino (130,000 sf. with 4,785 gaming positions); (b) theater (50,000–60,000 sf. with 3,000 seats); (c) retail (75,000 sf.); (d) casino hotel (600 rooms, 4 stories); (e) casino hotel (400 rooms, 6 stories); (f) spa (25,000 sf.); (g) convention center (50,000 sf.); (h) temporary casino (21,600 sf.); (h) free-standing hotels (604 rooms); and (i) free-standing restaurants (500 seats). (S77, at III and 27.)

In 2010, the casino complex at Westwoods would generate about 39,681 new daily vehicle trips during a typical peak season Friday and about 47,292 new daily vehicle trips during a typical peak season Sunday. (S108, at 11.) During peak traffic hours, the increase in vehicular activity would include 3,009 new vehicle trips during a summer Friday peak hour and about 3,689 new vehicle trips during a summer Sunday peak hour. (S108, at 11.) [41]

### 4. TRAFFIC CAPACITY ANALYSIS

GPI considered two alternates in determining the traffic impacts from a casino complex at Westwoods. (S77, at 36.) In "Build Alternate 1," GPI assumed that Westwoods cannot be directly accessed from Sunrise Highway and vehicles traveling to the casino complex on Sunrise Highway would have to use either Exit 65 or Exit 66 and then travel along the local roadways, including North Highway, Newtown Road (CR 62), Squiretown Road, and Montauk Highway (SR 27A), to reach Westwoods. (S77, at 36–37; Tr. 1522.)

In "Build Alternate 2," GPI assumed that ramps would be built from Sunrise Highway to Westwoods. One ramp would provide direct access for eastbound traffic on Sunrise Highway (SR 27) to Westwoods, one ramp would provide direct access for westbound traffic from Westwoods to the Sunrise Highway, and one ramp would provide direct access for westbound

---

**40.** To estimate traffic impacts in the 2010 No–Build Condition, GPI assumed that the casino complex at Westwoods would begin operating in 2010 and a traffic growth rate of 2% per year was assumed based on a stipulation between the parties that traffic would grow at a yearly rate of between 2 and 2½ percent. Based on this growth rate, GPI assumed that traffic volumes in 2010 would be 8 percent higher than in 2006. (S77, at 19; Tr. 1551–52.)

**41.** With respect to defendants' traffic volume estimates, the Court finds a number of flaws in the methodology used by defendants' expert, Mr. Rittvo, including the use of a gravity model to generate trips to a particular land use (rather than vehicle counts at similar land uses), which resulted in a significant disparity in his trip rates when compared to ten published studies of casino traffic generation. (S95, at 3–5; D328, at 49–51; Tr. 3772–73.)

traffic on Sunrise Highway from east of the Shinnecock Canal to Westwoods. (S77, at 37; Tr. 1578–80.) Visitors to the casino complex from east of the Shinnecock Canal would have to return on local streets. (S77, at 37.)

GPI conducted traffic capacity analyses for the two alternates using SYNCHRO and HCS software. The traffic impacts of the Westwoods casino complex were assessed by comparing traffic impacts in the No–Build 2010 Condition with Build Alternates 1 and 2. (Tr. 1547–52.) These analyses resulted in the following data: Eight of the nine signalized intersections analyzed would be operating under constrained traffic conditions during either the Friday and Sunday peak traffic hours under both Build Alternates 1 and 2, but the impacts would be more severe under Build Alternate 1. Of the eight intersections, four would be operating under constrained conditions during both Friday and Sunday peak hours, two would be operating under constrained conditions on Friday only, and the other two would be operating under constrained conditions on Sunday only. (S108, at capacity analysis summary tables; Tr. 1585–87.) Twelve of the fifteen unsignalized intersections would be operating under constrained traffic conditions in Build Alternate 1. Eleven intersections will be operating under constrained conditions during both the Friday and Sunday peak hours and one will be operating under constrained conditions only during the Sunday peak hour. Five unsignalized intersections will be operating under constrained traffic conditions under Build Alternate 2 during both Friday and Sunday peak hours. (S108, at capacity analysis summary tables.) The off-ramp at westbound Sunrise Highway (SR 27) and northbound CR 111 would be operating under constrained traffic conditions under both Build Alternates 1 and 2. In addition to this ramp, Build Alternate 2 would also result in traffic constraints at the off-ramp at westbound Sunrise Highway (SR 27) and northbound Route 24 operating at the lowest level of service. This ramp would not operate under constrained conditions under the No–Build 2010 Condition. (S108, at capacity analysis summary tables.) The freeway weaving segments at Sunrise Highway (SR 27) westbound between NYS Route 24 On/Off ramps would operate under constrained traffic conditions under both Build Alternates 1 and 2. (S108, at capacity analysis summary tables.) Based upon the data, GPI concluded:

> These capacity constraints and delays associated with the proposed project would have a negative cumulative impact on the overall traffic operations of the surrounding roadway network. Thus, the individual delays and queues at intersections would collectively result in a gridlock situation under Alternate 1 and significantly high traffic impacts under Alternate 2, when compared to the No–Build 2010 Conditions. The local streets would be unable to accommodate the newly added traffic under these conditions.... In summary, the analyses conducted for this assessment have indicated, even under the reasonable scenario we have assumed, that the traffic impacts imposed upon the existing road network would be overwhelmingly significant, imposing lengthy delays, creating extraordinary queues and resulting in degradation of safety.

(S77, at V.)

5. DEFENDANTS' TRAFFIC EXPERT

As a threshold matter, because defendants' traffic analysis expert, Sam Schwartz, used project-generated traffic volumes for his traffic impact analysis from Mr. Rittvo (Tr. 3771, 3780), the reliability of Mr. Schwartz's analysis is un-

dermined by the flaws in Mr. Rittvo's estimates. There are also flaws in the defendants' traffic impact analysis (S95, at 24–48), which the Court believes further contribute to an underestimation of the traffic impact by a casino at Westwoods.

In any event, Mr. Schwartz conceded that, in analyzing the casino currently proposed by the defendants (with 1,310 gaming stations and no hotel), certain traffic engineering changes would need to be made in order for traffic to operate at a "reasonable" level, such as upgrading or introduction of traffic signals, and some redesign of several intersections. (D320, at 5–6; D321, at 1; Tr. 3541.) Although he classifies these improvements as "routine," it is far from clear that these modifications will not implicate other traffic issues and considerations, or that they will necessarily alleviate the problems caused by the additional traffic. (S95, at 40–45.)

Moreover, Mr. Schwartz conceded that traffic generated by the casino in the constrained scenario (with 3,000 gaming stations and a 450–room hotel) and the unconstrained scenario (with 6,500 gaming stations and a 1,000–room hotel) would cause unreasonable disruption in the area of Westwoods in the absence of direct access ramps from Sunrise Highway to the casino. (Tr. 3935–37.)

Defendants presented no evidence concerning when, by whom, or at whose cost improvements described by Mr. Schwartz to any intersections intended to reduce traffic impacts would be accomplished. Moreover, there are other legal hurdles regarding the building of direct ramps to Westwoods from Sunrise Highway, which plaintiffs have failed to address. Specifically, the portion of SR 27 commonly known as Sunrise Highway, which bisects the southern portion of the Westwoods Parcel, is a New York highway. (Stipulation, dated January 16, 2007, Stip. No. 20.) There is currently no direct vehicular access to Westwoods from State Route 27. (Stipulation, dated January 16, 2007, Stip. No. 21.) Currently, the only vehicular access onto the Westwoods site from a public street is from Newtown Road. (Stipulation, dated January 16, 2007, Stip. No. 22.) None of the defendants, nor any person or agency acting on behalf of any of the defendants, has sought any authorization or permit from New York or the NYDOT alleged by the State to be necessary to build a highway or ramp connection from Sunrise Highway to Westwoods. (Stipulation, dated January 16, 2007, Stip. No. 24.) The Nation will not alienate any portion of Westwoods. (Tr. 2935, 2964.) The NYDOT will not grant a permit to any person seeking to build an access ramp from a limited access highway, such as Rt. 27, to private property unless the ramp connects to a publicly owned roadway before the private property. (S245; D361, at 75–76.) There are no public roads on the middle Westwoods parcel south of Newtown Road and north of Sunrise Highway. (D266; D274.)

### 6. Adverse Air Quality Impacts Related to Traffic

Mr. Grover of GPI prepared a Mobile Source Air Quality Report, in connection with development of a casino at Westwoods, which the Court found credible and reliable. (S200.) The purpose of the air quality assessment was to determine the impact of traffic generated by the development of a casino at Westwoods on air quality emissions in the area surrounding the property. (S200, at 4.) Highway traffic is a significant source of emissions of several air contaminants. (S200, at 4; Tr. 1933.) The pollutants emitted by automobiles and trucks consist of CO, VOCs, NOx, and particulate matter ("PM"), all of which are detrimental to human health

when they or chemicals created by them are inhaled. (S200, at 4; Tr. 1934–36.)

CO, VOC, and NOx emissions are all higher in the build condition than in the no-build condition. (S200, at 8; Tr. 1941–42.) Persons residing in and around the main travel routes to and from Westwoods would be exposed to greater amounts of CO, and to greater amounts of ozone arising from the reactions of VOCs and NOx in the atmosphere, should a casino be built at Westwoods. (S200, at 8; Tr. 2006–07.) PM emissions are higher for a casino complex at Westwoods in 2010, both with and without ramp access from Route 27, for both PM2.5 and PM10 in an amount over 40% greater than the levels expected should no casino be built. (S200, at 8.)

### 7. DISRUPTIVE TRAFFIC NOISE

GPI performed a study of the expected noise levels from traffic that would arise from the operation of a casino complex at Westwoods, which the Court found credible and reliable. (S200; S230.) The noise predictions made by GPI only consider typical vehicle noise, and do not account for the associated noise often encountered in a recreational/resort setting that a casino at Westwoods will likely create, such as loud stereos, beeping horns, etc. (S200, at 15; Tr. 1947.) GPI assigned 10 receptor locations for noise monitoring purposes on the basis of the proximity to the project and adjacent roads, and representation of the residential land use primarily found in the project area. (S200, at 10, and Figure 3; S230, at Figure 1; Tr. 1944.) GPI conducted monitoring using equipment certified by the manufacturer to meet or exceed American National Standards Institute standards for Type 1, 2 and 2A sound level meters, and which was calibrated at the beginning and end of each measurement session. (S200, at 13.)

According to Federal Highway Administration standards, traffic noise impacts from a highway improvement project occur when the predicted traffic noise levels approach or increase the noise abatement criteria, or when predicted future traffic noise levels substantially exceed the no-build levels. (S200, at 15; Tr. 1944–45.) The New York State Noise Analysis Policy has established that impacts occur when the predicted future traffic noise levels approach one decibel or exceed the noise abatement criteria or when the predicted future traffic noise levels substantially increase the no-build levels by six or more decibels. (S200, at 15; Tr. 1944–45.)

The predicted noise levels with an operating casino complex at Westwoods in 2010 exceed the noise levels expected in 2010 if no casino complex is built by more than 6 decibels at 6 of the 10 receptors under a Westwoods casino with no Route 27 access, affecting all of the residential development on Squiretown Road and Newtown Road north of Route 27, which includes approximately 75 single-family homes. (S200, at 14 (Table 18) and 16; Tr. 1945–46.)

### V. CONCLUSIONS OF LAW

There are several legal questions that the Court will address: (A) whether plaintiffs have demonstrated, as alleged in the causes of actions in the complaints, that the commencement of construction on Westwoods and the proposed gaming facility violates New York gaming laws and environmental laws, and the Town Code; (B) whether the Shinnecock Indian Nation's aboriginal title to Westwoods has been extinguished; (C) whether, even if the Nation holds unextinguished aboriginal title to Westwoods, plaintiffs have demonstrated that they are entitled to prevent the construction of a gaming facility under the Supreme Court decision in *Sherrill* because of the disruptive impact that will result from the Nation's assertion of sovereignty over Westwoods; (D) whether defendants can operate a gaming facility at

Westwoods in violation of New York gaming laws when such activity is not within the confines of the federal legal framework embodied in IGRA; (E) whether defendants can assert sovereign immunity as a defense; and (F) whether the requirements for permanent injunctive relief have been satisfied. The Court will address each of these issues in turn.

### A. THE CAUSES OF ACTION

As set forth below, the Court concludes that plaintiffs have demonstrated that the defendants' actions and threatened actions with respect to the construction and operation of a casino at Westwoods are not in compliance with applicable New York anti-gaming laws and environmental laws, as well as the Town Code.

### (1) NEW YORK ANTI-GAMING LAWS

With respect to the State's First Cause of Action, the State established that the Nation's planned gaming facility is not in compliance with New York anti-gaming laws. Although the New York State Constitution generally forbids gaming, it does allow certain forms of gaming, including a state lottery for education, pari-mutuel betting on horse racing, and limited charitable gaming in the form of bingo and "games of chance" conducted by religious, charitable, and certain non-profit groups. *See* N.Y. Const. art. I, § 9. Moreover, only authorized organizations that are licensed by the Board may conduct bingo and "games of chance." *See* N.Y. Gen. Mun. Law § 187. The General Municipal Law defines an "authorized organization" to "mean and include bona fide educational, fraternal or service organization or bona fide organization of veterans or volunteer firemen. . . ." N.Y. Gen. Mun. Law

§ 186(4). Furthermore, the conduct of these games is strictly regulated by New York law and regulations. *See* N.Y. Gen. Mun. Law §§ 188–a, 475; Exec. Law § 431. Unless the gaming activity is conducted pursuant to these exceptions in the New York Constitution and New York laws, gaming for profit in New York violates New York's criminal laws and is against public policy.[42] *See* Gen. Mun. Law §§ 189(14), 495–a; Penal Law § 225.30. Defendants have not obtained any authorization under New York law to conduct gaming at Westwoods.

### (2) NEW YORK ENVIRONMENTAL LAWS

With respect to the State's other causes of action, the Court concludes that the evidence at trial demonstrated that the Nation's actions and threatened actions with respect to the proposed gaming facility at Westwoods are not in compliance with New York environmental laws that are the subject of those causes of action. First, the Nation cannot operate the proposed casino without construction and operation of a sewage treatment facility that will, at least from time to time, discharge wastewater to surface or ground waters of the State from a pipe or other outfall. Accordingly, under New York law, the Nation is required to obtain a SPDES permit for the discharge of sanitary wastewater to either surface or ground waters of New York. *See* 6 N.Y.C.R.R. § 750–1.5(a)(4) (stating SPDES permit needed for discharges in excess of 1,000 gallons/day); 6 N.Y.C.R.R. § 750–1.14(c) (stating SPDES permit must be obtained before construction of wastewater treatment plant begins).

Similarly, under New York law, the Nation is also required to file for coverage

---

**42.** In 2001, the New York Legislature repealed in part the *per se* exception for slot machines. The use of slot machines, however, remains prohibited unless it is approved by the Board as an authorized "game of chance" or it is included in a State–Tribal Compact executed in accordance with federal law. *See* N.Y. Gen. Mun. Law § 186(3); N.Y. Penal Law § 225.30; 9 N.Y.C.R.R. § 5620.1.

under the SPDES General Permit for Stormwater Discharges for Construction Activities pursuant to N.Y. Envtl. Conserv. Law ("ECL") § 17–0807(4) and 6 N.Y.C.R.R. § 750–1.21(b) (2), by submitting a NOI certifying completion of a SWPPP that meets all of the DEC's technical requirements for erosion and sediment control. Thus, the Nation would be required to implement the SWPPP pursuant to the general permit and the NOI is required to be filed before the start of any construction activities. The Nation has not submitted an NOI to the DEC.

Furthermore, the issuance of the SPDES permit is also subject to an environmental review under SEQRA, which requires that an environmental review of an agency's proposed action occur before the action is undertaken. *See, e.g., Tri-County Taxpayers Ass'n v. Town Bd. of Queensbury*, 55 N.Y.2d 41, 45–46, 447 N.Y.S.2d 699, 432 N.E.2d 592 (1982). In this case, the action would be the construction of a water treatment facility. Thus, the issuance of necessary governmental permits for the proposed casino are agency actions subject to SEQRA, and no permits can issue before the required environmental review has been completed. ECL § 8–0109(2). As stipulated by the parties, "the development of a gaming facility at the Westwoods Parcel would likely to be a Type I action, a type of activity identified in 6 N.Y.C.R.R. Part 617.4 as being likely to require the preparation of an EIS; if the lead agency determines that the proposed action may result in at least one

potential significant adverse impact, it would issue a positive declaration to that effect in accordance with 6 N.Y.C.R.R. Part 617.7." (Stipulation, dated January 16, 2007, at ¶ 25.) Given the potential environmental impacts, the preparation of an EIS to identify, and then propose mitigation of, environmental impacts would be necessary before construction could commence on a casino in accordance with state law. *See Chinese Staff & Workers Ass'n. v. City of N.Y.*, 68 N.Y.2d 359, 366 n. 7, 509 N.Y.S.2d 499, 502 N.E.2d 176 (1986) (holding that unlike NEPA, SEQRA requires EIS whenever there may be significant effect on environment). Violations of New York's environmental laws are subject to suit for injunctive relief pursuant to ECL § 71–1931. *See also* ECL § 71–1929 (holding that violators of ECL article 15, titles 1 through 11, "may be enjoined from continuing such violation").[43]

In the instant case, the Nation has stipulated that it has not even applied for any environmental permits from New York and has not commenced any aspect of the required SEQRA review. (Stip. No. 52; Stipulation, dated January 16, 2007, at ¶ 1.) Accordingly, the Nation's actions concerning the construction of the casino, and their threatened actions, are in violation of New York's environmental laws.

### (3) Town Code

With respect to the Town's causes of action, the Court concludes that the Town has established that the Nation's actions and threatened actions, in connection with the development activities and planned use

---

43. The State's Complaint also includes a cause of action asserting that defendants could not build a casino with a new well whose pumping capacity exceeded forty-five gallons per minute and thus was proposing to build a casino which would draw ground water in violation of ECL § 15–1527. ECL § 15–1527 imposes permit requirements whenever any person proposes to build such a well. *See* ECL § 15–1527(2). The State's environmental expert concluded that on-site wells could not supply a sufficient amount of potable water. (S125, at 68.) In any event, if the Nation should propose substituting such wells for water supplied by the HBWD, the Nation then would be in violation of that provision of state law.

of Westwoods for a casino facility, violate the provisions of the Town Code set forth in the causes of action.

Section 330–184 (subdivision I) of the Southampton Town Zoning Law provides that "no regrading, clearing, tree removal or any other work in preparation of future use of a site may take place until site plan approval or written permission has been received from the Planning Board." (T267.) None of the site preparation activities in which the Nation engaged on or about July 12, 2003 was preceded by any application or request for, or issuance of, site plan approval or written permission of the Southampton Planning Board, as required by Section 330–184(1) of the Town Code. Thus, these July 12 activities were not in compliance with Section 330–184 of the Town Code.

Similarly, under section 325–6, subdivision A of the Town Code, a permit must be obtained to develop land within 200 feet of wetlands. Such development includes the clearing of natural vegetation, grading, excavation, placement of fill, building, structural changes, the installation of any manmade structure, planting, and landscape activities. (Tr. 277–28.) The northern parcel of Westwoods contains or lies adjacent to wetlands, as the Great Peconic Bay system is regulated as wetlands under Chapter 325 of the Southampton Town Code. Thus, any development of Westwoods within 200 feet of the wetlands on its northern boundary also would implicate Chapter 325 of the Town Code.

In addition to the violations of the specific Town Code sections referenced in the Complaint, the Town also established at trial defendants' violations of Town Code §§ 330–6 and 330–10, regarding zoning, as well as Town Code § 123–9A. First, the operation of a gaming casino is not a permitted use at Westwoods, which is zoned R60, according to Section 330–6 of the Town Zoning Law, and the related "Residence Districts Table of Use Regulations," set forth in Town Zoning Law Section 330–10. (T267.) As a R–60 designated parcel, Westwoods is limited to single-family residential use. (Tr. 114, 245; T267.) A gaming casino is not a permitted use in an R–60 zone, or in any other residential zone. In addition, the operation of a casino has not been identified as a "permitted" or "special exception" use within any "County Residence" or "Residence" zoning districts in the Table of Use Regulations appearing at § 330–10 of the Town of Southampton Zoning Law. (T267.) In fact, a gaming casino is not a permitted use anywhere in Southampton, and is not otherwise authorized in any respect by the Town. (Tr. 245–46; T267.) Thus, the Town has demonstrated that the Nation's proposed casino development violates the Town's zoning law as set forth in Section 330–6 and the related "Residence Districts Table of Use Regulations" as set forth in Section 330–10. (Stip. No. 48.)

To the extent that defendants suggest that Westwoods was "unzoned" because the current Town Zoning Map references Westwoods as "Ind–Res," the Court rejects that argument. Despite the lack of a designated zoning classification for Westwoods on the current version of the Town zoning map, the Town has classified the Westwoods parcel as residential property in 1957, 1972, 1984, and 1986, and has never taken any of the steps required to effectuate a change in that classification since 1986. Thus, there is no question, from a legal standpoint, that the Town has zoned Westwoods as residential and any references on the zoning map have no legal implication. *See, e.g., Paradis v. Town of Schroeppel,* 289 A.D.2d 1027, 735 N.Y.S.2d 278, 278 (N.Y.App.Div.2001) (invalidating town board resolution purporting to amend town zoning code provision); *accord No-*

*ghrey v. Town of Brookhaven*, 214 A.D.2d 659, 625 N.Y.S.2d 268, 268 (N.Y.App.Div. 1995); *Naftal Assocs. v. Town of Brookhaven*, 221 A.D.2d 423, 633 N.Y.S.2d 798, 798 (N.Y.App.Div.1995); *Rockland Props. Corp. v. Town of Brookhaven*, 205 A.D.2d 518, 612 N.Y.S.2d 673, 673 (N.Y.App.Div. 1994).

The Court also rejects any argument by the defendants that the Town should be estopped from enforcing any zoning regulation because of its failure to place the designation on the current zoning map or because of a failure to enforce it. As a threshold matter, the Second Circuit has held that "principles of laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow." *LaTrieste Rest. & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994); *see also Parkview Assocs. v. City of New York*, 71 N.Y.2d 274, 282, 525 N.Y.S.2d 176, 519 N.E.2d 1372 (1988) (holding that " '[e]stoppel is not available against a local government unit for the purpose of ratifying an administrative error,' " and such an administrative error does not confer rights contrary to the zoning laws) (quoting *Morley v. Arricale*, 66 N.Y.2d 665, 667, 495 N.Y.S.2d 966, 486 N.E.2d 824 (1985)). In any event, even if applicable, defendants' estoppel argument also fails on the merits. First, Shinnecock Trustees Gumbs and Eleazer acknowledged they were aware that Westwoods was assigned a zoning classification by the Town. (Tr. 2943; S249, at 12, 98–99.) In fact, the Nation made an unsuccessful request to remove such classification in 1985. Thus, the Nation has been aware of the residential classification. Second, any argument that the Town should be estopped because it failed to enforce the zoning law is also factually flawed because, prior to the Nation's July 2003 activities, Westwoods had essentially remained in its natural state as a woodlot and, therefore, there

was no reason for the Town to seek to enforce any provision of the Town Code or zoning laws prior to that time.

In addition to the zoning issues, the Town Code requires a Town-issued building permit to be issued in order to construct a commercial structure within Southampton. *See* Town Code 123–9. There is no question that the proposed construction of the casino facility at Westwoods would require the issuance of a building permit by the Town prior to the commencement of any construction or site preparation activities. Here, before commencing its site preparation activities, the Nation did not obtain a building permit. Thus, the activity at Westwoods violates Section 123–9 of the Town Code.

Defendants essentially concede that they have not complied with these New York and Town laws and have not obtained the various approvals and permits that would be required to construct and operate a gaming facility in New York and Southampton. The Nation's position is that it is immune from these laws and legal requirements because Westwoods is tribal land over which the Nation holds unextinguished aboriginal title and it is to this legal issue that the Court now turns.

### B. ISSUE OF EXTINGUISHMENT OF ABORIGINAL TITLE

■ Defendants argue that the construction and operation of a casino at Westwoods is immune from New York and local laws and regulations because the Nation holds unextinguished aboriginal title to Westwoods. In particular, at paragraph 16 of their Answer to the Town's Complaint, defendants

> Admit that none of Defendants has applied for or received any permit or approval from the Town of Southampton and aver that the Town of Southampton has no jurisdiction over the

Westwoods Parcel and has no power or right to enforce any part of the Code of the Town of Southampton or any other local law or regulation of the Town of Southampton within Shinnecock tribal lands or, specifically, within the Westwoods Parcel.

(Defs. Ans. to Town Complaint, at ¶ 16; *see also* Defs. Ans. to State Complaint, at ¶¶ 54, 59.) Similarly, defendants concede that the Gaming Authority "has not submitted any document to the DEC and aver that this agency of the State of New York has no right or power to require any of the Defendants to obtain any license or permit for activities on Shinnecock tribal lands or to regulate or interfere with any activities on Shinnecock tribal lands." (Defs. Ans. to State Complaint, at 158.)

Defendants' position on this issue is contained in the Third Affirmative Defense to the Town's claims:

> Under the Constitution and laws of the United States and federal common law, neither the Town of Southampton or any other municipal corporation in the State of New York, including any county in the State of New York, has any right or power (a) to require the Shinnecock Indian Nation or any of its instrumentalities or affiliates to obtain a license, permit or any other form of permission prior to conducting any of the activities sought to be enjoined by the Complaint; or (b) to interfere with the right of the Shinnecock Indian Nation or any of its instrumentalities or affiliates from engaging in any of those activities or, in particular, from engaging in gaming or gambling activities on Shinnecock tribal lands.

(Defs. Ans. to Town Complaint, at 8, 9.) The virtually identical Third Affirmative Defense is contained in the Defendants' Answer to the State Complaint. (*See* Defs. Ans. to State Complaint, at 13.)

As analyzed in detail below, the Court concludes that the evidence at trial established in a clear and convincing manner that the Nation's aboriginal title to the Westwoods land was extinguished in the 17th century and, thus, defendants' defense to the current and threatened violations of New York and local laws in construction and operation of a casino at Westwoods fails on the merits.

### (1) LEGAL FRAMEWORK FOR ANALYZING ABORIGINAL TITLE ISSUE

■ "Aboriginal title refers to the Indians' exclusive right to use and occupy lands they have inhabited 'from time immemorial,' but that have subsequently become 'discovered' by European settlers." *Seneca Nation of Indians v. New York,* 382 F.3d 245, 249 n. 4 (2d Cir.2004) (*quoting County of Oneida v. Oneida Indian Nation of N.Y.,* 470 U.S. 226, 233–34, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (*"Oneida I"*)), *cert. denied,* 126 S.Ct. 2351 (2006). In *Oneida I,* the Supreme Court explained how aboriginal Indian title derived from the doctrine of discovery, which provided that "discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use." *Oneida I,* 470 U.S. at 234, 105 S.Ct. 1245; *see also Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 279, 75 S.Ct. 313, 99 L.Ed. 314 (1955) ("After conquest [Indians] were permitted to occupy portions of territory over which they had previously exercised sovereignty.") (internal quotation marks omitted).

This "[a]boriginal title, however, was not inviolable." *Seneca,* 382 F.3d at 249 n. 4. Specifically, "Indians were secure in their possession of aboriginal land until their aboriginal title was 'extinguished' by the sovereign discoverer." *Id.; see also Oneida I,* 470 U.S. at 234, 105 S.Ct. 1245 ("[N]o one could purchase Indian land or otherwise terminate aboriginal title without the consent of the sovereign."). As the Su-

preme Court has long recognized, the sovereign "possessed exclusive power to extinguish the right of occupancy at will." *United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 46, 67 S.Ct. 167, 91 L.Ed. 29 (1946); *see also Johnson v. M'Intosh,* 8 Wheat. 543, 21 U.S. 543, 588, 5 L.Ed. 681 (1823) ("All our institutions recognise the absolute title of the crown, subject only to the Indian right of occupancy, and recognise the absolute title of the crown to extinguish that right."). "Extinguishment could occur through a taking by war or physical dispossession, or by contract or treaty ... and did not give rise to an obligation to pay just compensation under the Fifth Amendment." *Seneca,* 382 F.3d at 249 n. 4 (citations omitted); *see also United States v. Santa Fe Pac. R.R. Co.,* 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941) (holding that aboriginal title can be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise") (citation omitted).

The Second Circuit also has confirmed that, during the colonial era, Great Britain held the right of extinguishment. *See Oneida Indian Nation v. New York,* 860 F.2d 1145, 1150 (2d Cir.1988) ("*Oneida II*") ("The right to extinguish Indian title, sometimes called a right of extinguishment, was held by the sovereign-Great Britain in the period prior to the American Revolution."); *see also Seneca Nation of Indians v. New York,* 206 F.Supp.2d 448, 505–06 (W.D.N.Y.2002) ("In the period prior to the American Revolution, Great Britain, recognized as the discovering nation and sovereign after defeating the French, held both the right of extinguishment and the right of preemption of Indian lands located in the colonies. Thus, Britain had the exclusive authority to extinguish Indian title, and its underlying fee title or right of preemption was good against all other

discovering nations."), *aff'd,* 382 F.3d 245 (2d Cir.2004), *cert. denied,* —— U.S. ——, 126 S.Ct. 2351, 165 L.Ed.2d 278 (2006).

Although the sovereign clearly possesses a right of extinguishment, aboriginal title is not easily extinguished. In particular, "[i]t is well-settled that an intention to authorize the extinguishment of Indian title must be 'plain and unambiguous,' either 'expressed on the face of the [instrument] or ... clear from surrounding circumstances.'" *Seneca,* 382 F.3d at 260 (quoting *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 276, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (other citations omitted)); *see also Oneida I,* 470 U.S. at 248, 105 S.Ct. 1245 ("[C]ongressional intent to extinguish Indian Title must be 'plain and unambiguous,' ... and will not be 'lightly implied.'") (*quoting Santa Fe,* 314 U.S. at 346, 354, 62 S.Ct. 248); *Delaware Nation v. Pennsylvania,* 446 F.3d 410, 417 (3d Cir.2006) ("For extinguishment to occur, the sovereign must intend to revoke the Indians' occupancy rights.... The intent to extinguish aboriginal title must be 'plain and unambiguous' based on either the face of the instrument or surrounding circumstances.... Extinguishment cannot be lightly implied."). The foundational underpinning of this standard is the "policy of the federal government from the beginning to respect the Indian right of occupancy." *Cramer v. United States,* 261 U.S. 219, 227, 43 S.Ct. 342, 67 L.Ed. 622 (1923). Thus, given this strong policy, any ambiguity on the issue of whether aboriginal title has been extinguished must be resolved in favor of the Indian tribe. *See Santa Fe,* 314 U.S. at 354, 62 S.Ct. 248.

Moreover, in order to ensure that the extinguishment was plain and unambiguous, the Court may also consider events subsequent to any sovereign determina-

tions that may be relevant on that issue. For example, in *Absentee Shawnee Tribe of Indians of Oklahoma v. Kansas*, 862 F.2d 1415 (10th Cir.1988), the Tenth Circuit examined events subsequent to the treaty at issue to determine the intent and understanding of the Shawnee tribe:

> [T]he historical record indicates that the Shawnees understood that the Treaty entitled the Rev. Johnson to the property under the Treaty, and that they intended him to have it. This letter [from Chiefs and Council of the Shawnee Tribe of Indians] supports the conclusion that the Shawnees were fully cognizant of the effect of the 1854 Treaty in divesting their rights in the mission property. Even after the mission had discontinued providing educational services, the Shawnees clearly did not contemplate that they had any continued claim in the property. This is a case in which we cannot "ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims."

*Id.* at 1421–22 (quoting *Klamath Indian Tribe*, 473 U.S. 753, 754, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) and *Wash. State Commercial Passenger Fishing Vessel Ass'n v. U.S.*, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)); *see also Cree v. Waterbury*, 78 F.3d 1400, 1405 (9th Cir.1996) (remanding to district court to examine, among other things, the circumstances surrounding 1855 Treaty between the United States and the Yakima Tribe, and the post-Treaty conduct of parties in order to interpret the scope of rights granted by the Treaty); *Shawnee Tribe v. United States*, 423 F.3d 1204, 1220 (10th Cir.2005) (holding that courts may not ignore plain language that " 'runs counter to a tribe's later claims' "); *Cook v. United States*, 32 Fed.Cl. 170, 174 (Fed.Cl.1994) (same);

*United States v. Minnesota*, 466 F.Supp. 1382, 1385 (D.Minn.1979) ("To determine the intent of Congress and understanding of the Indians, the court must analyze the wording of the treaties, agreements, and enactments, the prior history, the surrounding circumstances, and the subsequent construction given those documents by the parties.").

■ Finally, once extinguishment of aboriginal title occurs, it cannot be revived. *See, e.g., Delaware Nation v. Commonwealth of Pennsylvania*, No. 04–CV–166, 2004 WL 2755545, at *10 (E.D.Pa. Nov. 30, 2004) ("[W]e find that the original right to possession, 'once having been extinguished, could not be revived, even if title were thereafter acquired by those who originally possessed that right.' ") (quoting *Tuscarora Nation of Indians v. Power Auth. of N.Y.*, 164 F.Supp. 107, 113 (W.D.N.Y.1958)), *aff'd*, 446 F.3d 410, 417 (3d Cir.2006); *see also Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 115, 118 S.Ct. 1904, 1911, 141 L.Ed.2d 90 (1998) ("When Congress makes Indian reservation land freely alienable, it manifests an unmistakably clear intent to render such land subject to state and local taxation. The repurchase of such land by an Indian tribe does not cause the land to re-assume tax-exempt status.").

### (2) COLLATERAL ESTOPPEL ISSUE

As a threshold matter, the Town made a motion *in limine* to bar defendants from introducing any evidence, including any expert testimony, or making any argument at trial that the Shinnecock Tribe currently holds unextinguished aboriginal title to Westwoods. In particular, the Town argues that the Shinnecock are collaterally estopped from claiming that they have unextinguished aboriginal title to Westwoods because the Shinnecock Tribe participated as a defendant in *King v. Shinne-*

*cock Tribe of Indians*, 221 N.Y.S.2d 980 (N.Y.Sup.Ct.1961),[44] in which the New York State Supreme Court held that the Shinnecocks' aboriginal rights to certain lands, including Westwoods, was extinguished in the 17th century (the *"King Litigation"*). Defendants argue that this motion is essentially a motion for reconsideration of Judge Piatt's denial of summary judgment under the guise of an evidentiary motion *in limine*.[45] Specifically, defendants contend that, although Judge Platt did not explicitly address this issue in his November 7 Memorandum and Opinion, the Town specifically moved for summary judgment in part on the ground of collateral estoppel and, by denying the motion, Judge Platt implicitly must have rejected this argument. As set forth below, whether viewed as a motion for reconsideration or a motion considered *de novo* by the Court, the Court finds the collateral estoppel doctrine to be inapplicable under the peculiar circumstances of the instant case. More specifically, since the issue was addressed in the prior lawsuit in the form of a stipulation by a New York State attorney acting on behalf of the Shinnecock Nation, the Town cannot rely on the collateral estoppel doctrine to preclude litigation of that issue in this lawsuit.

██ "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." [46] *In re Hyman*, 502 F.3d 61, 65–66 (2d Cir.2007) (citations omitted); *accord Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 94 (2d Cir.2005). "The party seeking the benefit of collateral estoppel bears the burden of

**44.** This lawsuit was authorized by an act of the New York State Legislature, Chapter 379, New York Laws of 1960, which expressly subjected the Shinnecock Tribe to the lawsuit commenced by King. *Id.* at 982.

**45.** Motions for reconsideration may be filed pursuant to Federal Rule of Civil Procedure 59(e). The decision to grant or deny a motion for reconsideration falls squarely within the discretion of the district court. *See Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 132 (2d Cir.1999). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked ... that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995) (internal citations omitted). Similarly, Local Civil Rule 6.3 provides that a party moving for reconsideration must "set[ ] forth concisely the matters or controlling decisions which [the party] believes the court has overlooked." In any event, "reconsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial re-

sources." *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (citation and quotation marks omitted); *see also Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, No. 97 Civ. 6612(SJ), 2006 WL 355137, at *1, 2006 U.S. Dist. LEXIS 7635, at *4 (E.D.N.Y. Feb. 15, 2006) ("The standard ... is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the Court.").

**46.** The Second Circuit has stated that, where as here a party is seeking to enforce a New York judgment, New York law is applied. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002) ("We apply federal law in determining the preclusive effect of a federal judgment and New York law in determining the preclusive effect of a New York State court judgment.") (internal citations omitted). In any event, although federal and state law differ in certain respects on some collateral estoppel issues, see *Indus. Risk Insurers v. Port Auth. of N.Y. and N.J.*, 493 F.3d 283, 288 (2d Cir.2007) (noting, as to collateral estoppel under New York and federal law, that "these two bodies of law do appear to diverge in some particulars"), the result here would be the same under either standard.

proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir.1991) (citing *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455–56, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985)).

Thus, the Court must look to the circumstances surrounding the *King* litigation to determine if these requirements were met. In *King*, a claim was brought by Douglas King against the Shinnecock Tribe to have the court resolve conflicting claims to land located within Southampton to the west of Canoe Place. *King*, 221 N.Y.S.2d at 981 (noting that the property at issue was located "about one quarter mile south of Montauk Highway at Hampton Bays in the Town of Southampton" and is "bounded ... on the east by Shinnecock Bay"). King contended that he and his family members had actually possessed the land for at least 100 years and, thus, he had title to land based upon adverse posses-

sion. *Id.* at 982. In the lawsuit, the Attorney General of New York, by an Assistant Attorney General, appeared for both the State and the Nation. As part of the litigation, the Assistant Attorney General conceded or stipulated, that "as of the year 1738, record title to the premises was in the white proprietors of the Town of Southampton and not in the Shinnecock Indians, who had divested themselves of any recorded interest by treaty in the years 1662 and 1666." *Id.* at 982.[47] Therefore, it was conceded that there was no aboriginal title to the lands; instead, the court noted that "[i]t is the contention of the defense that at some time prior to 1810 the premises became part of the reservation and property of the Shinnecock Indians." *Id.* at 983. The court, however, rejected that argument due to a lack of evidence.[48] *Id.* at 986–87. In particular, the court explained:

> There being no persuasive proof that the Shinnecock Indians have ever acquired any tribal interest in the prem-

---

**47.** The concession was actually made in a prior similar action in 1953, *see King v. Warner*, 137 N.Y.S.2d 568, 569 (N.Y.Sup.Ct.1953), but it was agreed that the 1961 *King* action would be tried based upon the record of the trial of the 1953 action. *King*, 221 N.Y.S.2d at 981. Thus, this stipulation in the 1953 action was applied to the 1961 *King* action.

**48.** In reaching this decision, the court did review "the genesis of title to lands in the Town of Southampton" and specifically referenced the analysis in *Trustees of the Freeholders and Commonalty of Southampton v. Mecox Bay Oyster Co.*, 116 N.Y. 1, 8, 22 N.E. 387 (1889). *See King*, 221 N.Y.S.2d at 985–86 (citing *Mecox Bay*). In *Mecox Bay*, the Court of Appeals referred to the Andros and Dongan patents and found that, prior to the Andros patent, "all the Indian deeds had been delivered, and the rights of the Indians extinguished." Specifically, the Court of Appeals reviewed the land grants to the Town of Southampton, including the Andros and Dongan patents:

The first patent of the town was in 1676 by Governor Andros.... There can be no doubt that under this patent the title to all the lands vested in the corporate body thereby created. The grant was from the sovereign, who gave the grantees capacity to take and hold in a corporate character
....
Under this grant, therefore, title vested in the town. The Dongan charter was granted 10 years later. It can hardly be presumed that it could have been intended by that deed to have changed the title to the land. Prior to the date of the Andros charter, all the Indian deeds had been delivered, and the rights of the Indians extinguished. Under that charter, the title had vested absolutely in the town.
116 N.Y. at 8, 22 N.E. 387. As discussed *infra*, it is undisputed that the Andros and Dongan Patents covered all lands within the Town of Southampton, including Westwoods. (Stip. No. 77.)

ises in question since their right of occupancy was extinguished by the sovereign, I conclude that the plaintiff has clearly established his title thereto by adverse possession.

221 N.Y.S.2d at 987.[49]

■ Although the Town argues that the defendants are collaterally estopped from denying the extinguishment of their aboriginal rights in Westwoods because the court in *King* determined that the Andros and Dongan Patents extinguished such aboriginal title, this Court concludes that the doctrine of collateral estoppel should not be applied to this lawsuit on that issue because of the circumstances under which this issue was litigated in the New York court. In particular, the Court notes that the Town is seeking estoppel based upon a stipulation made on behalf of the Nation by the State of New York—the Town's current co-plaintiff and the Nation's current adversary in this lawsuit—while, in *King,* New York was representing the Nation in a trust capacity. The Second Circuit has recognized that "[m]ost courts have held that a fact established in prior litigation by stipulation, rather than by judicial resolution, has not been 'actually litigated.'" *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 146 (2d Cir.2005) (citing cases); *see also North Shore–Long Island Jewish Health Sys., Inc. v. Aetna U.S. Healthcare,* 27 A.D.3d 439, 440–41, 811 N.Y.S.2d 424 (N.Y.App.Div.2006) ("An issue is not actually litigated if there has been 'a failure to place a matter in issue by proper pleading, or even because of a stipulation'") (quoting *Kaufman,* 65 N.Y.2d at 457, 492 N.Y.S.2d 584, 482 N.E.2d 63 (emphasis omitted)); *1829 Caton Realty v. Caton BMT Assocs.,* 225 A.D.2d 599, 599,

639 N.Y.S.2d 110 (N.Y.App.Div.1996) ("[T]he doctrine of collateral estoppel is not applicable since the issues resolved by the stipulation of settlement were never actually litigated.") (citation omitted). The Second Circuit also has "specified that where the parties intend a stipulation to be binding in future litigation, issues to which the parties have stipulated will be considered 'actually litigated' for collateral estoppel purposes." *Uzdavines,* 418 F.3d at 146; *see also Red Lake Band v. United States,* 221 Ct.Cl. 325, 607 F.2d 930, 934 (1979) ("As a general rule . . . an issue is not 'actually litigated' for purposes of collateral estoppel unless the parties to the stipulation manifest an intent to be bound in a subsequent action."); *see generally United States v. Int'l Bldg. Co.,* 345 U.S. 502, 504, 73 S.Ct. 807, 97 L.Ed. 1182 (1953) (finding no *res judicata* effect concerning tax deficiencies in previous years where deficiencies were entered into in prior tax litigation by stipulation). Here, where the stipulation regarding extinguishment of aboriginal title was entered into on behalf of the Shinnecock Nation by the attorney for New York, there is simply no indication from the record that this was done with the intent to be bound in subsequent actions. *See Red Lake Band,* 607 F.2d at 934 (holding that "an intention to be . . . bound [in future litigations] should not be readily inferred"). Thus, although the Nation was a party to that action, the Court does not consider this issue to have been "actually litigated" or litigated in a manner which provided a "full and fair opportunity" for litigation on the issue when it was based on a stipulation by the State of New York's attorney acting on behalf of the Shinnecock Nation in a lawsuit in which

---

49. The Shinnecock Nation took an appeal from the decision by the New York Supreme Court, but later abandoned that appeal. *See*

*King v. Shinnecock Tribe of Indians,* 17 A.D.2d 820 (N.Y.App.Div.1962) (dismissing appeal).

New York was also a party.[50] *See In re Hyman,* 502 F.3d at 69–70 (declining to "mechanically apply collateral estoppel").

In sum, the Court concludes, as Judge Platt implicitly did in denying summary judgment, that the stipulation in the *King* litigation should not bar the Nation from litigating the aboriginal title issue in this lawsuit; rather, the Court has examined this issue on the merits after a full trial in which the Nation has been given a full and fair opportunity to be heard and, as set forth below, finds that aboriginal title to Westwoods has been extinguished.

### (3) BURDEN AND STANDARD OF PROOF

The parties do not agree on the burden of proof or the standard of proof on the issue of the extinguishment of aboriginal title. Plaintiffs argue that, because defendants have asserted "unextinguished aboriginal title" to Westwoods as an affirmative defense to plaintiffs' intention to have this Court enjoin the development of a gaming facility on that land, defendants have the burden of proving this affirmative defense by a preponderance of the evidence. Defendants, however, argue that plaintiffs have the burden of proving by clear and convincing evidence that the Nation's aboriginal title to Westwoods has been extinguished.

The Court concludes that plaintiffs have the burden of proof to establish by a preponderance of the evidence the plain and unambiguous extinguishment of aboriginal title. The Court recognizes that the Nation has asserted aboriginal title as an affirmative defense and that it is well settled that defendants have the burden of proof with respect to affirmative defenses,

as well as matters that are interposed in avoidance of plaintiffs' claim. *See, e.g., Fitzgerald v. Henderson,* 251 F.3d 345, 357 (2d Cir.2001) (holding that defendant bears the burden of proof on an affirmative defense); *United States v. Sun Myung Moon,* 718 F.2d 1210, 1224 (2d Cir.1983) ("If defendant asserts an affirmative defense he bears the burden of proof on it."). However, in the instant case, it is undisputed that the Nation had aboriginal title at the time of initial discovery in 1640. *See Shinnecock Indian Nation,* 400 F.Supp.2d at 489 ("Defendants submitted a Fact Statement containing facts which are, for the most part, undisputed and which show that the Shinnecock Indian Nation ... [w]as in possession of the lands in and around the Town of Southampton when the first European settlers arrived in 1640...."). Instead, the issue is whether that aboriginal title was extinguished. The Court notes that a federal law enacted in 1834, 25 U.S.C. § 194, places the burden of proof on a "white person" in any case concerning Indians with respect to "the right of property." Plaintiffs argue that the Supreme Court, however, has held that this burden-shifting law does not apply to states because a state is not a "person" within the meaning of the statute, *see Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 667, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), and that one court has held that Section 194 does not apply to land within the bounds of an original state, such as New York, *see Cayuga Indian Nation v. Pataki,* Nos. 80–CV–930, 80–CV–960, 1999 U.S. Dist. LEXIS 5228, at *13 (N.D.N.Y. 1999). However, in *Cayuga Indian Nation of New York v. Village of Union*

---

**50.** To the extent plaintiffs also suggest that defendants should be judicially estopped from challenging the colonial era transactions, that argument is rejected for the same reasons discussed above. *See Uzdavines,* 418 F.3d at 147 (denying judicial estoppel and noting "we

limit[ ] the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity are certain") (citations and quotation marks omitted).

*Springs,* 317 F.Supp.2d 128 (N.D.N.Y. Apr.15, 2004), the court rejected that argument:

> In *City of Sherrill,* the Supreme Court's language in *Wilson* was relied upon to find that the burden of proof rested with the municipality, and the Court of Appeals for the Second Circuit affirmed, further substantiating that finding. *See [Sherrill], aff'd in part and rev'd in part,* 337 F.3d 139 (2d Cir.2003). Therefore, here, as in *City of Sherrill,* the burdens of proof and production rest with defendants, the non-Indian parties questioning Indian title.

317 F.Supp.2d at 135. This Court agrees with the reasoning in *Cayuga* and concludes, where as here the plaintiffs are questioning Indian title and arguing aboriginal title has been extinguished, the burden lies with plaintiffs.

Although the Nation further argues that the standard of proof is elevated to "clear and convincing" evidence rather than the "preponderance" standard, the Court disagrees. The Court recognizes, as noted *supra,* that extinguishment is not implied and plaintiffs must prove plain and unambiguous extinguishment of aboriginal title. That rule, however, does not transform the underlying standard of proof to a "clear and convincing" standard. The only case cited by defendants that supports this contention is a Court of Claims decision in which reference was made to a "clear and convincing evidence" standard, *Alabama–Coushatta Tribe of Texas v. United States,* No. 3–83, 2000 WL 1013532, at *34 (Fed. Cl. June 19, 2000). However, the citations referenced in the decision do not support

such a standard. In fact, the majority opinion in that case actually took exception to the dissenting judge's view that a rule of statutory construction in favor of Native Americans should be utilized in evaluating the findings of an administrative hearing officer and noted that "[i]t is a rule of statutory construction, to aid in determining the meaning of legislation, not a rule for the weighing of evidence and shifting of the normal burden of proof." [51] *Id.* at *7. Thus, this Court concludes that the burden of proof is on plaintiffs here to prove by a preponderance of the evidence that aboriginal title was plainly and unambiguously extinguished.

In any event, this dispute between the parties regarding the burden of proof and standard of proof is not critical to the outcome of this lawsuit because the Court finds that, even if the Court adopted defendants' position by placing the burden of proof on plaintiffs and applied a "clear and convincing evidence" standard, plaintiffs still prevail in this lawsuit. In other words, for the reasons discussed *infra,* the Court finds that plaintiffs have demonstrated by clear and convincing evidence that the Nation's aboriginal title to Westwoods has been extinguished in a plain and unambiguous manner.

### (4) USE OF EXPERT TESTIMONY

There were a series of motions and objections by the parties opposing their adversary's use of expert testimony regarding historical facts and circumstances pertaining to the issue of the extinguishment of aboriginal title. The Court addressed these issues during the trial uti-

---

**51.** To the extent that defendants suggest that, in any situation when something must be proven unambiguously, it necessarily must be by clear and convincing evidence, the Court disagrees. *See, e.g., MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 961 (2d

Cir.1997) ("To prevail on its claim of promissory estoppel, [plaintiff] had to prove by a preponderance of the evidence … a clear and unambiguous promise made by defendant. …").

lizing the standards and procedures set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Specifically, when a party wished to challenge an expert under *Daubert*, the Court allowed the opportunity to question the witness on the *Daubert* issues prior to the Court ruling on the motion to preclude the expert's testimony.[52] For reasons that were set forth on the record, the Court allowed all the proposed expert witnesses to testify because it found the *Daubert* criteria to be satisfied. Specifically, the Court concluded that the purported defects in qualifications and methodology went to the weight of the testimony, and not the admissibility, and that the testimony did not improperly infringe on the Court's role to determine questions of law. Although the legal and factual bases for the Court's decision regarding these challenges to the experts are contained in the record, the Court will highlight key aspects of its rulings below.

(A) The *Daubert* Standard

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form

of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Under *Daubert*, the district court must perform a gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that whether the witness' area of expertise was technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir.2005) ("The shift under the Federal Rules to a more permissive approach to expert testimony ... did not represent an abdication of the screening function traditionally played by trial judges.").

Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether

---

**52.** Some courts have concluded that, in the context of a bench trial where there is not the same concern of juror confusion or potential prejudice, the court has considerable discretion in admitting the proffered testimony at the trial and then deciding after the evidence is presented whether it deserves to be credited by meeting the requirements of *Daubert* and its progeny. *See, e.g., New York v. Solvent Chem. Co., Inc.*, No. 83–CV–1401C, 2006 WL

2640647, at *2 (W.D.N.Y. Sept.14, 2006) (collecting cases). Although the Court could have utilized that approach in this bench trial, the Court decided to follow the standard *Daubert* procedure and allowed the parties to conduct a preliminary examination of the witness to address any *Daubert* challenges first and then have the Court rule on those challenges before the witness was permitted to give his or her entire testimony.

the expert's testimony on a particular issue will assist the trier of fact. *See Nimely*, 414 F.3d at 396–97. Moreover, if the requirements of Rule 702 are met, the district court must also analyze the testimony under Rule 403 and may exclude the testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403; *accord Nimely*, 414 F.3d at 397.

Under the *Daubert* standards, the Court must first determine whether the expert has sufficient qualifications to testify. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir.2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.*, 506 F.Supp.2d 137, 144–45 (E.D.N.Y.2007) ("A court must consider the 'totality of a witness'[ ] background when evaluating the witness'[ ] qualifications to testify as an expert.' ") (quoting 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co.*, No. CV–03–0710, 2006 WL 2546551, at *2 (E.D.N.Y. Aug.31, 2006). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997).

With respect to reliability, as the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theo-

ry or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002) (citations and internal quotations omitted); *accord Nimely*, 414 F.3d at 396. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *Kumho*, 526 U.S. at 151, 119 S.Ct. 1167; *Nimely*, 414 F.3d at 396. Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts

before it, ... by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely,* 414 F.3d at 397 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786 ("These matters should be established by a preponderance of proof.") (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)); *see also* Fed.R.Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir.1996) ("It is the proponent of the expert who has the burden of proving admissibility."); *accord Baker v. Urban Outfitters, Inc.,* 254 F.Supp.2d 346, 353 (S.D.N.Y.2003) (same).

### (B) SUMMARY OF COURT'S RULINGS ON THE EXPERTS

As noted above, in the instant case, the Court utilized the procedure established for challenges to expert testimony under *Daubert,* analyzed the particular expert testimony that each party sought to admit under the applicable standard and, for the reasons set forth in detail on the record, determined that the testimony satisfied the requirements of Rule 702 and was not excludable under Rule 403. However, for purposes of convenience and completeness, the Court will summarize below the basis for the Court's ruling on these *Daubert* issues.

First, each of the experts had sufficient qualifications as historians or ethnohistorians by knowledge, skill, experience, training, or education to testify about the colonial era documents pertaining to transactions or events relating to the Westwoods parcel and to provide the historical context for those documents. For example, although the Shinnecock Nation challenged the credentials of Mr. Lynch, Judge Platt correctly found him sufficiently qualified to be permitted to proffer his opinions. Mr. Lynch's qualifications included, among other things, the following: (1) a Bachelor of Arts degree from Southern Connecticut State University where he majored in Sociology/Anthropology; (2) a Masters of Arts Degree from Wesleyan University, where his concentration of study was Anthropology/History and he authored a thesis on the process of adoption among the Iroquois Confederacy during the 18th century; (3) although he did not obtain a Ph. D., he completed all the necessary requirements for a doctoral degree in Anthropology/History at the University of Connecticut and passed his oral doctoral exam; (4) he has taken courses in title searching and conducted research, published works, and given presentations on many issues relating to Indian tribes of New York and New England; (4) he has approximately 13 years' experience as a private ethnohistorical consultant on Indian-related matters concerning Indian land claims, historical title searching, and petitions for federal acknowledgment as an Indian tribe; and (5) he was qualified as an expert in a Connecticut Superior Court lawsuit and has testified before the Connecticut Legislative Planning and Development Committee regarding legislation involving land grants. (T12; Tr. 394–96.) Thus, the Court found him qualified to testify concerning the matters

covered by his report and supplemental report, including an analysis of interactions between the Shinnecocks and early settlers of the Town, the nature and scope of the Shinnecocks' historical use of Westwoods, and the nature and scope of authority exercised over that property by the Shinnecocks and the Town.

The Court also found Alexander von Gernet (an adjunct professor of Anthropology at the University of Toronto) to be qualified based upon his educational background, training, experience, publications, teaching, and prior expert certifications. (Tr. 996–97.) In fact, Professor von Gernet had been qualified as a expert witness in numerous jurisdictions in both Canada and the United States (including testifying and/or writing affidavits in twenty court proceedings), had previously testified as an expert with respect to the authority of the colonial governors, had testified in the *Cayuga* land claim litigation, and had written reports in three New York land claim cases (Cayuga, Seneca, and Oneida) addressing claims that certain Indian lands in New York remained unextinguished due, among other things, to unauthorized acts by New York governors. (S62.) Although defendants raised issues regarding Mr. Lynch's impartiality and certain errors in his reports and testimony, and similar arguments asserted in connection with errors in Professor von Gernet's report, the Court concluded that those issues went to the weight of their testimony, but were not sufficient to render them unqualified under the Rule 702 standard. *See McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995) (holding that alleged weaknesses in expert's academic training and "other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility").

With respect to various arguments by the Shinnecock Nation that either Mr. Lynch or Professor von Gernet were testifying about issues or subject matters that were purportedly beyond their area of expertise, the Court also found those arguments unavailing. For example, although the Shinnecock Nation argued that Professor von Gernet was not qualified to give testimony regarding the historical powers of New York colonial governors and the Shinnecock Tribe because he had never researched that particular issue prior to this litigation, the Court concluded that his expertise and qualifications could not be viewed so narrowly. Specifically, the Court ruled that the training and skills he had clearly developed in his other research and writing about the relationship between aboriginal people and colonial governors qualified him to provided testimony about the historical context of the authority of colonial governors as it related to the Shinnecock Nation. (Tr. 997–98.) Similarly, despite objections from the Shinnecock Nation, Mr. Lynch was qualified, based upon the experience outlined above, to testify about the historical context of various colonial era documents, including deeds and patents, as well as the Canoe Place Division. *See, e.g., Bunt v. Altec Indus. Inc.*, 962 F.Supp. 313, 317 (N.D.N.Y.1997) ("Liberality and flexibility in evaluating qualifications should be the rule . . . [T]he expert should not be required to satisfy an overly narrow test of his own qualifications.") (citation and quotation marks omitted).

Second, the Court found that the methodology used by the various experts was sufficiently reliable to be admissible after considering the *Daubert* factors relating to this requirement. Specifically, the experts analyzed and considered the pertinent historical documents (including deeds, patents, confirmations, and other colonial era documents) in the context of the contem-

porary historical understanding. For example, Mr. Lynch's research included a review of "historical documents and records, deed, wills, leases, municipal and public records, treatises, and reports." (T12, at 6–7.) As a result, he spent substantial time researching and compiling the historical record that he has outlined in great detail in his report. The other experts, including Professor von Gernet and Professor Hermes, utilized a similar methodology. Based upon a review of these methodologies, the Court found that the experts' testimony was sufficiently reliable to be admissible under *Daubert* and, as with the objections to qualifications, the purported weaknesses complained of by the parties regarding methodology were the proper subject of cross-examination and went to the weight of these witnesses' testimony, not the admissibility. *See McCullock,* 61 F.3d at 1044 (finding expert testimony properly admitted where "[d]isputes as to the strength of his credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony"); *see also Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Finally, while seeking to offer their own expert testimony on these issues and topics, the parties sought to exclude or limit the opposing expert's testimony by arguing that the proffered expert testimony would not assist the court (as the trier of fact) in resolving the disputed issue regarding the extinguishment of aboriginal title and by arguing the testimony involved purely questions of law. After carefully considering this issue, the Court rejected those arguments and allowed both sides to present their expert testimony. The Court recognizes that the issue of whether aboriginal title was extinguished is a legal question for the Court to resolve and not experts. However, in deciding that issue, the Court is required to analyze centuries-old documents and historical events. It is the Court's conclusion that the consideration of expert testimony in the form of historians and ethnohistorians clearly assists the Court as the trier of fact, at a minimum, in identifying the ancient documents and historical events that may be relevant on this issue and providing testimony about the historical context for these documents and events to ensure that the meaning of the documents and/or events are not being misunderstood due to the substantial passage of time.

In fact, the Second Circuit has emphasized, in the context of litigation involving disputes about title to Indian land and extinguishment of Indian title to that land, that it is critical that the Court consider expert historical testimony to assist in the Court's determination of the meaning and interpretation to give to historical events. For example, in *Oneida Indian Nation v. New York,* 691 F.2d 1070 (2d Cir.1982), the issue was whether, under Article IX of the Articles of Confederation, New York had authority to extinguish Indian title to lands within its bounds. The district court, in granting a motion to dismiss, took judicial notice of historical facts that had been presented by both sides without the use of expert testimony. On appeal, the Second Circuit reversed and remanded the case for an evidentiary hearing to assist the district court in determining the issue raised by the motion to dismiss. The Second Circuit explained:

> The district court, after reviewing the language and meager legislative history of the pertinent Articles [of Confederation] (no record of debates or committee reports was made), took

judicial notice of pertinent individual records, notes, correspondence, histories, articles and other data, which may collectively be described as "historical evidence," as aids in interpreting the Articles, the Proclamation of 1783, and the 1784 Fort Stanwix Treaty. When there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible.... However, when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence, at least without affording the opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it. Judicial notice of a disputed fact should not ordinarily be taken as the basis for dismissal of a complaint on its face. The better course is to conduct an evidentiary hearing at which the plaintiff may have its "day in court," and, through time-honored methods, test the accuracy of defendants' submissions and introduce evidence of its own.

In the present case evidence of contemporary construction of the key Articles and surrounding circumstances relevant to their meaning, of which the district court took notice, contains statements with respect to factual issues, such as the understanding of representatives of federal and state governments and the Oneidas regarding the meaning of the disputed clauses, the pre-Revolutionary practices of the British Crown with respect to matters involved, and the post-Revolutionary practices of the new federal government and the states under the clauses. The district court drew heavily upon this extrinsic historical evidence as the basis for its interpretation of the Articles even though the evidence had not been the subject of cross-examination or analysis through expert testimony and may not have been put in perspective by introduction of other relevant evidence. In short, both sides and the court appear to have referred to, relied upon, and quoted from numerous untested primary and secondary historical sources, including history books, treatises, and other papers. We agree with appellants that the district court should not have granted defendants' Rule 12(b)(6) motion on the basis of this type of evidence without affording the plaintiffs an evidentiary hearing in order to clarify the meaning and context of statements relied on and the weight to be given to them.

*Oneida*, 691 F.2d at 1086 (citations omitted). In another opinion issued before the evidentiary hearing in *Oneida* took place, the Second Circuit further articulated what type of hearing needed to be held:

[T]he hearing to be held by the district court will be unlike the traditional trial of an issue of fact. Instead, the trial court will consider issues of law and statutory construction, against the historical background of the events surrounding the treaties, and the adoption of the applicable portions of the Articles of Confederation relied on by plaintiffs. This factual background in turn will probably be derived from the expert testimony of historians and others, and consideration by the court of contemporaneous documents and oral traditions.

*Oneida Indian Nation v. New York*, 732 F.2d 261, 265 (2d Cir.1984). On remand, the district court conducted an evidentiary hearing during which it considered the re-

ports and testimony of the parties' respective experts and then granted the defendants' motion to dismiss. *Oneida Indian Nation v. New York,* 649 F.Supp. 420, 422 (N.D.N.Y.1986), *aff'd,* 860 F.2d 1145 (2d Cir.1988).

In other cases involving tribal land and gaming claims, courts have similarly allowed consideration of historical experts to assist the trier of fact. *See, e.g., Cayuga Indian Nation v. Pataki,* 165 F.Supp.2d 266, 304–357 (N.D.N.Y.2001) (considering the testimony of Professor von Gernet on the question of New York's good faith in dealing with the Cayugas from the 1700s through the 1900s); *see also United States v. Idaho,* 210 F.3d 1067, 1069 (9th Cir. 2000) ("At issue in this case is the ownership of submerged lands lying within the present-day boundaries of the Coeur d'Alene Indian Reservation, which was originally set aside by executive order in 1873. After a nine-day trial involving multiple expert and lay witnesses, extensive written reports, scientific studies, and historical documents, the district court issued a lengthy and meticulous decision....");
*Wisconsin v. Stockbridge–Munsee Cmty.,* 67 F.Supp.2d 990, 993 (E.D.Wis.1999) (noting that court heard testimony of historian in lawsuit involving plaintiff seeking a preliminary injunction to enjoin defendant Indian tribe from conducting a gambling operation in an area which the state argued was statutorily off-limits to gambling); *Wisconsin v. Stockbridge–Munsee Cmty.,* 366 F.Supp.2d 698, 742–43, 779 (E.D.Wis. 2004) (granting summary judgment to the state and listing numerous expert witnesses).

Therefore, having considered the objections by the parties to their adversary's experts, the Court concluded that this expert testimony regarding these historical documents, and the circumstances surrounding the creation and implementation of these documents, was necessary and appropriate given the legal issues that the Court needed to resolve and did not constitute pure questions of law for which no expert testimony was necessary.[53]

---

**53.** In addition to objecting to Professor Hermes's testimony on the grounds that it involved purely legal conclusions, the State also objected to her testimony because the State believed that the political question doctrine precluded any testimony or exhibits offered to question the propriety of the sovereign's extinguishment of aboriginal title over the Westwoods land. The Court has considered that objection, but declines to reject or strike her testimony on that basis. The Court recognizes that, once extinguishment by the sovereign is established, the Court cannot question the wisdom or propriety of such extinguishment (as discussed *infra*). However, Professor Hermes's testimony was offered, in part, to attempt to persuade the Court *as a matter of historical fact* that extinguishment never occurred in the first place because the purchase of lands reflected in the Ogden and Topping Deeds was purportedly never approved by the General Court of the Colony of Connecticut as required by the 1650 Order. In other words, her position as it related to the two deeds was not that the sovereign invalidly extinguished aboriginal title in these deeds, but rather that the land transactions by these individuals with the Indians were invalid or void because they were never approved by the sovereign. Although the Court ultimately disagreed with her analysis, it needed to be fully considered. As noted above, the Second Circuit has cautioned that "when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence, at least without affording the opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it." *Oneida Indian Nation,* 691 F.2d at 1086. Therefore, despite the State's objection to Professor Hermes's testimony on grounds of the political question doctrine and the other grounds outlined in their motion to strike, the Court declines to preclude consideration of Professor Hermes's testimony regarding information that the Shinnecock Nation seeks to present to the Court that they view as challenging the fact or the propriety of the Court considering these

In sum, as set forth in the trial record, the Court found that each party provided a sufficient basis for the admissibility of the expert testimony under *Daubert* and the Court considered that testimony, not as direct testimony on the ultimate legal issue of extinguishment, but rather for a different purpose-namely, as instructed in other cases by the Second Circuit, to assist the Court in identifying the relevant colonial era documents and understanding the historical context for those documents, so that the Court could make the legal determination on the issue of extinguishment of aboriginal title.[54] The Court will now turn to its analysis of that issue having carefully considered the exhibits, expert testimony, and other evidence presented during the trial.

### (5) ANALYSIS

The evidence at trial demonstrated in an overwhelming manner that, during the colonial era, the Shinnecock Nation conveyed, ceded, and relinquished all of its right, title, and interest in the Southampton lands west of Canoe Place, including Westwoods, and that aboriginal title to those lands was extinguished by the then-prevailing sovereign authority. As set forth in detail below, the intentional sale of these lands, including Westwoods, by the Shinnecock Nation to non-Indians and the extinguishment of aboriginal title to such lands are plainly and unequivocally contained in the language of a series of colonial era documents pertaining to these transactions, including the following: (1) the 1659 Ogden Deed and 1662 Topping Deed reflecting transactions in which the Shinnecock conveyed certain lands, including Westwoods, to non-Indians; (2) the 1666 Nicolls Determination, in which Governor Nicolls confirmed that the lands, including Westwoods, had been conveyed by the Shinnecock Nation, thereby extinguishing aboriginal title in those lands; (3) the 1676 Andros Patent, in which Governor Andros issued a patent to the Proprietors of Southampton, which included Westwoods; and (4) the 1686 Dongan Patent, in which Governor Dongan again confirmed the prior extinguishment of aboriginal title. The assertions by the defendants that these transactions were void, and that the decisions of the New York Provincial Governors acting with sovereign authority were somehow inconsequential, are plainly contradicted by the historical record. Neither the language nor the context of the colonial era documents is ambiguous in any way; rather, the documents reflect a clear

---

historical documents. Instead, the Court has fully considered Professor Hermes's testimony, and the other evidence pointed to by the Shinnecock Nation seeking to undermine the plain language of these historical documents, and finds such arguments unpersuasive in light of the entire trial record, for the reasons discussed in detail *infra*.

54. As noted *supra*, the parties agreed that the contents of the expert reports would be deemed to have been read into the record for purposes of direct examination. In addition to moving to exclude certain experts in their entirety on the grounds that the expert's testimony related purely to questions of law, there were also objections to the reports because of purported legal opinions contained in certain portions of the reports. In other words, the argument was that, even assuming *arguendo* that the testimony should not be excluded in its entirety as pure legal opinions, there were certain statements within the report that should be stricken on that basis. However, the objecting parties made this generalized objection without identifying specific sentences or portions of the report that were objectionable. When the objections were made, the Court reiterated that, to the extent the reports contained sentences constituting pure questions of law, it was not going to consider such portions of the report, but invited the parties to submit objections to particular sentences within the report if they wanted to move to strike portions of a report. No such specific objections were submitted by the parties.

and compelling historical record establishing the sale of the land by the Shinnecock Nation and the repeated approval and confirmation of this conveyance of title to Southampton by various New York Provincial Governors, acting under the authority of the British Crown. Moreover, in addition to the clear and unmistakable intent of the sovereign authority to extinguish the Shinnecock Nation's aboriginal title to Southampton lands west of Canoe Place contained in these colonial era documents, the subsequent actions, and inactions, of the Shinnecock Nation after the issuance of these documents further confirm the extinguishment of aboriginal title to those lands—namely, prior to the position taken in the instant lawsuit, the Shinnecock Nation failed to challenge these conveyances and sovereign acts of extinguishment for over 300 years.

(A) THE COLONIAL ERA DOCUMENTS

(I) THE OGDEN AND TOPPING DEEDS

The Ogden and Topping Deeds reflect the plain and unambiguous conveyance of Southampton lands west of Canoe Place, including Westwoods, by the Shinnecock Tribe to non-Indians. *See South Dakota v. Bourland,* 508 U.S. 679, 689, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) ("When an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands."). Although the defendants presented expert testimony and other factual evidence in support of their argument that these conveyances were invalid or void, the Court found such evidence unpersuasive for the reasons set forth below.

As outlined in the Finding of Facts, the first critical colonial era document is the May 12, 1659 Ogden Deed by which the well-known Sachem Wyandanch and his son conveyed all of the Shinnecock Tribe's right, title, and interest in lands west of Canoe Place (which was then the western boundary of the Town) to John Ogden. (T50.) Ogden was a Southampton Proprietor and Connecticut General Court magistrate. The language of the Ogden Deed clearly states the Shinnecock's intent to relinquish and cede all of their rights to the lands covered by the Ogden Deed, which included Westwoods. In particular, the Ogden Deed provides that the Shinnecock have "given and granted" such lands "unto Mr. John Ogden for himself his heirs executors and assigns for ever . . . ." (T50, at 162.) When examining the execution of this deed in the historical context of other colonial era documents, it is clear that the reason for the conveyance of these lands to Ogden was payment of an arson fine imposed on the Shinnecock by Connecticut Colony. This conveyance to Ogden has become known as the "Ogden Purchase" or "Quogue Purchase." The lands involved in the Ogden Purchase were subsequently conveyed by Ogden to John Scott and Scott then conveyed those lands to the Proprietors of Southampton on February 2, 1663.

The second critical document of the colonial era is the April 10, 1662 Topping Deed. In the Topping Deed, Sachem Wyandanch's political successor, Weany Sunk Squaw, and others, on behalf of the Shinnecock Tribe, sold and conveyed lands west of Canoe Place (including lands located to the west of the western boundary of the Ogden Purchase) to Thomas Topping. (T58.) Topping was a Southampton Proprietor and Connecticut General Court magistrate. The Topping Deed specifically provides that the Shinnecock have "given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a

certain tract of land...." (T58, at 167.) The use of language such as "all our right title and interest" is precisely the type of language used when there is an intent to transfer all title in land. *See, e.g., Or. Dep't of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) ("The Treaty language that ceded that entire tract ... stated only that the Tribe ceded 'all their right, title, and claim' to the described area. Yet that general conveyance unquestionably carried with it whatever special hunting and fishing rights the Indians had previously possessed...."); *see also United States v. Minnesota*, 466 F.Supp. 1382, 1385 (D.Minn.1979) ("[T]he 'all right, title, and interest' language is 'precisely suited' for the purpose of eliminating Indian title ...." ) (citation omitted). The lands of the Topping Deed ran from Canoe Place, on the east, to "Seatuck" on the west, which is the modern-day border between Southampton and Brookhaven. More importantly, there is no question that those lands included Westwoods. The purchase price reflected in the Topping Deed was "four score fathoms of wampum." (T58, at 168.)

Although the defendants concede that the language of these deeds involve the conveyance of land including Westwoods by Shinnecock members, they seek to have this Court disregard these transactions as void or legally invalid on several grounds, including the following: (1) Sachem Wyandanch lacked authority from the Shinnecock to convey the land; (2) the Shinnecock may not have understood the import of the transaction; and (3) the applicable law of the Colony of Connecticut, whose jurisdiction Southampton operated under at the time of these transactions, prohibited any individual from directly acquiring Indian lands. These arguments were presented primarily through defendants' expert, Professor Hermes. However, the Court finds these arguments, and the evidence presented in support thereof, unpersuasive. As a threshold matter, prior to this litigation, the Shinnecock have never challenged the validity of these transactions. In fact, in the 1978 Litigation Request, the Shinnecock declared that "the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662." (T229, at 8; *see also id.* at 16 ("The tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662.").) Moreover, as set forth below, their current position regarding the invalidity of these deeds is clearly contradicted by historical documents, the opinions of other historians, and the Shinnecock's own admissions.

With respect to Sachem Wyandanch, although Professor Hermes disputed Sachem Wyandanch's authority to act on behalf of the Shinnecock Tribe as a matter of historical fact, that position is undermined by, among other things, the following: (1) the September 19, 1666 reports of Southampton Proprietors Thomas Saire and Thomas Halsey (T46, at 158); (2) the fact that, as acknowledged by Professor Hermes, Sachem Wyandanch's authority over the Shinnecocks was recognized by the Connecticut Colony General Court in 1657 (T47, at 295; Tr. 2541); (3) Professor Hermes's admission that John Strong, a historian who Professor Hermes admitted possessed some expertise regarding the Shinnecocks, also concluded that Sachem Wyandanch had such authority, which is the same conclusion reached by Mr. Lynch (Tr. 2542–43); and (4) Professor Hermes's concession that the Shinnecock Tribe has never disagreed with the proposition that Sachem Wyandanch was authorized to act

on the Tribe's behalf (Tr 2544).[55] In short, the historical record clearly supports the conclusion that Sachem Wyandanch was acting with the authority of the Shinnecock at the time of the Ogden transaction; there is simply no evidence to suggest otherwise.

The defendants' second argument—that the Shinnecocks may not have understood the meaning or import of their transactions with Ogden and/or Topping—is similarly unavailing. As one court noted in rejecting such an argument, the purported failure to recognize the import of giving up its rights at the time does not relieve the Shinnecock Nation of its obligations to live up to its agreement:

> Plaintiff's second argument is equally unavailing. Although plaintiff may not have thought it was relinquishing usufructuary rights in the 1831 treaty, its lack of understanding does not relieve it of its agreement to give up those rights.
>
> Plaintiff's third argument is that the tribe would not have understood the terms, "surveyed and offered for sale." . . . . It is one thing for the tribe to show that a particular term would have had another meaning to treaty negotiators in the mid-nineteenth century; it is an entirely different thing for the tribe to say that its leaders would not have known the meaning of a particular term . . . . [A] claim of the . . . lack of understanding by one party, is essentially immaterial.

*Menominee Indian Tribe of Wis. v. Thompson,* 943 F.Supp. 999, 1009, 1010 (W.D.Wis.1996), *aff'd,* 161 F.3d 449 (7th Cir.1998). Moreover, in the instant case, any suggestion that the Shinnecock did not

understand the parameters of these transactions, is based upon sheer speculation, rather than any evidence in the historical documents or record. To the contrary, the consideration received for these transactions and subsequent actions of the Shinnecock fully support a finding that they understood exactly what lands they were conveying by executing these transactions.

Finally, the defendants seek to evade the legal impact of the Ogden and Topping Deeds by arguing, through Professor Hermes, that those conveyances were "void ab initio" by reason of a pre–1650 order (law) of the Connecticut General Court, which required the General Court's approval of any transactions between settlers and Indians, and that no one has been able to locate any such approval. This position, however, has a number of significant weaknesses. First, Professor Hermes acknowledged that she has been unable to locate the pre–1650 Order of the Connecticut General Court upon which her opinion is based. (Tr. 2545–46.) Second, Professor Hermes conceded that she does not know whether that pre–1650 Order prescribed any consequences for its violation, such as rendering violative transactions "void." (Tr. 2548.) In fact, the 1650 Order, which makes reference to the pre–1650 Order on which Professor Hermes relies, does not contain the word "void" or its synonym, or the phrase "null in law." Third, although Professor Hermes testified she was unable to find any record of Connecticut General Court approval of either the Ogden Purchase or the Topping Purchase, she also conceded that there is no way to know for certain whether every transaction between settlers and Indians would necessarily be reflected in the records of a Colony's General Court. (Tr.

---

**55.** In fact, in its 1978 Memo, the Shinnecock Nation referenced that the Ogden Deed was from "Shinnecock sachem, Wiandance" and did not contest his authority to act on their behalf. (T229, at "I" of "Index to Appendices.")

2594-96.) Thus, her unsuccessful search for a record such as the authorization of a transaction between settlers and Indians does not necessarily mean that such a record never existed. In short, after considering the historical evidence, the Court does not believe that the pre–1650 Order provides a sufficient legal basis to declare these transactions void as a matter of historical fact or as a matter of law.[56]

In any event, the resolution of this issue regarding the 1650 Order is not critical to the Court's analysis because of subsequent historical events that demonstrate the clear and unambiguous intention to extinguish aboriginal rights in the lands involved in the Ogden and Topping Deeds, including Westwoods. More specifically, as discussed below, even assuming *arguendo* that the Ogden and Topping Deeds were violative of a pre–1650 Order of the Connecticut General Court, these transactions were later confirmed and ratified by the prevailing sovereign authority—namely, various New York Provincial Governors—thereby clearly extinguishing aboriginal title to those lands.

### (II) THE NICOLLS DETERMINATION

In a document dated September 17, 1666, several Shinnecock members recorded their "protest" over the 1662 Topping Purchase. In that document, these Shinnecock members argued that they were the "true proprietors of the said lands," and they expressed their desire to receive compensation for the sale to Topping. (T61.) Significantly, these protestors did not question the validity of the conveyance itself or seek to void that transaction. In particular, the protesting Shinnecock group expressly assigned and conveyed whatever interest they held in the lands of the Topping Purchase to "our ancient and loving friends the Townes men of Southampton to them and their successors for ever." (T61, at 169.) Instead, the focus of the protest was whether they should receive payment from Southampton for the land. Thus, the protesters asked that Governor Nicolls determine whether they should receive payment from the Southampton Proprietors for their interest.

Governor Nicolls had been appointed the first English governor of the Province of New York on April 2, 1664, by virtue of a commission from the Duke of York. As such, Governor Nicolls possessed the authority to make laws, settle disputes, and address the question of Indian land purchases. As a result of this protest, Governor Nicolls considered the dispute fully and, on October 3, 1666, he issued the Nicolls Determination. Specifically, Gov-

---

**56.** In addition, the Court notes that any alleged deficiency in these conveyances because of purported violations of Connecticut law was remedied by the Connecticut State Legislature in 1993. In particular, in 1993, the General Assembly of the State of Connecticut enacted "An Act Validating Transfers of Certain Lands," which provides, in pertinent part, as follows:

All transfers of land more than sixty years prior to the effective date of this act of any person or group or association of persons, otherwise valid except for the possible fact that the general assembly or its predecessor legislative bodies or other governmental authorities did not confirm, validate, ratify or approve such transfers of land in accor-

dance with state or colonial laws or resolutions, common law or any other provisions requiring legislative or governmental approval of transfers of land held or occupied by any such person or group or association of persons, are hereby confirmed, validated, ratified and approved.

Special Act 93–1. Thus, to the extent that the defendants argue that the Ogden and Topping Deeds are somehow invalid because they were never approved under Connecticut law, this statute further defeats such an argument because it approved, validated, and ratified such transactions. The Court is unaware of any legal constraint that would prevent Connecticut from approving these colonial era transactions in modern times.

ernor Nicolls concluded and determined a "difference" between the "town of Southampton" and Topping. (T66, at 54.) The Nicolls Determination was made at a time when Connecticut no longer had jurisdiction over Long Island and while Governor Nicolls was the prevailing sovereign authority in the Province of New York, which included Long Island.

The language of the 1666 Nicolls Determination reveals the plain and unambiguous intent of Governor Nicolls (the sovereign authority at that time) to recognize the validity of the Topping Deed and to extinguish the Shinnecock's aboriginal title to the lands of the Topping Purchase—namely, all Southampton lands west of Canoe Place, including Westwoods—and to recognize that those lands were now owned exclusively by the Town, subject to no other rights or interests. In the Determination, Governor Nicolls declared that "all the right and interest that ye said Capt Thomas Topping and John Cooper have by the said deeds or any other way or means obtained ... is belonging, doth and shall belong unto the town of Southampton." (T66, at 54.) In addition, Governor Nicolls directed Thomas Topping and John Cooper to "deliver the town of Southampton all their deeds, writings and evidences that they have of a certain tract of land [*i.e.,* the lands of the Topping Purchase]." (T66, at 54.) He further instructed the Town to pay to the "Indians (concerned to receive it)" the sum of four score fathom of wampum, which was precisely the amount specified as consideration in the Topping Deed. (T66, at 55.) Finally, Governor Nicolls assured the Town that he would defend the Town in its peaceable enjoyment of the lands of the Topping Purchase,

"[a]gainst all other claims whatsoever." (T66, at 55.)

Therefore, any conceivable doubt as to the validity of the Ogden and Topping Deeds, based upon those transactions having been purportedly done in violation of the laws of Connecticut, was completely eliminated by this Determination of Governor Nicolls, when he (and not the Connecticut Colony) was now the sovereign authority. At that time, Governor Nicolls would have already been aware of the contention of Connecticut Colony Secretary John Allyn, who had written to Governor Nicolls some 18 months earlier, that under Connecticut Colony law "no land was to be purchased to the perticuler use of any person, without the consent of or Generall Courte, and all such purchases to be null in lawe."[57] (D71.) Despite the existence of Allyn's claim, however, Governor Nicolls recognized the validity of the Topping Deed and the Town's title, which ultimately rested on that Deed. In fact, the Nicolls Determination does not suggest in any way that the Topping Deed was invalid or legally defective. It may have been that Governor Nicholls disregarded Allyn's position either because he did not believe that the Topping Deed had violated any Connecticut law, or he determined that the law of Connecticut Colony was irrelevant to his Determination as the sovereign authority over New York. In any event, whatever the reason, it is clear from the historical record that, despite Allyn's objection, the sovereign authority of New York ratified and confirmed the transaction.

Subsequent to the Nicolls Determination, the directives of Governor Nicolls were clearly implemented. Specifically,

---

**57.** Professor Hermes testified that "it is likely" that the Allyn Letter was referring to a 1663 law of the Connecticut Colony (not the 1650 Order), which was enacted after both the Ogden and Topping Deeds, but opined that it could have been referring to past practice. (Tr. 2554.)

Topping delivered the deeds, writings, and evidences of his Topping Purchase to Southampton by an instrument dated November 6, 1667, in which he formally assigned his right, title, and interest in the Topping Purchase to the Town. (T197.) Moreover, the Town remitted the "four score fathom of wampum" to the Shinnecock. This is confirmed in a document dated February 22, 1667 (N.S.), in which several Shinnecocks affirmed not only their April 10, 1662 sale of lands to Topping and that they were "fully contented" with that transaction, but they also acknowledged their receipt of the four score fathom of wampum from the Town. (S70, 70A.) *See United States v. Dann,* 873 F.2d 1189, 1194 (9th Cir.1989) ("[P]ayment for the taking of a[n] aboriginal title establishes that title has been extinguished."); *see also United States v. Gemmill,* 535 F.2d 1145, 1149 (9th Cir.1976) ("[A]ny ambiguity about extinguishment . . . has been decisively resolved by congressional payment of compensation").

Therefore, the events surrounding the Nicolls Determination conclusively establish that: (1) the Shinnecock signatories in February 1667 expressed their agreement with their prior conveyance of land to Topping; (2) payment from the Town was accepted and retained by the Shinnecock for that land; and (3) the Governor, as the sovereign, had determined that, regardless of any position by the Connecticut Colony, the rights and interests to the land from the Topping Deed (including Westwoods) belonged to the Town. Under such circumstances, it is hard to imagine a more clear and unambiguous extinguishment of aboriginal title to this land.

Defendants attempt to argue that any alleged extinguishment of title, by Governor Nichols or otherwise, was subsequently invalidated by the Dutch's re-conquering New York in 1673 as a result of the

Third Anglo–Dutch War and by the Order of the New York General Court of Assizes, dated October 5, 1676, relating to Southampton's failure to comply with the Law of 1664 concerning the taking out of "Grants, Patents, or Confirmations for their Towns or Lande." The Court finds both of these arguments to be without merit.

First, as a threshold matter, once aboriginal title is extinguished, it cannot be revived. In any event, any potential invalidation of titles by the Dutch re-conquering New York in 1673, for a brief period, was clearly remedied by Governor Andros in 1674 after the English re-conquered New York. More specifically, after the English re-conquered New York in 1674, a new charter was granted to the Duke of York in June 1674 on substantially the same terms that had existed previously. (S62, at 25.) Moreover, in that same year, after Governor Andros was appointed Governor of New York, he issued a proclamation in which he explicitly stated that "all former grants priviledges or concessions heretofore granted and all the estates legally possessed by any under his Royall Highnesse before the late Dutch government, As also all legall, judiciall proceedings during that government to my arrivall in these parts are hereby confirmed; And the possessors by virtue thereof to remain in quiet possession of their rights." (S72, at 108.) In other words, at the time when Governor Andros was the sovereign in New York, he made clear that all the transactions that occurred before the Dutch re-conquered in 1673 were still valid. Therefore, any argument that the prior extinguishment of aboriginal title was invalidated by the Dutch re-conquering of New York cannot prevail.

Second, defendants' contention regarding the consequence of the 1676 Order of the Court of Assizes is similarly unavailing. The Judgment made clear that the

execution of the forfeiture of their titles and rights to lands in the town would take place *if* they did not comply with the Law of 1664 (regarding the taking out of "Grants, Patents or Confirmations for their Towns or Lande") by October 23, 2006, stating that the Town of Southampton "have forfeited all their titles, Rights & priviledges to the lands in the sd Townshipps & if they doe not by Monday fortnight next (being the 23rd day of this instant month) send up the acknowledgmt of their past Default & Resolves & Desire to obey & fulfill the Law & the severall orders of the Cort of Assizes, for the taking out their Grants, Patents or Confirmations, as directed by Law, Then Execution to issue out by Authority of this Crt for the above forfeiture to the use of his Maty without further delay." (D77, at 724.) However, the Town did comply with the Judgment, as well as the Law of 1664 and the prior orders, by the October 23, 1676 deadline. (D77, at 724.) Therefore, the condition that would lead to the execution of the forfeiture Judgment never took place. Accordingly, any claim that the Town lost title to Westwoods because of failure to comply with the October 5, 1676 Order is simply contradicted by the historical record.

### (III) THE ANDROS PATENT

On November 1, 1676, at a time when New York was no longer under the jurisdiction of Connecticut Colony, Governor Andros issued the Andros Patent. Governor Andros's authority to issue such a Patent, and to extinguish Indian title, cannot be questioned.

The Andros Patent confirmed the tract of land belonging to Southampton, and described that land as running from Seatuck on the west (which is the same western border established by the Topping Deed) and Wainscott on the east. (T188.) Thus, the Andros Patent described the entirety of the lands of modern-day Southampton, which include Westwoods, and ratified, confirmed, and granted, unto the freeholders and inhabitants of the Town, all of those lands, and "every part and parcell thereof ... for ever...." (T188, at 280.) Thus, Governor Andros confirmed that the Town was the owner of all lands from Wainscott (East Hampton) to Seatuck (Brookhaven), which included West-woods.[58]

### (IV) THE DONGAN PATENT

Subsequent to the issuance of the Andros Patent, disputes apparently arose between the Town and the Shinnecocks regarding the respective rights of the parties in the lands of the Town. As a result, an application was made by Major John Howell, a freeholder of the Town, and one of the patentees under the Andros Patent, for confirmation that the freeholders of the Town lawfully held the land. *See* T69, at 387 (seeking to have the Governor "confirm unto ye ffreeholders of said Towne in a more full & ample manner all the abovecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the

---

**58.** The Andros Patent provides also that "if it shall so happen that any part or parcell of the Lande within the bounds and Limits afore described be not already Purchased of the Indyans It may bee purchased (as occasion) according to Law ...." (T188, at 280.) Although the defendants contend that this sentence suggests that lands such as Westwoods had not been purchased lawfully, such an inference cannot be drawn from this language. Specifically, the word "if" indicates that Governor Andros was not making any finding that there were lands not already purchased from Indian tribes, but rather was simply providing that any such lands, if they existed, could be purchased. Thus, this language does not undermine the conclusion that all lands within the bounds of the Town had, in fact, already been lawfully purchased from the Shinnecocks.

Indyans and the freeholders of the said towne of Southampton").

In response to that application, and on December 6, 1686, Governor Dongan issued the "Dongan Patent" to the Proprietors of Southampton. Governor Dongan's authority to issue such a Patent is well-established and the Colony of Connecticut had no jurisdiction over the Province of New York at this time. The Dongan Patent restates the terms of the Andros Patent, including its description of the "tract of land" belonging to Southampton, running from Wainscott on the east to Seatuck on the west. Moreover, the Dongan Patent provides, in relevant part, that the Governor had:

> examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid....

(T69, at 387–88.) The "lands within the Limitts and bounds aforesaid," which the Town purchased from the "Indyans," were the entire lands of the Town, from Wainscott on the east, to Seatuck on the west. As with the Nicolls Determination, the Dongan Patent again emphasizes in clear and unmistakable language the prior extinguishment of the Shinnecock's aboriginal rights to any and all lands within the bounds of Southampton, including Westwoods.[59]

In short, these colonial era documents plainly and unambiguously demonstrate beyond any question the extinguishment of aboriginal title by the sovereign authority on all Southampton lands west of Canoe Place, including Westwoods.

### (B) SUBSEQUENT STATEMENTS AND CONDUCT BY THE SHINNECOCK NATION

The extinguishment of aboriginal title to this land is not only apparent from these colonial era documents and transactions, but is also confirmed by the conduct and statements of the Shinnecock in the centuries that followed these events.

First, in 1808, due to the rapid depletion of timber resources to the east of Canoe Place within Southampton, the Shinnecock sought to obtain from the Town the right to cut timber situated to the west of Canoe Place. Specifically, at the 1808 Trustee Meeting, it was voted, in the presence of Shinnecock Trustees and Southampton

59. To the extent that the defendants suggest that the Town was not created until the Dongan Patent was issued in 1686 and thus could not have acquired land as a Town prior to that time, the Court rejects that argument. Although the Trustees of the Freeholders and Commonality of the Town of Southampton was formerly created in 1686, the Town itself dates back to 1640. See, e.g., Beers v. Hotchkiss, 256 N.Y. 41, 46, 175 N.E. 506 (1931) ("Southampton in its beginnings was without a royal patent, though its inhabitants like true precursors of the thought of Hobbes and Locke, had organized themselves already into a political community. The defect in the documents was supplied by the Andros patent of 1676 and the Dongan patent a decade later."). In fact, as discussed supra, there are numerous colonial era documents created between 1640 and 1676 that confirm that the Town was formed, and in actual existence, well before the Andros and Dongan Patents were issued. Thus, the Andros and Dongan Patents did not create the Town; rather, "[t]he rights of the original settlers were recognized and confirmed by the Andros and Dongan [patents], and any divisions of the common lands made prior thereto do not appear thereafter to have been questioned." Shinnecock Hills & Peconic Bay Realty Co. v. Aldrich, 132 A.D. 118, 122, 116 N.Y.S. 532 (2d Dep't 1909).

Trustees, that the Shinnecock lease 120 acres west of Canoe Place that, by reference to the land boundaries in the minutes of the meeting, included Westwoods. (T134.) The Shinnecock's desire to lease these timber lands west of Canoe Place, including Westwoods, from the Town reflects an understanding by the Shinnecock that they no longer possessed ownership or occupancy rights west of Canoe Place.

Second, there have been sworn statements by members of the Shinnecock before the New York State Legislature reflecting their understanding that Southampton lands west of Canoe Place had been sold by the Shinnecock. For example, in 1888, Milton Winfield Lee, a Shinnecock Tribe member who was later elected multiple times as a Shinnecock Tribal Trustee, testified before the Special Committee that "[t]he tribe bought fifty acres of wood land" and that "I think they [the tribe] have a deed of this tract." (T145, at 850–51.) This testimony, which appears to be a reference to land including Westwoods, reflects an understanding that the Shinnecock no longer had aboriginal rights to this land and had to purchase it. Similarly, in 1943, a 74-year old Shinnecock member named Fred Smith testified at a public hearing before the "Joint Legislative Committee on Indian Affairs," which had been established by the New York State Legislature. Smith testified that he had lived in Southampton his whole life and

that the Tribe had purchased the "west wood land," an apparent reference to Westwoods, "by some money the Shinnecocks had." (T233, at 41–42.)

Finally, perhaps the most compelling statement by the Shinnecock Nation indicating their understanding that aboriginal title in Westwoods had been extinguished was in connection with a document submitted by the Tribe to the federal government about thirty years ago. Specifically, in the 1978 Litigation Request, the Shinnecock did not contest, or refuse to recognize, the legality of the Ogden and Topping Deeds in connection with Westwoods; rather, the Tribe conceded the validity and legality of these deeds by stating that "the Tribe's domain to the west of Canoe Place was conveyed to non-Indian individuals in 1659, 1662" (T229, at 8) and that "[t]he tribal territory to the west of Canoe Place was subsequently conveyed to non-Indian individuals by deeds of 1659 and 1662." (T229, at 16.)

Thus, the actions and statements by the Shinnecock Nation, or its members, in dealings with both the federal and state government bodies, as well as the 1808 lease with the Town, provide further evidence in support of the plain and unambiguous extinguishment of aboriginal title that is demonstrated in the series of colonial era documents relating to Southampton lands west of Canoe Place, including Westwoods.[60]

---

**60.** In addition to the affirmative actions and statements by the Shinnecock Nation, there also are a number of points in history, after the issuance of these colonial era documents, where the Shinnecock failed to claim it had aboriginal title to the land west of Canoe Place in circumstances where, if the Shinnecock understood such aboriginal title still existed, such a position logically would have been taken. For example, in 1738, the Town laid out and created the 1738 Canoe Place Division. This Division subdivided a 3,000 to 4,000 acre area west of Canoe Place and

north of Montauk Highway, which included Westwoods, into 39 numbered lots. The Shinnecocks were not allotted any interests in those lots and there is absolutely no evidence in the historical record to any objection or challenge to the Canoe Place Division by the Shinnecock Tribe. Furthermore, in the Tribe's petition in 1822 to the New York State Legislature, the Shinnecock contended to be the "lawfull owners of a certain tract of land ... in the ... Town of Southampton ... bounded on the west by a place called canoe

(c) EVIDENCE REGARDING USE AND OCCUPANCY OF WESTWOODS

In support of its argument that plaintiffs have failed to demonstrate extinguishment of aboriginal title to Westwoods, defendants presented evidence regarding the Shinnecock Nation's use and occupancy of land west of Canoe Place, including Westwoods, and argued that "the evidence overwhelmingly supports the conclusion that the Nation has continuously owned and occupied Westwoods since first European contact." (Plts. Conclusions of Law, at 23.) Defendants pointed to several pieces of evidence including, but not limited to, the following: (1) the *Cassady* Litigation, in which the Trustees of the Shinnecock Tribe of Indians brought suit in 1890 against James Cassady in Suffolk County Court, in their capacity as Trustees; (2) the *Hubbard* Litigation, in 1922, in Suffolk County Court, involving the taking of loam from Westwoods by a road foreman of the Town; (3) the oral history of the Shinnecock Nation, as reflected in the testimony of a current Shinnecock Trustee who reported the general belief in the community that the Nation has always owned Westwoods; (4) historical evidence regarding meeting houses, chapels, and interactions with missionaries in the vicinity of Westwoods; (5) a 1879 photograph of purported Indian huts; and (6) a book in which the author recounts information told to him by his grandfather concerning the Shinnecock Nation.

The Court has carefully examined all of the evidence regarding the use and occupancy of the Westwoods land as it relates to the issue of aboriginal title and disagrees with both the factual assertion by defendants based upon this evidence, as well as the legal conclusions to be drawn from the evidence of use and occupancy.

With respect to the defendants' factual assertion, although there is evidence demonstrating the Shinnecock's use of the land west of Canoe Place in the 19th and 20th century, there is insufficient credible, reliable evidence demonstrating use or occupancy of that land by the Shinnecock Nation from the time of these colonial era transactions through the 18th century. As outlined in more detail in the Findings of Fact, there are several reasons for the Court's conclusion on this factual issue.

First, much of defendants' evidence only pertains to use of such land in the 1800s going forward. For example, in the 1890 *Cassady* Litigation, the court entered judgment for the Trustees and made a finding that the Nation had, at that time, been in quiet possession of Westwoods for "upwards of sixty years," which would place such possession in the early 1800s. Similarly, in the 1922 *Hubbard* Litigation, the court found that "for more than 70 years last past" plaintiff Shinnecock Tribe and its members "have obtained its firewood and fencing" from Westwoods, which would place such activity in the mid–1850s.[61] Thus, these references do not

place...." (T136.) However, in that petition, the Shinnecock did not make any claim of ownership of any lands west of Canoe Place. In addition, in the early 1920s, the Town widened and improved Newtown Road (T208; T232, at 350), including the section of the road that runs across Westwoods, and there was no objection to that activity by the Shinnecock Nation.

**61.** Although the referee appointed in the *Hubbard* case also stated that "within the memory of living witnesses three, four or five families of said tribe resided on said tract," (D1, Findings, at 2), there is no specific information that those families resided on Westwoods because the tract at issue in that case was "about 100 acres," (*id.*), while Westwoods is approximately 80 acres, and there is no information that any other families or individuals ever resided at Westwoods.

establish possession or use of Westwoods from the late 1600s to the 1800s.

Second, much of the evidence offered by the defendants to try to establish use and occupancy of the land west of Canoe Place, including Westwoods, between the late 17th and end of the 18th centuries is unpersuasive either because (1) the evidence only demonstrated use and occupancy of land east of Canoe Place (which is not in dispute); or (2) the evidence showed that Shinnecock may have been in the vicinity of Canoe Place or Westwoods, without any specificity regarding location in terms of whether it was west or east of Canoe Place and/or the precise nature and scope of the relationship of the Shinnecock Tribe to the location. For example, although there was a meetinghouse constructed by the Shinnecock Tribe in the late 18th century, the clear evidence is that it was situated east of Canoe Place. In addition, although there was evidence regarding the existence of the Canoe Place Chapel and the Reverend Paul Cuffee burial plot, both located south of Westwoods, there is no evidence of a Shinnecock Tribal settlement at that location or evidence that the chapel was exclusively a Shinnecock house of worship. Similarly, nothing in the missionary records shows that members of the Shinnecock Tribe inhabited Westwoods during the 18th century. Moreover, although defendants introduced an 1879 photograph purporting to depict Indian huts, there is nothing in the photograph supporting the position that the huts were at or near Westwoods, nor does it show when the huts were erected or whether the huts were occupied by Indians or non-Indians at the time.

Third, the Court finds that some of the evidence, in addition to being vague, is simply not reliable. For example, defendants point to Russell Carman's article *In the Beginning: The Shinnecock Indians and the First White Settlers in Quogue*, in which Carman stated that "[t]he Indians told my grandfather, and he told me, that a large portion of the [Shinnecock] tribe lived, except during the severe cold months, on the bluffs overlooking the Peconic Bay, on the westerly side of the 'haulover', where the Shinnecock locks are today." (D107, at 1.) However, the Court views this secondary source (with multiple levels of hearsay) as having very little, if any, probative value for several reasons. First, Carman does not identify the period of time during which this was reported and defendants' Indian habitation witness (Dr. Campisi) estimated that Carman's grandfather was told this information concerning the purported habitation of the haulover 200 years after the latest time at which the habitation occurred. (Tr. 2726–27.) Second, Carman cited no historical sources or documents for his statement that the Shinnecocks were living west of the "haulover" and the information itself is also vague. Even defendants' expert acknowledged that this "is not the strongest piece of evidence in the world" and is not a primary source document. (Tr. 2654–55; 2658–60.) Finally, and perhaps most importantly, to the extent defendants try to argue that this supports their position in a meaningful way, there is simply insufficient corroboration in the historical record to support their position.

Not only is there the absence of reliable proof of use and occupancy of the land west of Canoe Place by the Shinnecock Tribe from the late 17th century until the 19th century, there is affirmative evidence that, at least as of the late 18th century, the Shinnecock Tribe was situated only east of Canoe Place, near Cold Spring, and not west of Canoe Place. In the late 18th century, the Shinnecocks built a meeting house that was situated east of Canoe Place, Specifically, the maps from that time period show the presence of a meet-

ing house for the Shinnecock Tribe, east of Canoe Place, and no indication of habitation west of Canoe Place, including the following: (1) the 1797 NYDOT Map, which depicts the Indian meeting house east of Canoe Place and does not indicate any Shinnecock habitation west of Canoe Place (T199); (2) the 1780 map prepared by Major John Andre, which does not show any Indian habitation at all west of Canoe Place (D208a); (3) the 1829 Burr Map, which indicates both the name Shinnecock (spelled "Shunnecock") and the meeting house east of Canoe Place, but does not indicate the presence of Shinnecock Indians west of Canoe Place (T360); (4) the 1833 Sumner Map depicts a triangle symbol, indicating the location of the Indians, east of Canoe Place (T250); (5) the 1838 U.S. Coast Guard and Geodetic Survey Map depicts Indian dwellings east of Canoe Place at Shinnecock Neck, but shows no Indian dwellings or Indian habitation west of Canoe Place (T247, at 265, 269–71); (6) the 1859 Chace Map places the Shinnecock Indians east of Canoe Place, and does not show any Shinnecock habitation west of Canoe Place (T247, at 272); (7) the 1873 Beers map displays the Shinnecock Indians east of Shinnecock Bay, and east of Canoe Place, on Shinnecock Point or Shinnecock Neck, and contains no indication of Shinnecock presence or habitation west of Canoe Place (T247, at 274); (8) the Proprietor's Map, created no later than 1885, referenced two Shinnecock locations east of Canoe Place, but contains no indication of any Shinnecock interest in lands west of Canoe Place (T226).[62]

Similarly, the Court does not view evidence regarding Shinnecock's oral history as undermining the extinguishment of ab-

original title. Defendants rely on the testimony of Mr. Gumbs, Chairman of the Shinnecock Tribal Trustees, to support the Shinnecock's position that its oral history demonstrates that it has always owned Westwoods. As a threshold matter, the Court notes that Mr. Gumbs's testimony is not a particularly strong basis for the evidence regarding oral history because the principal source of his understanding and knowledge of Westwoods was from Augustus (Gus) Thompson, who died when Mr. Gumbs was 10 years old, and with whom Mr. Gumbs became close because of nightly dinners and helping Mr. Thompson on his garbage collection route. There is no basis for concluding that Mr. Thompson had any leadership position with the Tribe or had any special knowledge as it related to tribal history. Moreover, this testimony is inconsistent with evidence regarding views of other members of the Shinnecock Nation. For example, during the course of a Shinnecock tribal meeting held on February 4, 2003, Kevin Eleazer, a former Shinnecock Tribal Trustee, stated, "[W]e're not even sure if we own the land in West Woods It was given to us by a millionaire, and yet there was never a deed for that." (T261, at 42; Tr. 2947–48.) Moreover, as discussed in detail *supra*, the testimony by Mr. Gumbs about the oral history is also contradicted by the statements of Shinnecock representatives in state legislative hearings and in litigation that suggests that the Shinnecock Nation's aboriginal title to the Westwoods land was extinguished. Therefore, the Court concludes that the evidence of the Shinnecock Nation's oral history does not undermine the overwhelming evidence of extinguishment of aboriginal title contained in the record as a whole.

**62.** Although the 1836 Smith Map indicates a Shinnecock reservation south of Canoe Place on the west side of Shinnecock Bay, a report co-authored by defendants' habitation witness concluded that the map was in error. Moreover, the 1839 republication of the 1829 Burr map repeats the error in the 1836 Smith map.

In sum, the Court's thorough examination of the use and occupancy demonstrates that (1) there is no reliable evidence of use and occupancy of land west of Canoe Place by the Shinnecock Tribe from about 1675 until the 1800s; and (2) at some point in the 1800s, the Shinnecock Tribe was using land west of Canoe Place (which may have included Westwoods) for timber and, since that time, the Tribe has used such land for timber and other recreational uses, such as picnics. In terms of the legal conclusion that can be drawn from this factual evidence, the Court concludes that there is nothing in the historical evidence regarding use and occupancy that is inconsistent with the extinguishment of aboriginal title to Westwoods in the mid–17th century as indicated in the colonial era documents, discussed *supra*, from that time period. In fact, the use and occupancy evidence is completely consistent with the 1808 Southampton record indicating that the Shinnecock Tribe (through lease or otherwise) sought to use the Westwoods land for timber. Thus, the fact that the Shinnecock Tribe has been using the land for timber and some limited recreational uses for many years since the 19th century does not undermine the Court's conclusion from the plain and unambiguous language in the colonial era documents of the 17th century, demonstrating the acquisition of this land by the Town and the extinguishment by the sovereign of aboriginal title to this land.

(D) NEED FOR ECONOMIC DEVELOPMENT DOES NOT ALTER THE COURT'S ANALYSIS

Finally, the Shinnecock presented evidence of the poverty that exists on the Shinnecock Reservation and argued that the development of a casino at Westwoods will provide the Nation with much-needed economic development to support its self-governing community. Although the Court recognizes the difficult economic circumstances facing many families living on the Shinnecock Reservation, these economic hardships do not give any authority to this Court to rewrite history and ignore the overwhelming evidence demonstrating that aboriginal title of the Westwoods parcel has been extinguished. The Supreme Court has repeatedly cautioned that the justness, wisdom, or equity of a sovereign's extinguishment of aboriginal title is not open to re-examination by the court. *See, e.g., Santa Fe,* 314 U.S. at 347, 62 S.Ct. 248 ("[W]hether [extinguishment] be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts."); *Beecher v. Wetherby,* 95 U.S. 517, 525, 24 L.Ed. 440 (1877) (noting that "the propriety or justice of [the sovereign] towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion ...."); *see also Oneida,* 691 F.2d at 1096 ("[A]ssuming *arguendo* that New York was entitled without federal consent to purchase the Oneidas' land, judicial inquiry into the 'manner, method and time' of its extinguishment of Indian title would be barred.") (*quoting Santa Fe,* 314 U.S. at 347, 62 S.Ct. 248); *Delaware Nation,* 446 F.3d at 416 (" '[T]he manner, method, and time of the sovereign's extinguishment of aboriginal title raise political, not justiciable, issues.' ") (quoting *Santa Fe,* 314 U.S. at 347, 62 S.Ct. 248); *Gemmill,* 535 F.2d at 1147 ("[W]hen the Government clearly intends to extinguish Indian title the courts will not inquire into the means or propriety of the action.").

Thus, although the law requires the plain and unambiguous extinguishment of aboriginal title, *Santa Fe,* 314 U.S. at 354, 62 S.Ct. 248, once that standard is met, the Court cannot disregard the clear intent of the sovereign. As one court explained

when faced with similar concerns raised by a Tribe in connection with a land issue,

> The above principles require the court to take a sympathetic view toward the position of the Red Lake Band [of Indians], but those principles do not permit us to ignore the clear wording of a treaty, agreement, or enactment, or to disregard the intent of Congress. The Supreme Court has cautioned that the courts cannot remake history or expand treaties and legislation beyond their clear terms to remedy a perceived injustice suffered by the Indians.

*Minnesota,* 466 F.Supp. at 1385. In the instant case, the various New York Provincial Governors, while acting under the authority of the British Crown, repeatedly approved of, and confirmed, the fact that the Shinnecock had ceded, relinquished, and conveyed their interest in lands west of Canoe Place, including Westwoods, to Southampton, and the historical record since that time is completely consistent with that unequivocal act of the sovereign. Thus, aboriginal title has been unambiguously extinguished. Since the extinguishment standard has been met, any injustices that the Shinnecock Nation believes occurred prior to that time, or since that time, with respect to that land or the Shinnecock Nation are beyond the purview of the Court's determination of the legal issue that has been decided in this case.

### C. Analysis Under *Sherrill* of Defendants' Claim of Sovereignty Over Westwoods

 Plaintiffs also argue that, regardless of whether the Nation has unextinguished aboriginal title to Westwoods, defendants are barred from asserting sovereignty at Westwoods by the equitable doctrines of laches, acquiescence, and impossibility under the Supreme Court standard articulated in *Sherrill.* Defendants argue that *Sherrill* is inapplicable to the factual situation here because, among other things, the Nation is not re-acquiring possession of land as was the circumstance in *Sherrill.* As set forth below, having carefully considered the trial evidence in the context of the *Sherrill* decision and Second Circuit authority interpreting *Sherrill,* the Court finds that equitable doctrines do provide an independent basis for plaintiffs' success on the merits of this case even assuming *arguendo* that the Nation's aboriginal title to Westwoods was not extinguished.

### (1) Legal Framework for Analyzing Disruptive Land Claim Issue

The 2005 decision of the United States Supreme Court in *Sherrill* set forth the legal framework under which a court must examine equitable doctrines in the context of an attempt by an Indian tribe to reassert sovereignty over a parcel of land. In particular, *Sherrill* involved a refusal by the Oneida Indian Nation (the "OIN") to pay taxes on ten small parcels of land that it had recently purchased, which had been part of its former Indian reservation. Specifically, the OIN argued that "because the Court in *Oneida II* recognized the Oneidas' aboriginal title to their ancient reservation land and because the Tribe has now acquired the specific parcels involved in this suit in the open market, it had unified fee and aboriginal title and may now assert sovereign dominion over the parcels." *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197, 213, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005). The Supreme Court, however, rejected that argument and held that equitable principles barred the OIN from unilaterally reviving its ancient claim of sovereignty over the land:

> Our 1985 decision [in *Oneida II*] recognized that the Oneidas could main-

tain a federal common-law claim for damages for ancient wrongdoing in which both national and state governments were complicit. Today, we decline to project redress for the Tribe into the present and future, thereby disrupting the governance of central New York's counties and towns. Generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation. And at least since the middle years of the 19th century, most of the Oneidas have resided elsewhere. Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.

*Id.* at 202–03, 125 S.Ct. 1478. Specifically, the Court noted that the "unilateral reestablishment of present and future Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences" because "[a] checkerboard of alternating state and tribal jurisdiction in New York State— created unilaterally at OIN's behest— would seriously burde[n] the administration of state and local governments and would adversely affect landowners neighboring the tribal patches." *Id.* at 219–20, 125 S.Ct. 1478 (citation and quotation marks omitted). The Court further explained that "the distance from 1805 to the present day, the Oneidas' long delay in

seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate." *Id.* at 221, 125 S.Ct. 1478. Thus, although OIN could seek damages for any wrongful ancient dispossession with respect to this sovereign land, the Court ruled that the Tribe was precluded by equitable principles from seeking to reestablish sovereignty over the land. *Id.*

In the instant case, assuming aboriginal title has not been extinguished, defendants argue that *Sherrill* is inapplicable because, unlike the OIN, which had not been in possession of the land at issue for over a century, the Nation has always been in possession of Westwoods and has not been subject to taxation or government regulation on that land at any point. However, in *Cayuga*, the Second Circuit recognized that *Sherrill* "has dramatically altered the legal landscape" and had to be considered in deciding the land claim at issue in that case. 413 F.3d at 273. In particular, citing the broad language in *Sherrill*, the Second Circuit emphasized that *Sherrill's* holding could not be limited to the narrow factual circumstances in *Sherrill*, but rather should be applied to disruptive Indian land claims more generally:

> We understand *Sherrill* to hold that equitable doctrines, such as *laches*, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations.

> The [*Sherrill*] Court's characterization of the Oneidas' attempt to regain sovereignty over their land indicate that what concerned the Court was the disruptive nature of the claim itself,

... Although we recognize that the Supreme Court did not identify a formal standard for assessing when these equitable defenses apply, the broadness of the Supreme Court's statements indicates to us that *Sherrill's* holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to disruptive Indian land claims more generally.

*Id.* at 273–74 (citations and quotations omitted).

Therefore, given the broad language in *Sherrill* and the Second Circuit's conclusion that *Sherrill* should be applied more generally to disruptive land claims, the Court finds that it is appropriate to utilize the *Sherrill* framework to analyze the Nation's proposed use of the Westwoods land, which has been dormant for hundreds of years from a development standpoint, to build a casino in violation of New York and local laws. Nor does it matter that the Nation is the defendant is this case, rather than the plaintiff. There is no question that this lawsuit is centered around the Nation's position that it is not subject to any New York or local laws or regulation of any kind in connection with its proposed development of a casino at Westwoods. Thus, although the suit was initiated by the State and Town, the Court must resolve the Nation's land claim in the context of this suit and, in doing so, must consider whether the development of Westwoods is so disruptive that equitable principles should prevent the defendants from initiating such development free of governmental laws and regulations. In fact, the Supreme Court also reached such a conclusion in *Sherrill* in rejecting a suggestion by the dissent that a claim of tribal immunity could be raised defensively in a tax proceeding consistent with the majority opinion. *See Sherrill*, 544 U.S. at 214 n. 7,

125 S.Ct. 1478 (citations omitted) ("The dissent suggests that, compatibly with today's decision, the Tribe may assert tax immunity defensively in the eviction proceeding initiated by Sherrill.... We disagree. The equitable cast of the relief sought remains the same whether asserted affirmatively or defensively.").

Accordingly, the Court will apply the *Sherrill* framework to the particular facts of this case to determine whether such equitable relief is warranted. Moreover, as with the extinguishment issue, the Court has placed the burden of proof on plaintiffs under a preponderance of the evidence standard, since they are the parties invoking the equitable principles to prevent the assertion of sovereignty. *See, e.g., Gidatex, S.r.L. v. Campaniello, Imports, Ltd.*, 82 F.Supp.2d 126, 130–136 (S.D.N.Y.1999) (holding that party invoking equitable principles of unclean hands, laches, and acquiescence has burden of proof); *see also United States v. 0.28 Acres of Land*, 347 F.Supp.2d 273, 279 (W.D.Va.2004) (holding that party claiming laches bears the burden of proof).

### B. Nation's Motion to Preclude Evidence Regarding Potential Uses of Westwoods

During the trial, defendants sought to preclude any consideration by the Court of evidence regarding potential uses of Westwoods or the purported impact of those potential uses because such evidence is irrelevant and speculative. Instead, defendants argued that the Court should base its analysis only on evidence relating to the impact caused by the current proposed use of the property by the Nation as reflected in its development agreement—namely, a 61,000 sf. facility to be constructed on about 15 acres at Westwoods, capable of holding between 900–1,000 gaming machines and 60 table games. (D237, at 13,

15–16.) For the reasons set forth below, the Court disagrees and will consider, in conjunction with the entire record, both the impact of the current intended use by the Nation of the property, as well as the potential disruption that could be caused generally by the Nation's unfettered ability to develop the property without regard to the laws and regulations of New York and the Town.

As a threshold matter, the Court notes that this lawsuit is not limited to a desire to enjoin construction of a casino of a particular size or nature; rather, plaintiffs seek to enjoin all construction as it relates to gaming activity at Westwoods. Moreover, in this lawsuit, the Nation has consistently taken the position that they have the absolute right to expand the gaming at Westwoods beyond the terms of any current contract with developers in any manner at any time free of New York and local laws. Thus, the dispute here relates not just to a particular proposed facility, but rather involves a more general position by the Nation that they can use the land for any purpose whatsoever.

In any event, both the Supreme Court in *Sherrill* and the Second Circuit in *Cayuga* analyzed the issue of the disruptive impact of the underlying land claims based upon potential future disruptiveness that would result from a decision in favor of the tribe. As noted *supra*, the *Sherrill* Court noted that "the unilateral reestablishment of present *and future* Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences." 544 U.S. at 219, 125 S.Ct. 1478 (emphasis added). In fact, the *Sherrill* Court specifically referenced the potential harmful consequences that could result in the future if the Oneidas' claim of sovereignty over the land was recognized—namely, the potential of future litigation to free the land of local zoning and other regulatory controls. *See id.* at 220, 125 S.Ct. 1478 ("If OIN may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the Tribe from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area."). In addition, the *Sherrill* Court cited in a footnote, as an example of potential future disruptive consequences, the Cayugas' attempt to assert tribal sovereignty over newly acquired property in order to conduct gaming in violation of local regulatory controls. *See id.* at 220 n. 13, 125 S.Ct. 1478. Moreover, the *Sherrill* Court also stated that attempts to regain sovereignty over newly acquired parcels should be addressed through the land-in-trust provisions established by Congress and the Department of Interior. *Id.* at 220, 125 S.Ct. 1478. That process includes consideration by the Secretary of the Interior of potential future conflicts of land which may arise. *Id.* at 221, 125 S.Ct. 1478 ("Before approving an acquisition, the Secretary must consider, among other things, ... 'the impact of the State and its political subdivisions resulting from the removal of the land from the tax rolls'; and '[j]urisdictional problems and potential conflicts of land use which may arise.' 25 C.F.R. § 151.10 (2004).").

Similarly, in *Cayuga*, the Second Circuit also considered the potential future impact of the Cayuga's possessory land claim, which sounded in ejectment. Specifically, in rejecting the contention that the request for ejectment should not be precluded under the equitable defense of laches because ejectment is characterized as an action at law rather than an action in equity, the Second Circuit stated that "[w]hether characterized as an action at law or in equity, any remedy flowing from this possessory land claim, which would call into question title to over 60,000 acres of land

in upstate New York, can only be understood as a remedy that would similarly 'project redress into the present and future.'" *Cayuga,* 413 F.3d at 275 (quoting *Sherrill,* 544 U.S. at 221 n. 14, 125 S.Ct. 1478) (footnote omitted). The Court further explained that "the import of *Sherrill* is that 'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches." [63] *Id.* at 277.

Thus, the Court believes that, in considering the disruptive impact under *Sherrill,* it should consider not only the current stated use of the land, but also other future disruptive consequences that could flow from a broad ruling by this Court (as urged by defendants) that the Nation is free to develop the Westwoods land in any way it sees fit free of any New York or local laws or regulations. However, the Court emphasizes that this conclusion is not critical to the Court's *Sherrill* analysis under the facts of the instant case because, as discussed *infra,* the Court concludes that even the Nation's current intended use of Westwoods is sufficiently disruptive that it should be barred under the equitable principles articulated in *Sherrill.*

### (3) ANALYSIS

In applying *Sherrill* to the facts of this case, this Court has considered a number of factors including the degree of control and governmental authority asserted by the Nation and the Town at Westwoods over the past several centuries, the amount of historical delay in the Nation's assertion of sovereignty over Westwoods, and the degree of disruptive impact over neighboring landowners and the community if the

Nation were now able to assert sovereignty over this land and build a gaming facility free from governmental laws and regulations. As discussed below, the Court concludes that when these factors are considered in the context of this case—namely, the Nation's hundreds of years of delay in claiming sovereignty over this land, the Nation's lack of use of this land for centuries for anything other than cutting timber and periodic recreational events, and the substantial disruption that a casino facility would have on the administration of governmental affairs in the Town and on the health, safety, and long-settled expectations of the community—the assertion of sovereignty is barred under the equitable doctrines of laches, acquiescence, and impossibility, even assuming *arguendo* that the Nation holds unextinguished aboriginal title to the land.

#### (A) HISTORIC LACK OF GOVERNMENTAL AUTHORITY OR CONTINUOUS PRESENCE BY THE NATION AT WESTWOODS

The Nation has not maintained a continuous presence at Westwoods or exercised any governmental authority over that land. The evidence at trial demonstrated that the Nation has used Westwoods for its timber resources, pursuant to a lease sought by the Nation and granted by the Town in the early 19th century. This arrangement followed the depletion of timber resources in the lands east of Canoe Place, known as the 1703 Lease Lands. In fact, the only usage of Westwoods attested to by the Nation at trial was for cutting wood, Sunday school, and Fourth of July picnics. This lack of use or exercise of governmental authority over Westwoods

---

**63.** In fact, Judge Hall also acknowledged in his dissent in *Cayuga* that *Sherrill* applied equitable considerations to land possession claims that involved forward-looking, disruptive remedies. *See id.* at 290 (stating that *Sherrill* "supports the proposition that the na-ture of forward-looking, disruptive remedies generally will serve as equitable considerations that can bar such equitable remedies as re-possession, even against the United States").

was further confirmed by other evidence at trial, including but not limited to, the following: (1) there are no Shinnecock records or other records suggesting or indicating exclusive or continuous Shinnecock habitation of Westwoods; (2) there is no documented or recollected allotment of any lands within Westwoods to any Shinnecock tribal member; (3) there are no written tribal laws, rules, or regulations for use of Westwoods by Tribe members; (4) no permanent structure exists on any part of Westwoods and the property has never been fenced in by the Nation; (5) other than the 1808 minutes reflecting the Shinnecock request to lease 120 acres of land including Westwoods, the Town's Indian records contain no historical references to Westwoods; (6) a 2003 archaeological study of the 15–acre site within Westwoods, that relates to the proposed casino, found "minimal human activity in the past" (T135, at ii; Tr. 964–66); (7) a December 2003 report of a 3–acre site in the vicinity of Westwoods found "[n]o historic features or artifacts" (T202, at 14); and (8) when a non-Shinnecock owner of land adjacent to Westwoods encroached upon Westwoods land, the Nation took no action to have the encroachment removed. In short, the Nation is seeking to assert sovereignty in connection with a parcel of land over which the Nation has never claimed sovereignty prior to this litigation and which has remained essentially dormant for hundreds of years, other than use for timber and periodic social gatherings.

### (B) TOWN'S EXERCISE OF GOVERNMENTAL AUTHORITY OVER WESTWOODS

In contrast to this lack of usage or exercise of governmental authority over Westwoods for centuries, the Nation has allowed the Town to exercise significant governmental authority over the land without any objection from the Nation. As a threshold matter, the defendants have emphasized, and the Court recognizes, that the Town has never sought to impose property taxes on the land. There is no record documenting the reason for such inaction, but defendants argue that it is indicative of an implicit recognition of sovereignty by the Town. However, the Court rejects that conclusion in light of the entire trial record. Although imposition of taxes is a strong indicator of governmental authority, it is certainly not the exclusive indicator under the law, or the dispositive indicator under the facts of this case. More specifically, despite the Town's failure to impose property taxes on Westwoods, the Town has over the years engaged in activity in connection with the land that is clearly indicative of the exercise of governmental authority, including but not limited to the following: (1) the 1738 Canoe Place Division, which subdivided a 3000–4000 acre area west of Canoe Place and north of Montauk Highway, including Westwoods, into 39 numbered lots; (2) the Canoe Place Division Lot Drawing, during which, even though no interests were allotted to Shinnecock members, there was no objection or challenge to the establishment of the Canoe Place Division or the allotment process; (3) Town records indicate that the Town regulated the harvesting of timber throughout the Town in the 18th century, including in areas west of Canoe Place; and (4) in the 1920s, the Town widened and improved Newtown Road, including the portion of the road that runs through Westwoods, without any objection from the Nation. Moreover, since the Town's first zoning ordinance was adopted in 1957, Westwoods has been classified as residentially-zoned property by the Town and remains zoned as residential (R–60) today. Moreover, when the Nation requested that this designation be removed in 1985, the Town refused and the Nation did not further challenge that decision. Thus, even in the absence of the

imposition of property taxes, the Town has exercised substantial government authority over Westwoods for several centuries without objection from the Nation and this fact is significant in considering the equitable factors under *Sherrill.*

### (c) DISRUPTIVE IMPACT OF NATION'S EXERCISE OF SOVEREIGNTY

In connection with the summary judgment motions and the preliminary injunction motion, Judge Platt identified some of the anticipated disruptive effects that could be caused by the casino project. *See Shinnecock Indian Nation,* 400 F.Supp.2d at 496 n. 6 ("[A] remedy may also be disruptive in cases similar to the one at bar, where dispossession is not at issue and only neighboring landowners will be affected by the Indians' claims.") (*citing Sherrill,* 544 U.S. at 219–20, 125 S.Ct. 1478); *Shinnecock Indian Nation,* 280 F.Supp.2d at 9–10 ("[T]he construction of a casino like the one proposed by Defendants would cause incredible traffic congestion in the surrounding community.... [I]t is also likely to drastically heighten air pollution along Routes 25 and 27."); *see also id.* ("If Defendants fail to abide by State and Town environmental regulations, the likely harm to the pristine community of Southampton could be devastating.").

The concerns raised by Judge Platt in the pre-trial context regarding potential disruptive effects of this assertion of sovereignty by the Nation at Westwoods were borne out at trial. As described below, the evidence at trial demonstrated that the construction and operating of a gaming complex at Westwoods would undoubtedly cause a substantial disruption of the administration of state and local governments, as well as severely harm the settled expectations of landowners neighboring the Westwoods property and Town residents more generally. Moreover, the health and environmental problems would be further magnified in the instant situation because the assertion of sovereignty of the property would allow the Nation to develop a casino project free of New York and local laws and regulations.

First, a casino at Westwoods would require a significant expenditure of additional state and local funds to provide essential services to the facility, including such items as police, fire, ambulance, and providers of other municipal services such as the water district. Although taxation is generally used to at least partially offset these additional costs, no such offset could occur if the Nation were able to assert its sovereignty over the Westwoods land in a manner that made it immune from such taxes and fees,

Second, there is no question that a casino at Westwoods would have substantial disruptive impact on the area's already saturated transportation infrastructure. The evidence at trial clearly demonstrated that the traffic in and around the area of Southampton during the summer months is extremely high, resulting in substantial delays to motorists. Based upon the expert testimony and other evidence the Court heard at trial, the Court finds that the impact of adding thousands and thousands of additional motorists, destined for a Westwoods casino, into this severely-burdened transportation network would be devastating. Plaintiffs' traffic expert concluded: "In our expert opinion, with respect to traffic, the Westwoods project would impose a significant burden on an already overtaxed system.... [A] project the size of the Westwoods project, even if it is located west of the canal, would create significantly detrimental traffic and safety impacts to local communities." (S77, at II.) The Court finds that conclusion fully supported by the trial record. The disruption is not limited to the substantially-increased traffic delays and congestion

that would inevitably result in the area as a result of the additional usage, but also safety issues that would flow from such a scenario. For example, plaintiffs' expert testimony credibly established that the use of local roads to access Westwoods, especially when considering the unreasonable delays on the major highways and roads that would ensue, would create enormous safety issues for motorists and residents. That evidence included the following: (1) local roadways "would not be able to handle the additional traffic activity" (S77, at 66, V ("The local streets would be unable to accommodate the newly added traffic under these conditions.")); (2) buses going to the casino would have to travel over small, winding residential roads—without shoulders, curbs, sidewalks, or street lights—that are "not appropriate for commercial buses to be on" (Tr. 1466–67); and (3) "extraordinary delays" resulting from the unsignalized intersections being unable to handle the increase in traffic would "encourage unsafe choices by motorists" thereby "increasing the potential for accidents." (S77, at 40.) Even the Nation's expert regarding traffic impact acknowledged that there would be substantial increases in traffic in and around Westwoods from the operation of a casino. However, he concluded that the "unreasonable" traffic impacts could be alleviated through a series of modifications to various roadways *and* if direct access ramps from Sunrise Highway to Westwoods were built. (Tr. 3935–41.) In other words, even the Nation's traffic expert concluded that a casino would cause unreasonable disruption in the area of Westwoods in the absence of direct access ramps from Sunrise Highway to the casino. Yet, it was far from clear from the evidence who would build these ramps, whether they were legally permissible under current regulations, and who would bear the costs of such construction.[64] Moreover, even if the ramps could be built, it is entirely unclear how the construction of ramps where Squiretown Road or Newtown Road pass under Sunrise Highway would alleviate these traffic problems; instead, the traffic would just be tunneled into these small roads and create additional traffic issues there. Therefore, the evidence at trial demonstrated that a Westwoods casino would substantially disrupt the use of roadways in and around the Southampton area as a result of the increased traffic on an already severely-burdened traffic network.

Finally, the Court concludes that there are a series of disruptive health and environment impacts that would flow from the construction and operation of a casino at Westwoods. The Court credits the testimony and evidence offered by the plaintiff that there would be numerous short-term and long-term effects to the natural environment in and around Westwoods, including: (1) the degradation of water quality (Tr. 1847); (2) the loss or fragmentation of "very sensitive, actually rare" ecological subcommunities in the area (Tr. 1848); (3) the potential erosion of the coastal bluff area (Tr. 1851); (4) the generation of "very detrimental" edge habitats, which are used to "provide avenues for the incursion of . . . non-native species into the interior of

---

64. For example, plaintiffs introduced evidence suggesting that there is substantial doubt as to whether such ramps would be consistent with the current criteria for such ramps under New York Department of Transportation rules. Specifically, the NYS DOT will not grant a permit to any person seeking to build an access ramp from a limited access highway, such as Route 27, to private property, such as Westwoods, unless the ramp connects to publicly-owned roadway before the private property. (S245, D361, at 75–76.) Because the ramps envisioned here would go directly into Westwoods and not connect to any public road, it would be problematic.

the forest where they displace native wildlife" (Tr. 1958); and (5) other potential damage to "a critical ecosystem to Long Island," (Tr. 1955), which includes several dozen species of birds and rare plant species (Tr. 1955–59). In addition, plaintiffs offered credible evidence that traffic-related pollutants would increase and "cause a whole series of health impacts." (Tr. 1935–36; S200, at 4–5.) Moreover, the noise quality of the area also would be adversely impacted (in Build Alternative 2, the build without ramp access scenario) and affect "all of the residential development on Squiretown Road and Newtown Road north of Rte 27, which includes approximately 75 single-family homes." (S200, at 16.)

Defendants presented evidence and made a number of arguments to address the massive evidence of disruptive impact offered by the plaintiffs. In particular, the Nation had three principal arguments: (1) although it is the Nation's position that it is not subject to New York or local regulations of any kind in connection with development at Westwoods, its current Development Agreement specifically requires that the initial 61,000 sf. facility and any future expansion be constructed in accordance with state environmental laws (Defs. Proposed Conclusions of Law, at 65); (2) the plaintiffs' expert testimony, and the assumptions and methodologies underlying that testimony, are "so unrealistic and unreliable as to be useless for any purpose" (*id.* at 66); (3) plaintiffs' disruption evidence "suffers from a fatal defect" because "[i]nstead of addressing the development of Westwoods as actually contemplated by the Development Agreement, the State and the Town chose to present only evidence with respect to the potential impact

of a grossly overstated development of Westwoods that is contemplated only in their own imaginings" (*id.* at 12). The Court has carefully considered all of defendants' expert testimony and their arguments regarding the insufficiencies of plaintiffs' experts and is unpersuaded by the Nation's contention that plaintiffs have not made a sufficient showing of disruptive impact under *Sherrill.* The Court will address the Nation's three main contentions below.

With respect to the Nation's current intention as reflected in the Development Agreement to comply with state environmental standards and its stated intention at trial to use best practices to avoid environmental impacts, the Court does not view such circumstances as sufficient to eliminate the disruptive impacts under *Sherrill.* The Nation currently has no environmental laws, building codes, or any other ordinances that require any contractor building on Westwoods to adhere to any standards whatsoever, or to consider environmental impacts. In any event, if the exclusive sovereignty sought by the Nation over Westwoods were recognized by the Court, the Nation would be free to modify any such codes or ordinances at any time even if they were adopted, and also would be able to modify the Development Agreement or any other contract at any time to eliminate any current desire to comply with New York environmental standards. Thus, the Nation's current intention to comply voluntarily with state environmental standards does not alter the Court's analysis under *Sherrill* under the facts of this case.

Defendants' position regarding flaws in the methodologies and assumptions of plaintiffs' experts is similarly unavailing.[65]

65. For example, defendants made the following arguments, among others, with respect to plaintiffs' experts: (1) "The methodology underlying the plaintiffs' expert testimony relating to the costs that would be imposed on the State and Town is characterized by gross er-

Both plaintiffs and defendants in this lawsuit pointed to certain errors made by the opposing party's experts or certain factual assumptions that could not be supported with certainty. Each side argued that these flaws by the opposing expert led to an estimated calculation in terms of disruptive impact that made the expert opinion exaggerated and unreliable. The Court spent considerable effort navigating through this battle of the experts. Although defendants believe that the purported errors by plaintiffs' experts make them useless, the Court simply disagrees. When assessing these types of impacts based upon a proposed development of a site (or economically-viable potential use of a site), experts by necessity must utilize certain assumptions and estimates about human behavior in terms of how many people will attend such a casino, how long they will spend at the casino, as well as their method and route of transportation. The fact that these require some level of prediction about future human behavior, and that reasonable minds can differ regarding a particular assumption by an expert, does not mean that the testimony is useless. Here, despite defendants' contention to the contrary, the Court concludes that the methodologies utilized by plaintiffs' experts are sufficiently sound to be relied upon by the Court.[66] Moreover, even if plaintiffs' experts' calculations were adjusted to reflect the purported errors or weaknesses identified by defendants, the remaining levels of impact would still be sufficient to satisfy the *Sherrill* standard.

Finally, the Court rejects defendants' contention that the expert evidence offered by plaintiffs is fatally flawed because it erroneously measures impact not of the current intended 61,000 sf. facility, but rather is based upon much larger casino projects not currently intended by the Nation. As a threshold matter, as discussed *supra*, the Court rejects the Nation's legal argument that the Court cannot consider under *Sherrill* the potential development of a casino even larger than the one currently anticipated by the Nation. In other words, the equitable analysis under *Sherrill* cannot take place on a piecemeal basis for each building erected at Westwoods or have to be reassessed and regulated by the federal courts every time there is a future change in activity at Westwoods; rather, this equitable issue under *Sherrill* necessarily looks forward into potential disruptive impacts that can reasonably result from unfettered development of the property. Moreover, the Court finds that plaintiffs credibly demonstrated that a large casino at Westwoods far beyond the Nation's current intentions is economically feasible. As plaintiffs' expert credibly concluded, given its proximity to New York City and the high demand for a gaming facility closer than Atlantic City or Connecticut, a gaming facility at Westwoods would have the economic potential to be massive in scale far beyond the 61,000 sf. casino that the Nation states that it currently intends to build. (Tr. 1410 (describ-

---

rors and unfounded assumptions, and ignores any possibility of economic benefits to the community." (Defs. Proposed Conclusions of Law, at 66); (2) "The plaintiffs' environmental analysis suffers from the same unfound assumptions, and displays a notable lack of expertise. In particular, the plaintiffs' analysis of air and noise issues is amateurish and so methodologically defective as to be useless for any purpose" (*id.*); and (3) plaintiffs' traffic expert's report contained numerous errors,

including a defective model and arithmetic errors (*id.* at 66–67).

**66.** Although defendants moved to strike reports and testimony of certain of plaintiffs' impact experts, the Court found, for the reasons set forth on the record, that the experts' reports and testimony satisfied the *Daubert* criteria.

ing a 300,00 sf. casino with 7,000 gaming devices and approximately 250 tables).) The expert reached a conservative conclusion that a stand-alone casino at Westwoods comprising 162,500 sf., including 3,500 gaming devices and 140 table games, would be financially viable. (S1, at 3, 6–8; Tr. 1393–96.) In fact, one of the defendants' expert witnesses (Mr. Rittvo), performed an economic analysis of a gaming facility with 3,000 gaming positions (and 450 hotel rooms and a restaurant with seating for 1,000 to 2,000 people), which he concluded would be "optimally sized" and extremely profitable, with between S358.4 million and $403.2 million in revenues for the Nation. (D329, at 1–2.) The defendants' expert also analyzed an unconstrained scenario with a casino with 6,500 positions, which would have revenues within the range that he considered necessary to be profitable.[67] (D238, at 1; S268, at line 64, col B; Tr. 3216.) Therefore, to the extent that defendants argue that all plaintiffs' expert testimony should be rejected because it looks at casino proposals beyond the one currently anticipated, the Court finds that argument unpersuasive.

In any event, even if the Court adhered to the defendants' position on this issue and only looked at the disruptive impact under *Sherrill* of the current proposed casino development as reflected in the Development Agreement, the Court's conclusion would not be altered under the facts of this case. First, it is undisputed that even the Nation's proposed 61,000 sf. gaming facility would be inconsistent with the current residential zoning classification of the Westwoods property. Second, if the Nation were allowed to assert exclusive sovereignty over this land, such development would take place without the Nation being required to comply with New York and local environmental and health laws and regulations. Third, although the levels of impact in the various areas described above would be less than the projections for the larger potential facilities, it is beyond cavil for the Nation to argue that the current proposal would not significantly increase the level of services that state and local authorities would have to provide in the area, as well as significantly disrupt the neighboring landowners and residents of the Town in various aspects including traffic, noise, and other related effects of a casino construction and operation. Perhaps the best illustration of this point is the testimony of the Nation's traffic expert. Although the Nation's expert regarding traffic impact acknowledged that there would be substantial increases in traffic in and around Westwoods based upon the Nation's current proposal, he concluded that the "unreasonable" traffic impacts could be alleviated through a series of modifications to various roadways. Even if these modifications were made, it is not clear to this Court based upon the detailed traffic evidence submitted at trial that the "unreasonable" traffic impacts will be avoided.

Thus, even the 61,000 sf. facility currently being contemplated by the Nation has a sufficiently disruptive impact to satisfy *Sherrill*. In *Sherrill*, the Supreme Court relied upon the mere possibility that the Oneidas would seek to free the land at issue from zoning and other regulatory controls at some future time as sufficient to apply laches to their sovereignty claim.[68]

---

**67.** Specifically, with respect to the casino with 6,500 gaming positions, defendants' expert concluded it would generate more than $521 million in gaming revenues and have a win per position of $220, which is within the range of win per position that the expert "likes to see" for a successful casino. (D328, at 1; S268, at line 64, col. B.; Tr. 3216.)

**68.** In *Sherrill*, there was no trial on the disruptive impact from the reassertion of sover-

*See* 544 U.S. at 220, 125 S.Ct. 1478 ("If [the Oneida Indian Nation] may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the Tribe from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area."). Even Justice Stevens, as the lone dissenter in *Sherrill,* recognized that "[g]iven the State's strong interest in zoning its land without exception for a small number of Indian-held properties arranged in a checkerboard fashion, the balance of interests obviously supports the retention of state jurisdiction in this sphere." *Id.* at 226–27 n. 6, 125 S.Ct. 1478.

The court reached a similar conclusion in *Cayuga Indian Nation of New York v. Village of Union Springs,* 390 F.Supp.2d 203 (N.D.N.Y.2005). In *Union Springs,* the court vacated an injunction that prohibited the defendants from enforcing local zoning and land use laws in connection with the Cayuga's activities on property recently purchased by the tribe, within an area subject to the tribe's land claim. In doing so, the court found that immunity from zoning and land laws was even more inherently disruptive than the Oneida's claimed immunity from taxation:

> If avoidance of taxation is disruptive, avoidance of complying with local zoning and land use laws is no less disruptive. In fact, it is even more disruptive. The Supreme Court [in *Sherrill*] clearly expressed its concern about the disruptive effects of immunity from state and local zoning laws,

even to the point of citing this case as an example. . . .

> The Nation is seeking relief that is even more disruptive than non payment of taxes. The Supreme Court's strong language in *City of Sherrill* regarding that disruptive effect on the every day administration of state and local governments bars the Nation from asserting immunity from state and local zoning laws and regulations.

*Union Springs,* 390 F.Supp.2d at 206.

In the instant case, this Court recognizes that there is no allegation that the Nation recently re-possessed Westwoods and, thus, it is factually distinct from *Sherrill* (and *Union Springs*). Although this fact should obviously be carefully weighed in the *Sherrill* equitable analysis, the Court must also recognize that the degree and clarity of the disruption in the instant case demonstrated during the course of a lengthy trial far surpasses the disruption in *Sherrill,* in terms of how the development of Westwoods in violation of local zoning and land usage regulations would disrupt the administration of state and local governments, and negatively impact the well-being and settled expectations of adjacent landowners and the local population. Moreover, the other equitable factors strongly favor plaintiffs, including (1) despite possessing the Westwoods land for centuries, the Nation never claimed sovereignty over that land prior to this lawsuit; (2) the Nation has not used the land for anything other than timber and periodic recreational gatherings; and (3) the Nation never sought to free itself from the decades-old zoning classification, or sought

---

eignty and the Court did not remand the case to the district court to take evidence on that issue. In fact, the district court had granted summary judgment in OIN's favor, finding there was no evidence of irreparable harm and the City of Sherrill could address any burdens from removal of the parcels from the

tax rolls. *Oneida Indian Nation v. City of Sherrill,* 145 F.Supp.2d 226, 252, 255 (N.D.N.Y.2001). Instead, the Supreme Court found the disruptive impact warranting equitable relief "on considerations not discretely identified in the parties' briefs." 544 U.S. at 214 n. 8, 125 S.Ct. 1478.

to engage in activity that violated the Town's zoning laws or New York's environmental laws. In sum, after considering all of the equitable factors, the Court finds that, even assuming *arguendo* that the Nation had aboriginal title over Westwoods, the equitable doctrines of laches, acquiescence, and impossibility as articulated in *Sherrill* preclude the Nation from exercising sovereignty over that land for purposes of developing such land without regard to local zoning and land use laws, or other New York and local laws and regulations.

### D. IGRA AND COMMON LAW RIGHTS UNDER *CABAZON*

██ After the trial in this consolidated action was commenced and the trial was reassigned to the undersigned, the State sought reconsideration of the denial by Judge Platt of their potentially dispositive motion for partial summary judgment and for a permanent injunction as it related to IGRA. Specifically, in its original motion and reconsideration motion, the State argued that, through the enactment of IGRA, Congress had occupied the field of Indian gaming and that any gaming outside the scope of this federal law must comply with New York law. As applied to the Nation in this case, the State contended that, because the planned gaming facility does not comply with IGRA and violates New York gaming laws, the State was entitled to partial summary judgment on its first cause of action (alleging violation of New York gaming laws) and a permanent injunction. Although the Nation acknowledged that it is not a tribe under IGRA and thus cannot conduct gaming under the provisions of IGRA, the Nation argued, among other things, that IGRA did not supplant its common law right to conduct gaming activity on Westwoods.

In granting the motion for a preliminary injunction, Judge Platt agreed with the State's position that the Nation did not meet the criteria under IGRA and that any gaming would violate New York law. *Shinnecock Indian Nation*, 280 F.Supp.2d at 6–7. In denying the State's motion for partial summary judgment, the Court held that a trial was required to determine whether the Nation had retained aboriginal title over Westwoods and, if so, whether the impact of the casino on Westwoods was sufficiently disruptive that it could be prevented under the *Sherrill* case. *Shinnecock Indian Nation*, 400 F.Supp.2d at 493–96. However, Judge Platt did not specifically address the IGRA issue in the opinion.

Defendants suggested, when the motion for reconsideration was made during the trial, that Judge Platt implicitly concluded that, if the Nation continues to have unextinguished aboriginal title to Westwoods (an issue that needed to be resolved with a trial), the Nation would retain a common law right under *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), to conduct gaming activity outside of IGRA. However, plaintiffs argued that Judge Platt simply overlooked this controlling legal issue and, thus, plaintiffs asked that the Court stop the trial and grant their motion for reconsideration. When the belated motion to reconsider was raised during the trial, the Court declined to halt the trial to decide the motion, but instead allowed the parties to re-brief the issue while the trial continued and advised the parties that the Court would re-analyze the IGRA issue in light of the motion for reconsideration at the conclusion of the case with the benefit of the full trial record. As set forth below, the Court finds that the Nation does not have a common law right to engage in gaming, outside the scope of IGRA, in violation of New York gaming laws and, even assuming *arguendo* that aboriginal title provided a common

law safe-haven for such activity, no such exemption exists because aboriginal title has been extinguished.

### (1) The IGRA Framework

Through the Commerce Clause of the United States Constitution, which allows Congress to "regulate Commerce ... with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3, Congress has the authority to regulate Indian affairs. Pursuant to that authority, Congress enacted IGRA in 1988 in response to the Supreme Court's decision in *Cabazon*. In *Cabazon*, the Supreme Court analyzed California's bingo laws, which restricted the operation of games, but did not prohibit them entirely. 480 U.S. at 210, 107 S.Ct. 1083. The Court held that because California permitted a "substantial amount of gambling activity ... California regulate[d] rather than prohibit[ed] gambling in general and bingo in particular" and, thus, was precluded from prohibiting an Indian tribe from conducting bingo on Indian lands, even though it was being conducted in violation of California penal laws. *Id.* at 211, 107 S.Ct. 1083. IGRA was enacted to create a comprehensive federal statutory scheme for tribal gaming that differed from the common law principles recognized by the *Cabazon* Court. *See Am. Greyhound Racing Inc. v. Hull*, 305 F.3d 1015, 1018 (9th Cir.2002) ("Congress declared [in 25 U.S.C. § 2702(1)] that IGRA's primary purpose was 'to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.' ") (footnote omitted); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1548 (10th Cir.1997) (holding that IGRA "provides a comprehensive regulatory framework for gaming activities on Indian lands which seeks to balance the interests of tribal governments, the states, and the federal government") (internal quotation

marks omitted). Specifically, Section 1166(a) of Title 18 provides, in pertinent part, as follows:

> Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.

18 U.S.C. § 1166(a). The only exception to Section 1166(a) is gaming that occurs in compliance with IGRA. *See* 18 U.S.C. § 1166(c).

Gaming under IGRA can only be conducted by an "Indian tribe" on lands that the federal government defines as "Indian lands." 25 U.S.C. § 2710(d)(1). "Indian tribe" under IGRA is defined narrowly to include only tribes that are recognized by the BIA. 25 U.S.C. § 2703(5)(A). It also defines "Indian lands" to include all lands within the limits of any Indian reservation and any lands title to which is held in trust by the United States for the benefit of any Indian Tribe. 25 U.S.C. § 2703(4); 25 C.F.R. 502.12.

IGRA also divides gaming into three classes. Class I gaming includes social games for prizes of minimal value and traditional forms of Indian gaming engaged in as part of, or in connection with, tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class II gaming includes bingo and certain card games, but not banking card games or electronic facsimiles of any games of chance or slot machines of any kind. 25 U.S.C. § 2703(7)(A), (B). Class III gaming is defined as all forms of gaming that are not within the definitions of Classes I and II, including casino games, banking card games, and lotteries. 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4.

With respect to Class III gaming, in addition to the requirements that the gaming be engaged in only by an "Indian tribe" on "Indian lands," IGRA provides the Class III gaming is only lawful where it is: (1) authorized by an ordinance or resolution adopted by the government body of the Indian Tribe and approved by the Chairman of the National Indian Gaming Commission; (2) located in a state that permits such gaming for any purpose by any person, organization, or entity; and (3) conducted in conformance with a tribal-state compact entered into by the Indian Tribe and the state that is in effect. 25 U.S.C. § 2710(d)(1). Pursuant to this framework, the state must negotiate in good faith with an Indian tribe to enter into a tribal-state compact governing the conduct of gaming activities when such negotiation is requested of the state by an Indian tribe with jurisdiction over Indian lands. 25 U.S.C. § 2710(d)(3). The Secretary of the Interior ("the Secretary") must then approve the tribal-state compact before it takes effect. 25 U.S.C. §§ 2710(d)(3)(B), (d)(8). "Since New York allows some forms of class III gaming—for charitable purposes—such gaming may lawfully be conducted on Indian lands provided it is authorized by a tribal ordinance and is carried out pursuant to a tribal-state compact." *Dalton v. Pataki,* 5 N.Y.3d 243, 259, 802 N.Y.S.2d 72, 835 N.E.2d 1180 (N.Y.2005). In short, under IGRA, class III gaming may only be conducted by an "Indian tribe" on "Indian land" in New York pursuant to a tribal-state compact approved by the Secretary. Given this framework, IGRA preempts state law in the field of regulating Indian gaming, but only to the extent of its application. In other words, if IGRA does not apply, then state law prohibitions on gambling are not preempted. *See, e.g., Carruthers v. Flaum,* 365 F.Supp.2d 448, 466 (S.D.N.Y.2005) ("IGRA preempts state anti-gaming laws, but only to the extent of its application."); *Cayuga Indian Nation of N.Y. v. Vill. of Union Springs,* 317 F.Supp.2d 128, 148 (N.D.N.Y.2004) (same); *see also First Am. Casino Corp. v. E. Pequot Nation,* 175 F.Supp.2d 205, 209–10 (D.Conn.2000) ("Because IGRA's text unambiguously limits its scope to gaming by tribes that have attained federal recognition, the statute does not apply to defendant's gaming-related activities.... Accordingly, plaintiff's state law claims are not completely preempted by IGRA.") (citation omitted).

There is no question that the Nation cannot satisfy the requirements necessary to conduct gaming at Westwoods under IGRA. First, and foremost, the Nation cannot satisfy the definition of an "Indian tribe" because it is undisputed that the Nation is not recognized as a tribe by the BIA. In fact, in its opposition to the State's motion for partial summary judgment, the Nation acknowledged that "[a]ll parties agree that IGRA by its terms does not apply to the Shinnecock Nation, in that the Nation has not been acknowledged to be an Indian tribe under the administrative procedures of the Department of the Interior described at 25 C.F.R. Part 83." (Defs. Memorandum of Law in Opposition to State's Motion for Partial Summary Judgment, at 11 (footnote omitted).) Moreover, Westwoods does not fall within the definition of "Indian lands" under IGRA.[69] As noted above, in the decision

---

69. To the extent that defendants also seek to separately argue that Westwoods is "Indian country" under 18 U.S.C. § 1151, the Court disagrees and concludes that Westwoods is not Indian country because it fails to satisfy any of the § 1151 criteria and has never been set aside and superintended by the federal government. However, even assuming *arguendo* that aboriginal title could be equated with Indian country under § 1151, defendants' argument would fail because the Court

granting the preliminary injunction, Judge Platt thus concluded that the Nation could not conduct gaming consistent with IGRA and that any gaming would violate New York law:

> IGRA outlines which tribes may conduct gaming in the United States, where such gaming may occur, and the types of gaming that may occur. Pursuant to IGRA, high-stakes bingo and slot machines—the type of gaming contemplated by the Shinnecock Nation—may only be conducted by an Indian tribe on lands that the federal government defines as Indian lands, unless the state otherwise permits such activity. 25 U.S.C. § 2710(d)(1). For the purposes of IGRA, an Indian tribe is one that has been recognized as such by the federal government. 25 U.S.C. § 2703(5)(A).... As discussed above, Defendants are not permitted to conduct bingo gaming or games of chance under New York law. There is no exception under Article I, Section 9 of New York State Constitution or State gambling laws that allows a state-recognized Indian tribe to conduct gaming in New York. Likewise, there is no dispute that the *Shinnecock Nation* may not conduct gaming pursuant to IGRA, given that Defendants are not an Indian tribe within the meaning of the statute, and the Property does not constitute Indian land, as defined by federal statute.

280 F.Supp.2d at 6–7.

Despite this legal conclusion and the failure to fall within IGRA, defendants argue that gaming on Westwoods is still permissible because IGRA was not preemptive and they continue to have a common law right to engage in tribal gaming. To the extent that the Nation argues

that they continue to possess a common law right under *Cabazon* to engage in gaming at Westwoods outside the confines of IGRA, the Court finds that argument unpersuasive. The Court concludes that IGRA and Section 1166 have eliminated any common law right to engage in unregulated gaming under *Cabazon.* In cases involving broad federal legislation supplanting previously-existing common law rights, the Supreme Court and Second Circuit have both cautioned that courts should not infringe on Congress' authority by continuing to adhere to common law rules. For example, the Supreme Court concluded in *City of Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), in holding that the Federal Water Pollution Control Act Amendments of 1972 had displaced the common law nuisance claims brought by plaintiffs, that "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." 451 U.S. at 314, 101 S.Ct. 1784. With respect to the statutory scheme enacted by Congress to supersede the common law nuisance claim, the Court explained that "Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Id.* at 317, 101 S.Ct. 1784. The Court also emphasized that the question to be asked is "whether the legislative scheme 'spoke directly to a question' ... not whether Congress had affirmatively proscribed the use of federal common law." *Id.* at 315, 101

has found aboriginal title to Westwoods has been extinguished.

S.Ct. 1784 (citation omitted); *see also United Steelworkers of Am., AFL–CIO v. United Eng'g Inc.*, 52 F.3d 1386, 1393 (6th Cir.1995) (holding under *Milwaukee* that "a manifest and clear purpose need not be shown to displace federal common law.... Rather, the question to be asked is whether Congress has occupied the field") (citations omitted).

The Second Circuit, applying *City of Milwaukee*, reached a similar conclusion in *Senator Linie GMBH & Co. KG v. Sunway Line, Inc.*, 291 F.3d 145 (2d Cir.2002), and held that a comprehensive maritime statute—the Carriage of Goods by Sea Act ("COGSA")—which contained a strict liability standard for shipping inherently dangerous goods superseded the scienter requirement in the maritime common law. The Second Circuit explained that the common law must yield to Congress' legislative design:

> We must therefore ask whether the legislative scheme of COGSA speaks directly to the question of strict liability for shippers of inherently dangerous goods. When [a maritime code] does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless. There is a basic difference ... between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.

*Id.* at 168 (citations and quotations omitted). As the Second Circuit noted, quoting *City of Milwaukee*, " 'we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standard to be applied as a matter of federal law.' " *Id.* (quoting *City of Milwaukee*, 451 U.S. at 317, 101 S.Ct. 1784).

In the instant case, it is clear from the comprehensive statutory scheme that Congress enacted as part of IGRA that Congress intended to occupy the field of tribal gaming in response to *Cabazon*. In other words, Congress enacted a comprehensive regulatory program, which would be supervised by an expert federal administrative agency, and thereby sought to balance the interests of the tribes and states in the wake of *Cabazon* and provide the framework in which Indian tribes could conduct gaming on Indian lands. *See generally Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 721 (9th Cir.2003) ("[T]he same time Congress passed IGRA, it gave California the regulatory authority that *Cabazon* took away, 18 U.S.C. § 1166."). Thus, given the language and nature of this statute, the Court concludes that Congress intended to supplant any federal common law right of Indian tribes to engage in tribal gaming outside the IGRA framework.

To hold otherwise would lead to the untenable conclusion that, although an Indian tribe recognized by the BIA could not conduct gaming on Indian land without a tribal-state compact under IGRA, an Indian tribe such as the Shinnecock Nation, not recognized by the BIA, could still conduct gaming that would otherwise violate IGRA. Such an interpretation—which gives the Nation more authority to conduct gaming than a BIA-recognized tribe under IGRA—would render IGRA's provisions nonsensical.

The court in *Carruthers v. Flaum* reached a similar conclusion. The circumstances in *Carruthers* related to an effort by the Unkechaug Indian Nation to open gaming facilities in Sullivan County. The plaintiff developers claimed, among other things, tortious interference by the defendants in their gaming and employment agreements. The court held that, because the contemplated facilities could not be opened in New York, the agreements were necessarily void. In reaching this conclu-

sion, they rejected the argument that, even though the Unkechaug Nation was not recognized by the United States government, they could operate a gaming facility on ancestral land without interference from the state or federal government. Specifically, the court found that the Unkechaug Indian Nation did not have a common law right to operate the gaming facility outside the confines of IGRA:

> Plaintiffs contend that, because they do not fall within the ambit of IGRA, the Supreme Court's decision in *Cabazon* permits the tribe to conduct whatever gaming it likes on its ancestral lands. But they are wrong.... *Cabazon* itself applies only to gaming activities conducted by federally-recognized Indian tribes on land that the federal government recognizes as reservation land.... *Cabazon* by its terms has no applicability to this case, which involves a tribe that is not federally recognized as a sovereign nation, and whose ancestral lands have not been recognized by the federal government. Gaming activities on land that is not federally recognized as tribal lands remains within the State's historic right to regulate this controversial type of economic activities.

365 F.Supp.2d at 467. This Court agrees with the *Carruthers* analysis.[70] In short, IGRA did not leave available the back-door that defendants now seek to use and the Nation does not retain a common law right to engage in unregulated gaming at Westwoods outside the confines of IGRA.[71]

Finally, even assuming *arguendo* that there was some residual common law right possessed by a non-BIA recognized tribe such as the Shinnecock Nation to conduct

---

**70.** Defendants also assert that plaintiffs have no standing to enforce IGRA, except where the State is seeking to enforce a tribal-state compact. *See* 25 U.S.C. § 2710(d)(7). Though the Court agrees with this general point, defendants in fact miss the mark. Plaintiffs here are not asserting a cause of action for a violation of IGRA; rather, plaintiffs allege that, in light of IGRA, defendants have no federal common law right to conduct gaming and, therefore, must comply with New York law. As this Court determined above, Congress supplanted any federal common law right with IGRA and, thus, the Nation has no right to engage in unregulated gaming and must comply with New York law. *See, e.g., Carruthers*, 365 F.Supp.2d at 467 ("The Unkechaug are not a federally recognized tribe. Therefore, IGRA provides no exception for the Unkechaugs from the general prohibition on gambling in New York State."). Thus, plaintiffs' cause of action lies in violations of New York anti-gambling law in light of the inapplicability of IGRA, not in any right of action under IGRA.

**71.** To the extent that defendants similarly contend that they have an "inherent sovereignty" to engage in unregulated gaming even though they have not met the criteria of IGRA, the Court also rejects that argument.

The Supreme Court has strictly limited the application of this doctrine of inherent tribal sovereignty. *See, e.g., McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) ("[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption.... The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.") *accord South Dakota v. Bourland*, 508 U.S. 679, 694–95, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *see also Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 23–24 (1st Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 673, 166 L.Ed.2d 516 (2006). Here, where Congress has enacted IGRA and the proposed gaming does not relate to the protection of tribal self-government or internal relations, there is no basis for the assertion that the Nation—which has not met the requirements of IGRA—has inherent tribal sovereignty to engage in gaming without regard to state law.

unregulated gaming on land if it held unextinguished aboriginal title to that land, no such right exists here because, as the Court found *supra*, aboriginal title to the Westwoods land has been extinguished.

### E. DEFENSE OF SOVEREIGN IMMUNITY

 Defendants also argue that sovereign immunity acts as a complete bar to this lawsuit by the State and the Town. In particular, defendants argue that "[t]he Nation is a sovereign tribe of Indians and consequently as a matter of law cannot be sued absent consent or waiver, which it did not give in either of these consolidated actions." (Defs. Proposed Conclusions of Law, at 15–16.) The defendants raised this defense in their summary judgment motion and, although Judge Platt found the Nation to be a tribe of Indians, he denied the defendants' motion for summary judgment on the basis of sovereign immunity. *See Shinnecock Indian Nation*, 400 F.Supp.2d at 493 ("Unfortunately, recognizing the Shinnecocks as a Tribe does not end the matter. The question remains as to what use Defendants may put the Westwoods property adjacent to

the western border of their reservation."). As set forth below, there are a number of independent grounds for the Court's conclusion that sovereign immunity is not a defense to this action.[72]

As a threshold matter, defendants have voluntarily submitted to the jurisdiction by removing the State's and Town's state court actions to federal court. The Supreme Court, in *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 616, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), held that a state waives its Eleventh Amendment immunity from suit when it voluntarily removes a lawsuit to federal court. Although the *Lapides* decision was limited to state law claims, there is no reason why the reasoning of *Lapides* would not apply to removal of both state and federal claims when the removing party is subject to suit in state court. *See, e.g., Embury v. King*, 361 F.3d 562 (9th Cir.2004); *Estes v. Wyo. Dep't of Transp.*, 302 F.3d 1200, 1204 (10th Cir. 2002); *Brownscombe v. Dep't of Campus Parking*, 203 F.Supp.2d 479, 482 (D.Md. 2002). Moreover, even though *Lapides* did not involve an Indian tribe, the Court

---

72. With respect to the burden of proof on a claim of sovereignty immunity, the Court concludes that the party asserting this defense—namely, defendants—bears the burden of proof. In *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir.1995), the Third Circuit held, in the context of a state agency seeking to invoke a sovereign immunity defense, "that the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability"; *accord ITSI TV Prods. v. Agric. Ass'n*, 3 F.3d 1289, 1291 (9th Cir.1993). The Second Circuit has cited *Christy* and *ITSI TV Productions* with approval in cases in which a State agency was required to demonstrate that it was entitled to invoke Eleventh Amendment immunity. *See, e.g., Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 449 (2d Cir.1999); *see also Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir.1996) ("[T]he Thruway

Authority is entitled to immunity if it can demonstrate that it is more like 'an arm of the State,' such as a state agency, than like 'a municipal corporation or other political subdivision.'") (citations omitted). Although the Second Circuit has not decided this issue in the context of Indian tribes, the Eleventh Amendment jurisprudence on the burden of proof applies with equal force to assertions of tribal immunity and, thus, the defendants have the burden of proof on this issue. *See, e.g., State Engineer of Nev. v. S. Fork Band of the Te-Moak Tribe of W. Shoshone Indians of Nev.*, 66 F.Supp.2d 1163, 1173 (D.Nev.1999) ("Indian tribal sovereign immunity is closely analogous to a state's immunity from suit under the Eleventh Amendment."). However, even assuming that plaintiffs had the burden of proving that such immunity does not apply here, the Court concludes that plaintiffs have met the burden for the reasons set forth *infra*.

concludes that the issue of Indian tribal sovereignty can be analyzed under the analogous legal framework utilized when considering issues of state immunity from suit under the Eleventh Amendment. For example, in the *State Engineer* case, the district court explained:

> In the instant case Respondent Tribe joined in the removal to federal court, answered the complaint, and opposed a motion to remand on immunity grounds. If the Tribe were a state, that would clearly be sufficient to waive the state's sovereign immunity. We see no reason to treat the Tribe differently. As such, we treat the Tribe's actions as amounting to a clear and unequivocal waiver of immunity in this Court.

66 F.Supp.2d at 1173. Thus, the defendants can be sued in the instant lawsuit because of their voluntary removal of the state actions to this Court.

Second, it is clear from the Supreme Court's decision in *Sherrill* that a tribe can be prevented from invoking a defense of sovereign immunity where equitable doctrines preclude the tribe from asserting sovereignty over a particular parcel of land. In other words, the *Sherrill* Court held that the OIN could not invoke sovereign immunity to defend against local real property tax enforcement proceedings, including eviction proceedings. 544 U.S. at 211, 125 S.Ct. 1478. Specifically, as noted *supra*, Justice Stevens argued in his dissent that tribal immunity could be raised "as a defense against a state collection proceeding." *Id.* at 225, 125 S.Ct. 1478. However, the majority opinion specifically rejected that reasoning. *See id.* at 214 n.

7, 125 S.Ct. 1478 ("The dissent suggests that, compatibly with today's decision, the Tribe may assert tax immunity defensively in the eviction proceeding against Sherrill. We disagree."); *see also id.* at 221, 125 S.Ct. 1478 (Souter, J., concurring) (rejecting claim of territorial sovereign status whether affirmative or defensive). Thus, *Sherrill* allows a tribe to be sued by a state or town, such as the instant case, to enforce its laws with respect to a parcel of land if equitable principles prevent the tribe from asserting sovereignty with respect to that land. To hold otherwise would completely undermine the holding of *Sherrill* because, if defendants are immune from suit, plaintiffs here would be left utterly powerless to utilize the courts to avoid the disruptive impact that the Supreme Court clearly stated they have the equitable right to prevent.[73]

Finally, even if the Shinnecock Indian Nation had tribal immunity when sued by the State, its tribal officials could be sued in their official capacities for prospective equitable relief. Specifically, the Second Circuit and other courts have held that a suit for injunctive relief can be pursued against a tribal official in his official capacity so long as plaintiff can maintain a cause of action under the applicable statute. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 87–88 (2d Cir.2001); *see also Frazier v. Turning Stone Casino*, 254 F.Supp.2d 295, 310 (N.D.N.Y.2003) ("*Ex parte Young* offers a limited exception to the general principle of state sovereign immunity and has been extended to tribal officials acting in their official capacities ... but only to enjoin conduct that violates

---

**73.** To the extent that the United States District Court for the Northern District of New York has concluded otherwise, in finding that the Oneida Nation is immune from county real property tax enforcement proceedings regarding the lands at issue in *Sherrill*, the Court disagrees with that conclusion for the reasons stated above. *See Oneida Indian Nation v. Oneida County*, 432 F.Supp.2d 285, 289 (N.D.N.Y.2006); *Oneida Indian Nation v. Madison County*, 401 F.Supp.2d 219, 228–30 (N.D.N.Y.2005).

federal law."); *Bassett v. Mashantucket Pequot Museum and Research Ctr. Inc.*, 221 F.Supp.2d 271, 278–79 (D.Conn.2002) ("[U]nder the doctrine of *Ex parte Young*, prospective injunctive or declaratory relief is available against tribal officials when a plaintiff claims an ongoing violation of federal law or claims that a tribal law or ordinance was beyond the authority of the Tribe to enact.").[74] In the instant case, although the State commenced the action alleging violations of New York anti-gaming and environmental law, Judge Platt held in his denial of the State's remand

motion that the lawsuit raised federal claims related to IGRA, possessory interests of an Indian tribe with respect to Indian land, and the tribal status of the Shinnecock. (Memorandum and Order, at 3–5.). Thus, given the federal questions found by Judge Platt, the State may sue tribal officials for prospective injunctive relief pursuant to *Ex parte Young* and such defendants do not have a defense of sovereign immunity.[75]

In sum, for the reasons set forth above,[76] the Nation cannot assert sovereign immunity as a defense to the instant lawsuit.[77]

**74.** The Supreme Court's decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) is distinguishable from these cases because it was addressing sovereign immunity of federally-recognized Indian tribes from damages actions, not for injunctive relief as is being sought here. *See TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676, 680–81 (5th Cir.1999) (distinguishing *Kiowa* and holding that "while the district court correctly dismissed the damages claim based on sovereign immunity, tribal immunity did not support its order dismissing actions seeking declaratory and injunctive relief"); *Comstock Oil & Gas v. Ala. and Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 571–72 (5th Cir.2001) ("[T]he district court erroneously concluded that the Tribe was entitled to sovereign immunity against oil companies' claims for equitable relief.").

**75.** Moreover, with respect to tribal officials, the Supreme Court has also held that a suit for equitable relief against tribal officials for violation of state law may be brought in state court. *See Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165, 171–72, 97 S.Ct. 2616, 53 L.Ed.2d 667 ("[W]hether or not the Tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members is permissible."). In addition, in *Garcia*, the Second Circuit cited *Puyallup Tribe* in concluding that lawsuits for injunctive relief may be brought against tribal officials. 268 F.3d at 87.

Therefore, pursuant to *Puyallup Tribe*, the lawsuits in the instant case could have proceeded in state court against tribal officials and a defense of sovereign immunity would have been unavailable. There is no basis for concluding that the removal of these claims against individual tribal members to federal court should alter this analysis.

**76.** Plaintiffs also set forth a number of other grounds to defeat any claim of sovereign immunity, including (1) defendants do not have sovereign immunity from suit for alleged violations of the SPDES program requirements because Congress abrogated such immunity in the Clean Water Act (Plts. Proposed Conclusions of Law, at 133–36); and (2) defendants have no immunity from suit brought by the State because the Nation is not federally recognized and is subject to state jurisdiction under New York law (*Id.* at 138–40). Because the Court has found the defense of sovereign immunity to be unavailable in this lawsuit for the reasons described above, the Court declines to address these other alternative arguments.

**77.** Defendants have a series of other affirmative defenses in their answers to the State and Town complaints, including, but not limited to, asserting that the claims are barred by collateral estoppel, waiver and equitable estoppel, laches, and unclean hands. The Court has considered all of these other affirmative defenses and, for the reasons outlined in this Memorandum and Order, find that none of these doctrines, or any other defenses asserted in the answers, bar plaintiffs' claims.

### F. Necessity for Permanent Injunctive Relief

■ Plaintiffs seek a permanent injunction enjoining and restraining defendants from engaging in any further or additional site preparation, construction, development, or gaming-related activities at Westwoods, in furtherance of their announced intention to construct and operate a casino on Westwoods, and from otherwise violating state or local gaming, environmental, land use, and zoning laws with respect to Westwoods. As discussed below, the Court concludes that the requirements for permanent injunctive relief have been satisfied by the plaintiffs.

"A party seeking preliminary injunctive relief must establish (1) either (a) a likelihood of success on the merits of its case as (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir.2007) (emphasis in original). The standard for a permanent injunction is the same as that for a preliminary injunction except that the plaintiff must establish actual success, rather than merely a likelihood of success on the merits. *See, e.g., Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir.2007) (" 'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show

a likelihood of success on the merits rather than actual success.' ") (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Moreover, the Supreme Court recently reiterated the four-factor test that the court must satisfy in connection with an application for permanent injunctive relief:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006).

Applying this standard, all of the requirements for permanent injunctive relief have been met by the plaintiffs. First, plaintiffs have demonstrated actual success on the merits for all the reasons discussed *supra*. Second, plaintiffs have shown that, if the Nation is permitted to construct a gaming facility at Westwoods, they will suffer irreparable injury.[78] In particular,

---

**78.** As an initial matter, under New York law, a municipality such as the Town is not required to demonstrate irreparable injury to demonstrate its right to injunctive relief where the action involves enforcement of zoning ordinances. *See, e.g., Inc. Vill. of Williston Park v. Argano*, 197 A.D.2d 670, 602 N.Y.S.2d 878, 878 (N.Y.App.Div.1993) ("Because the plaintiff proved that the defendants were in violation of the local zoning ordi-

nance, it was not required to show irreparable injury in order to demonstrate its right to injunctive relief."); *Town of Southampton v. Sendlewski*, 156 A.D.2d 669, 549 N.Y.S.2d 434, 435 (N.Y.App.Div.1989) ("[N.Y.] Town Law § 268 which authorizes a town to institute any action or proceeding to enforce its zoning ordinances requires no showing of injury to the public or the nonexistence of an adequate remedy at law as a condition to

plaintiffs have shown that construction and operation of a casino in violation of the zoning laws would irreparably harm the community in terms of its essential character, as well as its health and safety. As Justices Stevens and O'Connor noted in *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), development of land in contravention to zoning violations, as is proposed here, can have a highly destructive impact on the community:

> Zoning is the process whereby a community defines its essential character. Whether driven by a concern for health and safety, esthetics, or other public values, zoning provides the mechanism by which the polity ensures that neighboring uses of land are not mutually—or more often unilaterally—destructive.

*Id.* at 433–34, 109 S.Ct. 2994 (Stevens, J., O'Connor, J., concurring). Moreover, plaintiffs have shown that the anticipated construction and operation of the casino will have a detrimental environmental impact, some of which is essentially irreversible, such as the destruction of trees. Similarly, the proposed gaming at Westwoods would be conducted in violation of New York's anti-gaming provisions, which are designed to protect the public. Violations of these provisions clearly constitute irreparable harm to plaintiffs and the public. Third, none of these injuries—zoning violations, environmental injuries, and gambling in violation of state laws—can be adequately addressed by remedies at law, such as monetary damages. *See, e.g., Amoco Prod. Co.,* 480 U.S. at 545, 107 S.Ct. 1396 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."). Third, the Court has considered the balance of hardships, and finds that a remedy in equity is warranted. Specifically, as the Court discussed in detail in connection with the *Sherrill* analysis—where this land has been undeveloped for centuries, the Nation has never sought to assert sovereignty over the land prior to this litigation, and the proposed development without regarding to zoning or other regulations would substantially disrupt the settled expectations of the community and almost every aspect of the residents' lives—the balance of hardships is decidedly in plaintiffs' favor. Finally, the public interest clearly

---

injunctive relief."); *Town of Smithtown v. Schleider,* 156 A.D.2d 668, 549 N.Y.S.2d 433, 434 (N.Y.App.Div.1989) (holding that in action to enjoin defendant's illegal use of property, "it was not necessary for the [Town] to demonstrate that the defendant's allegedly illegal use of his property was causing irreparable injury"). Here, the Town's suit for injunctive relief to restrain violations and threatened violations of its zoning laws is authorized by New York Town Law § 268(2). Therefore, because the Town's request for injunctive relief is statutorily-authorized, irreparable injury is presumed. *See, e.g., Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 479 (2d Cir.1995) (holding that a railroad seeking statutorily authorized injunctive relief is exempt from equitable criteria). Similarly,

where as here the State is seeking an injunction to prevent violations of New York environmental laws, the requirements of irreparable injury and the balancing of the equities need not be shown independent of establishing a statutory violation. *See, e.g., New York v. Sour Mountain Realty, Inc.,* 276 A.D.2d 8, 714 N.Y.S.2d 78, 83–84 (N.Y.App.Div.2000); *Adirondack Park Agency v. Hunt Bros. Contractors, Inc.,* 234 A.D.2d 737, 651 N.Y.S.2d 634, 635 (N.Y.App.Div.1996); *New York v. Brookhaven Aggregates, Ltd.,* 121 A.D.2d 440, 503 N.Y.S.2d 413, 414–15 (N.Y.App.Div. 1986). However, even in the absence of this presumption of irreparable harm, the Court finds that plaintiffs have satisfied the permanent injunction requirements.

would not be disserved by a permanent injunction. To the contrary, the public interest is served by ensuring that development of this land does not take place in violation of current zoning laws, other land use regulations, and New York's anti-gaming provisions.

 Defendants argue that any irreparable injury in this case is completely speculative and, thus, injunctive relief is unwarranted. The Court disagrees. The Court recognizes that "[i]njunctive relief should be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir.1994) (citing *Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1251 (2d Cir.1984)). Moreover, for an injunction to issue, "more than an abstract or nebulous plan to possibly commit a wrong sometime in the future, must be shown before the broad and potentially drastic injunctive power of the court will be exercised. Rather, 'injunctions issue to prevent existing or presently threatened injuries.'" *Gen. Fireproofing Co. v. Wyman*, 444 F.2d 391, 393 (2d Cir. 1971) (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602 (1931) (emphasis omitted)). In the instant case, there is nothing speculative or remote about the irreparable harm that would result in this case if the injunctive relief is not granted. The Nation formed a Gaming Authority and entered into a Development Agreement for the development, construction, and operation of a 61,000 sf. facility, and subsequently, prior to the issuance of the preliminary injunction, commenced construction activities at the Westwoods site by clearing trees with a bulldozer and other heavy equipment. Where the Nation's intent and imminent plans to build a gaming facility in violation of New York and Town laws have been made clear by words and action, plaintiffs are not required to wait until the facility is built to seek injunctive relief. Although the Nation continues to argue that harm from the potential expansion of a casino beyond its current plans cannot be the basis for injunctive relief, it is the Court's conclusion for the reasons discussed above that, even with respect to the currently planned casino, there is irreparable, imminent harm that would result if such construction and operation went forward in violation of state and local anti-gaming laws, zoning laws, and requisite environmental permits and approvals. Thus, plaintiffs have shown that they "will suffer 'real and imminent, not remote, irreparable harm' in the absence of a [permanent injunctive] remedy.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 290 (2d Cir.2003) (quoting *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir.1992) (internal quotation omitted)). Accordingly, permanent injunctive relief is warranted.

## VI. CONCLUSION

For the reasons set forth above, plaintiffs have met their burden for declaratory and permanent injunctive relief.[79] Plaintiffs shall submit a proposed judgment and permanent injunction by November 7, 2007. Defendants shall provide any objections to the specific language of the proposed judgment and permanent injunction by November 14, 2007.

SO ORDERED.

---

79. Defendants moved for a judgment on partial findings at the close of plaintiffs' case pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, which the Court declined to rule on until the close of all evidence. For the reasons set forth in this Memorandum and Order, that motion is denied.